# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **v.** | § | **Case No. 21-CR-00046-RDM** |
| | § | |
| **PATRICK MONTGOMERY and** | § | |
| **BRADY KNOWLTON,** | § | |
| | § | |
| *Defendants* | § | |

## DEFENDANTS' JOINT SUPPLEMENTAL BRIEF
## ON DEFENDANTS' MOTION TO DISMISS

RONALD SULLIVAN LAW, PLLC

by: /s/ Ronald S. Sullivan Jr.
RONALD S. SULLIVAN JR.
D.C.D.C. Bar ID 451518
rsullivan@ronaldsullivanlaw.com

1300 I Street NW
Suite 400 E
Washington, DC 2005
Tel: (202) 935-4347
Fax: (617) 496-2277

ATTORNEY FOR BRADY KNOWLTON


WAGNER PLLC

by: /s/ Camille Wagner
CAMILLE WAGNER
DC Bar No. 1695930
law@myattorneywagner.com

1629 K Street NW, Suite 300
Washington, DC 20006
(202) 630-8812

ATTORNEY FOR BRADY KNOWLTON


MAYR LAW, P.C.

by: /s/ T. Brent Mayr
T. BRENT MAYR
Texas State Bar Number 24037052
D.C.D.C. Bar ID TX0206
bmayr@mayr-law.com

5300 Memorial Dr., Suite 750
Houston, TX 77007
Tel: (713) 808-9613
Fax: (713) 808-9613

ATTORNEY FOR BRADY KNOWLTON


A.J. KRAMER, FED. PUBLIC DEFENDER

by: /s/ Dani Jahn
DANI JAHN
Assistant Federal Public Defender
Dani_Jahn@fd.org

625 Indiana Avenue, N.W., Ste 550
Washington, D.C. 20004
Tel: (202) 208-7500
Fax: (202) 501-3829

ATTORNEY FOR PATRICK MONTGOMERY

# TABLE OF CONTENTS

A.   The legal interpretation of "official proceeding" as that phrase is defined in Section 1515 and used in Section 1512 and why the election certification proceedings do not qualify as such. ................................................ 3

    1.   The Electoral Count Act and why the election certification proceedings do not qualify as an "official proceeding" .......................... 7

    2.   Examples of "proceedings before Congress" that do qualify as an "official proceeding" ................................................................ 10

B.   "Otherwise obstructs" and how the Defendants' alleged actions goes well beyond the reach of Section 1512(c)(2) .................................................... 18

C.   The electoral certificates are not "evidence" .................................................... 23

D.   "Corruptly obstructs, influences, or impedes any official proceeding " and the lack of a limiting principle makes Section 1512(c)(2) unconstitutionally vague as applied based on the allegations in the indictment ................................................................................................ 26

    1.   Problems with using the term "corruptly" to limit the Defendants' conduct ................................................................ 28

    2.   "Corruptly" as "obstructing justice" ...................................................... 39

E.   The allegations against the Defendants based on a violation of Section 1512(c)(2) are unconstitutionally overbroad. .................................................... 41

F.   The rule of lenity also can be used to find that the allegation in the indictment falls outside the scope of Section 1512(c)(2) .................................. 43

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002)............................................................................................42

*Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 49 S. Ct. 452, 455, 73 L. Ed. 867 (1929) ...........................................................................9

*Bates v. United States*, 522 U.S. 23, 118 S. Ct. 285, 139 L.Ed.2d 215 (1997) .......................34

*Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 107 S. Ct. 2568, 96 L. Ed. 2d 500 (1987)............................................42

*Begay v. United States*, 553 U.S. 137, 128 S. Ct. 1581, 170 L. Ed. 2d 490 (2008)...................................................................................................1

*Bouie v. City of Columbia*, 378 U.S. 347, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964)..................................................................................................27

*Broadrick v. Oklahoma*, 413 U.S. 601, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973)..................................................................................................43

*Cleveland v. United States*, 531 U.S. 12, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000)..............................................................................................43, 44

*Connally v. General Construction Company*, 269 U.S. 385, 46 S. Ct. 126, 70 L. Ed. 322 (1926)..................................................................................28

*Duncan v. Walker*, 533 U.S. 167,  121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001) .......................34

*Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995)....................................................................................................6

*Johnson v. United States*, 576 U.S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015)..................................................................................................27

*Kolender v. Lawson*, 461 U.S. 352, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983) ............27, 32, 36

*Liparota v. United States*, 471 U.S. 419, 105 S. Ct. 2084, 85 L. Ed. 2d 434 (1985)..................................................................................................44

*Marx v. General Revenue Corp.*, 568 U.S. 371, 133 S. Ct. 1166, 1178, 185 L. Ed. 2d 242 (2013) ..............................................................................22

*McGrain v. Daugherty*, 273 U.S. 135, 47 S. Ct. 319, 71 L. Ed. 580 (1927)............................11

*Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984)...................................................................24

*Osborne v. Ohio*, 495 U.S. 103, 110 S. Ct. 1691, 109 L. Ed. 2d 98 (1990) .............................41

*R.A.V. v. St. Paul*, 505 U.S. 377,  112 S. Ct. 2538, 120 L. Ed.  2d 305 (1992) ......................42

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 135 S. Ct. 2218, 192 L. Ed. 2d
    236 (2015)............................................................................................................................42

*Rewis v. United States*, 401 U.S. 808, 91 S. Ct. 1056, 28 L. Ed. 2d 493 (1971)....................43

*Russello v. United States*, 464 U.S. 16, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983)....................34

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502
    U.S. 105, 118, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991)........................................42

*United States v. Barry*, No. MAG 18-00111 (RMM), 2019 WL 2396266
    (D.D.C. June 5, 2019)...................................................................................................36

*United States v. Bonds*, 784 F.3d 582 (9th Cir. 2015)................................................................40

*United States v. Carson*, 560 F.3d 566 (6th Cir. 2009) ............................................................20

*United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237 (S.D. Tex. 2020)............................21

*United States v. Edwards*, 869 F.3d 490 (7th Cir. 2017) ........................................................40

*United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013) ......................................1, 3, 4, 5, 6

*United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976)......................................................11

*United States v. Jefferson*, 751 F.3d 314 (5th Cir. 2014) ........................................................20

*United States v. Jones*, 207 F. Supp. 3d 576 (E.D.N.C. 2016) ................................................40

*United States v. Lucas*, 499 F.3d 769 (8th Cir.2007) ..............................................................20

*United States v. Mintmire*, 507 F.3d 1273 (11th Cir. 2007) ....................................................20

*United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) ............................................................29

*United States v. Petruk*, 781 F.3d 438 (8th Cir. 2015) ............................................................20

*United States v. Phillips*, 583 F.3d 1261 (10th Cir. 2009) ......................................................20

*United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991)......................28, 29, 30, 31, 32, 33

*United States v. Pugh*, 945 F.3d 9 (2d Cir. 2019)......................................................................21

*United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008)..........................................................1, 5

*United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981) ..........................................................40

iv

*United States v. Ring*, 628 F. Supp. 2d 195 (D.D.C. 2009) ......................................21

*United States v. Tyler*, 732 F.3d 241 (3d Cir. 2013) ..............................................1

*United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 73 S. Ct. 227, 97 L. Ed. 260 (1952) ............................................................................44

*United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014) ..............................20

*United States v. William Pepe*, 21-cr-52, ECF No. 55 (D.D.C. 2021).....................17

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008)........................................42

*Watkins v. United States*, 354 U.S. 178, 77 S. Ct. 1173, 1 L. Ed. 2d 1273 (1957)..........................................................................................11

*Yates v. United States*, 574 U.S. 528, 135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015)............................................................ 1, 2, 6, 19, 33, 34, 43, 44

## Statutes

18 U.S.C. § 1512(a) ......................................................................................6

18 U.S.C. § 1512(c) ....................................................................................18

18 U.S.C. § 1515(a) ..................................................................................6, 34

18 U.S.C. § 1515(b) ..............................................................................28, 33, 34

18 U.S.C. § 1752 ........................................................................................31

3 U.S.C. § 11 ............................................................................................24

3 U.S.C. § 15 ........................................................................................7, 24

3 U.S.C. § 18 ..............................................................................................7

3 U.S.C. § 5 ..........................................................................................7, 24

3 U.S.C. § 6 ..........................................................................................7, 24

40 U.S.C. § 5104 ........................................................................................31

## Other Authorities

"Kavanaugh protestors ignore Capitol barricades ahead of Saturday vote," Roll Call, Oct. 6, 2018, available at: https://www.rollcall.com/2018/10/06/kavanaugh-protesters-ignore-capitol-barricades-ahead-of-saturday-vote/ ......................................................37

"Kavanaugh protestors take over Sen. Grassley's office," Wash. Post., Sept.
6, 2018, available at:
https://www.washingtonpost.com/video/politics/kavanaugh-protesters-
take-over-sen-grassleys-office/2018/09/06/9732de44-b1ef-11e8-8b53-
50116768e499_video.html ..................................................................................38

"Kavanaugh protests escalate, over 120 arrested on Capitol Hill," ABC
News, Sept. 24, 2018, available at:
https://abcnews.go.com/Politics/kavanaugh-protests-escalate-120-
arrested-capitol-hill/story ?id=58048599 ...........................................................37

10 Annals of Cong. 130 ............................................................................................8

128 CONG. REC. 26810 ..........................................................................................16

167 CONG. REC. H79, 105-06, 108, 111 (2021) ..................................................9, 17

167 CONG. REC. S16, 25, 32 (2021) ....................................................................9, 17

2 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED
STATES § 1464 (1833) .........................................................................................10

3 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED
STATES § 831 (1833) ...........................................................................................10

Act of Jan. 29, 1877, ch. 37, § 2, 19 Stat. 227, 229.................................................9

Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF
LEGAL TEXTS 73 (2012) .........................................................................................4

Del Quentin Wilbur, "Roger Clemens Acquitted of all Charges" Wash. Post,
June 18, 2002, available at
https://www.washingtonpost.com/local/crime/roger-clemens-trial-verdict-
reached/2012/06/18/gJQAQxvzlV_story.html.......................................................12

Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure*
3–4 (2d ed. 1899).....................................................................................................5

EVIDENCE, BLACK'S LAW DICTIONARY (11th ed. 2019) ...........................................24

House Special Committee, Counting Electoral College Votes, H.R. Msc. Doc.
44-13 (1877)............................................................................................................8

JUSTICE, BLACK'S LAW DICTIONARY (11th ed. 2019)...............................................13

Memorandum from William Barr to Deputy Attorney General Rod
Rosenstein and Assistant Attorney General Steve Engel of June 8, 2018
(hereafter Barr Memo), available at
https://s3.documentcloud.org/documents/5638848/June-2018-Barr-Memo-
to-DOJ-Muellers-Obstruction.pdf............................................... 19, 20, 21, 22, 23

Proceeding, Black's Law Dictionary 1241 (8th ed. 2004) ............................................4, 25

Pub. L. 97-291, § 4(a), Oct. 12, 1982, 96 Stat. 1252................................................14

Ryan Teague Beckwith, "Here Are All of the Indictments, Guilty Pleas and
  Convictions From Robert Mueller's Investigation," Time, March 22, 2019,
  available at https://time.com/5556331/mueller-investigation-indictments-
  guilty-pleas/....................................................................................................12

S. Rep. 97-532 ...................................................................................... 14, 15, 16, 17

S. Rep. No. 107-146 (2002) ..............................................................................13, 22

The Records of the Federal Convention of 1787, at 502–03 (Max
  Ferrand ed., 1911)...........................................................................................10

The William J. Bauer Pattern Criminal Jury Instructions of the
  Seventh Circuit (2020 Ed.), 18 U.S.C. § 1512 Definition of "Corruptly"
  at 629................................................................................................................40

Tribunal, Black's Law Dictionary (11th ed. 2019)......................................6, 7, 14

Understanding the Iran-Contra Affair, available at
  https://www.brown.edu/Research/Understanding_the_Iran_Contra_Affair
  /prosecutions.php ...........................................................................................11

Vasan Desavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L.
  Rev. 1653, 1659 (2002) .............................................................................7, 8, 9, 10

Vote, Black's Law Dictionary (11th ed. 2019) ................................................24

## Rules

Fed. R. App. P. 27(d)..............................................................................................25

## Constitutional Provisions

U.S. Const. amend. XII .................................................................................7, 8, 25

U.S. Const. art. I, § 5.................................................................................................9

U.S. Const. art. II, § 1 .........................................................................................7, 25

TO THE HONORABLE RANDOLPH D. MOSS, UNITED STATES DISTRICT
JUDGE FOR THE DISTRICT OF COLUMBIA:

At the beginning of the hearing on the Defendants' Motion to Dismiss Count
Ten of the Indictment (hereafter "the hearing"), this Court indicated that it was "not
yet persuaded at least that the Defendants are correct that the proceedings to certi-
fy the electoral vote do not constitute 'official proceedings' within the meaning of
1512(c)(2)." Video Motion Hearing (VMH) at 4. The Court continued that "it's hard
to imagine a proceeding, short of an impeachment proceeding, that has more of the
trappings of an 'official proceeding' or even that are analogous to a judicial proceed-
ing that occur before Congress than the certification process." *Id.* at 4–5.

While this belief is consistent with the lay interpretation of what is meant by
a "proceeding" — the interpretation embraced here by the Government — it fails to
give credit to the *legal* interpretation of the term adopted by the Ninth Circuit in
*United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013) and used by the Third and
Fifth Circuits in *United States v. Tyler*, 732 F.3d 241 (3d Cir. 2013) and *United
States v. Ramos*, 537 F.3d 439 (5th Cir. 2008), respectively. It further contradicts
the context of the statutory language as a whole employing the methods of interpre-
tation used by the Supreme Court in *Begay v. United States*, 553 U.S. 137, 128 S.
Ct. 1581, 170 L. Ed. 2d 490 (2008) and *Yates v. United States*, 574 U.S. 528, 135 S.
Ct. 1074, 191 L. Ed. 2d 64 (2015). Most importantly, it treats the electoral certifica-
tion proceedings as something more than it really is: a largely ministerial function
of the Legislative branch where there is no formal investigation of facts and little to
no discretion on the part of the Joint Session of Congress and its Presiding Officer.

1

This Court got it right when it stated, "I don't think Congress was intending to say we're just going to pass a statute here that makes it unlawful to do anything with a bad purpose that impedes an official proceeding in any way. Because that's just an extremely capacious statute where you would expect them to have said something, and not to have just put it in the obstruction of justice section of the code to do so." VMH at 46. Context plays a significant role in understanding Section 1512(c)(2)'s prohibition against the corrupt obstruction of a proceeding before Congress. Such prohibition was never meant to apply to a proceeding like the election certification proceedings that are not judicial or judicial-like, nor in any way related to the administration of justice.

If this Court, however, continues to reject that interpretation of "official proceeding," it is still stuck with a statute that could never, and was never meant to apply to a situation such as the one presented here. Just as the Supreme Court in *Yates* noted when enacting this statute as part of the Sarbanes–Oxley Act, "Congress trained its attention on corporate and accounting deception and coverups." *Yates*, 574 U.S. at 532. The Government's prosecution of Defendants for violating Section 1512(c)(2) wholly ignores this and tries to, just as the Government did in *Yates*, go well beyond the plain meaning and reach of the law. Applying the analysis in *Yates*, this Court must conclude that the indictment fails to state a prosecutable offense. Without any allegation that the Defendants corruptly obstructed the certification proceeding by affecting the gathering and presentation of evidence — evi-

dence that can be used to establish a violation of the law and administer justice —
there can be no conviction for violating Section 1512(c).

It cannot be ignored that the Government has other statutes available to
charge Defendants for their alleged obstructive conduct. Using *this* statute — and
an unintended interpretation of it — violates the due process protection against
vague and overbroad statutes. It contradicts the Department of Justices' own man-
ual, as well as its former Attorney General. It contradicts prior action taken by the
Government to prosecute obstructive conduct in Congress. The correct decision in
this case is to dismiss Count Ten of the indictment against the Defendants.

A.   **The legal interpretation of "official proceeding" as that phrase is de-
fined in Section 1515 and used in Section 1512 and why the election
certification proceedings do not qualify as such.**

Defendants understand how this Court can initially view the certification
proceedings as an official proceeding. A proceeding, as the Government points out,
is defined "[i]n its broadest and most 'general sense'" as "[t]he carrying on of an ac-
tion or series of actions; action, course of action; conduct, behavior." Response by
Gov't to Def. Motion (Doc. 41) at 10 (citing *Ermoian*, 752 F.3d at 1169). Before we
all gained our legal training and knowledge, we viewed certain events in our lives
whether they were, for instance, a school graduation or a board meeting, and
learned to call them "proceedings." Some cultures celebrate marriage proceedings
over the course of several days. We attend funeral proceedings for a deceased rela-
tive or a friend. In each one of these examples, several people gather for a formal
occasion to carry out an action or series of actions. With this lay understanding of

3

the term "proceeding" in mind, one could certainly view the election certification proceedings as such.

However, as Justice Scalia and Bryan A. Garner, editor of *Black's Law Dictionary* for over the past 20 years, wrote, "Sometimes context indicates that a technical meaning applies. . . . And when law is the subject, ordinary legal meaning is to be *expected*," even though it "often differs from common meaning." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 73 (2012) (emphasis added). Based on this principle, the Ninth Circuit held that the *legal* interpretation of the term "official proceeding" defined in Section 1515 should be used in determining whether certain conduct violates Section 1512. *Ermoian*, 752 F.3d at 1170. To that end, as discussed in previous briefing to the Court, the Ninth Circuit looked at (1) the legal meaning of the term "proceeding", (2) its use in the grammatical context of the "official proceeding" definition in Section 1515, and (3) the broader statutory context to conclude that a criminal investigation is not an "official proceeding" under this particular obstruction of justice statute. *Id.* at 1170–72.

Just as the "criminal investigation" in that case did not meet the definition of an "official proceeding" under the obstruction of justice statute, neither do the "election certification proceedings" meet that same definition here. As the court noted in *Ermoian*, "'[p]roceeding' is a word much used to express the *business done in courts*' and 'is an act done *by the authority or direction of the court,* express or implied.'" *Id.* at (quoting BLACK'S LAW DICTIONARY 1241 (8th ed. 2004) in turn, quoting Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 3–4

(2d ed. 1899)) (emphasis in original). While the election certification proceedings may, to use this Court's wording, have the "trappings" of a judicial proceeding, as discussed *infra*, the reality is that the certification proceedings hardly rise to that similar level of "business done in courts" in that there is no formal investigation or consideration of facts and little to no discretion on the part of the Joint Session of Congress and its Presiding Officer.

Furthermore, when considering the grammatical context of the statute — the applicable statute here referring to proceedings "before Congress" — as the court noted in *Ermoian*, "the use of the preposition 'before' suggests an appearance in front of the agency sitting as a tribunal." *Id.* at 1170–71. As the court further noted, this was consistent with the Fifth Circuit's interpretation of "official proceeding" which held that the "use[ of] the preposition 'before'... implies that an 'official proceeding' involves some formal convocation of the agency in which parties are directed to appear." *Id.* at 1171 (quoting *Ramos*, 537 F.3d at 462–63). In this case, no person is directed to appear and give testimony during the certification proceedings. In fact, the interested party — the winner of the electoral college vote — does not appear to observe the proceedings (unless it happens to be the then-Vice President or other member of Congress).

Finally, there is the broader statutory context for both Sections 1512 and 1515. Looking solely at Section 1512, the court in *Ermoian* noted that Section 1512 refers to "prevent[ing] the attendance or testimony of any person in an official proceeding"; "prevent [ing] the production of a record, document, or other object, in an

official proceeding"; and "be[ing] absent from an official proceeding to which that person has been summoned by legal process." *Id*. at 1171–72 (quoting 18 U.S.C. §§ 1512(a)(1)(A)-(B), (a)(2)(B)(iv))." "The use of the terms 'attendance', 'testimony', 'production', and 'summoned'" as noted by the court "strongly implies that some formal hearing before a tribunal is contemplated." *Id*. at 1172.

Although the court in *Ermoian* did not consider it, this Court can also look at Section 1515 and apply *noscitur a sociis*. *See Yates*, 574 U.S. at 543 (quoting *Gustafson v. Alloyd Co*., 513 U.S. 561, 575 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995)) ("[W]e rely on the principle of *noscitur a sociis* — a word is known by the company it keeps — to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress."). That section defines an "official proceeding" *inter alia* as a proceeding before various judges or courts of the United States, a federal grand jury, a federal agency when the proceeding is authorized by law, or an insurance regulatory official, agent, or examiner appointed to "examine the affairs." *See* 18 U.S.C. § 1515(a)(1). All these qualify as "tribunals" thus lending further support that the "proceeding" at issue involve the examining body acting in its capacity as a "tribunal."

Black's Law Dictionary defines a "tribunal" as "[a] court of justice or other adjudicatory body." TRIBUNAL, BLACK'S LAW DICTIONARY (11th ed. 2019). That same definition also gives a sub-definition for an "administrative tribunal" as "[a] court-like decision-making authority that resolves disputes, esp. those in which one dis-

putant is a government agency or department; an administrative agency exercising a quasi-judicial function." *Id.* It further defines the same as "[a] governmental division established to implement legislative policy." *Id.* With those definitions in mind, we can turn to answering the question of when a "proceeding before Congress" meets this "quasi-judicial function."

### 1. The Electoral Count Act and why the election certification proceedings do not qualify as an "official proceeding"

As Defendants conceded in their reply to the Government's response to their motion to dismiss, they do not contest the "formality" of the election certification proceedings or that it is a "solemn" occasion. But formality does not equate to adjudicatory.

The procedures in Congress for certifying the electoral college vote are regarded primarily as a ministerial act. *See* Vasan Desavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. REV. 1653, 1659 (2002) ("The counting function appears to be a ministerial duty of tabulation imposed by the Constitution because each of the electoral colleges meet in their respective states instead of at some central location."). This is consistent with the directive set out in the Constitution requiring that "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." U.S. CONST. amend. XII; *see also* U.S. CONST. art. II, § 1. Nothing in the Constitution or the Electoral Count Act (ECA), codified at 3 U.S.C. §§ 5–6, 15–18 — the legislation that sets out the procedures for the certification of the electoral college vote — re-

quires the Joint Session of Congress call for witnesses to bring forth testimony or other evidence to carry out this "counting function."[1]

Additionally, the Twelfth Amendment provides that once the President of the Senate has opened all the Certificates, "the votes shall *then* be counted" and, in the case of electoral deadlock, the House of Representatives is to "immediately" choose the next President from those on the list. U.S. CONST. amend. XII (emphasis added). These principles of immediacy "militates against the deliberative aspects of counting and the judging of the electoral votes." *See* Desavan at 1719 ("After all, judicial determinations take time.").

Historical practice since the dawn of the Republic confirms this. Prior to and after the passage of the ECA, there has never been an instance where Congress engaged in a full-blown investigation with the calling of witnesses to give testimony, requests for records, or consideration of other evidence in order to decide the electoral count. *See id.* at 1678–94 (providing a survey of all historical incidents where a

---

[1] Contrast this with The Grand Committee Bill of 1800, a piece of proposed legislation that would have created a committee to "sit with closed doors" and have the "power to send for persons, papers, and records to compel the attendance of witnesses" for determining the results of the electoral college vote. *See* Desavan at 1671 (quoting House Special Committee, Counting Electoral College Votes, H.R. Msc. Doc. 44-13, at 17 (1877)). During the debates on this bill, Senator Charles Pickney, one of the Constitution's original framers, noted how this was entirely contradictory of the Framer's Intent:

> It never was intended, nor could it have been safe, in the Constitution, to have given to Congress thus assembled in convention, the right to object to any vote, or even to question whether they were constitutionally or properly given. . .. To give to Congress, even when assembled in convention, a right to reject or admit the votes of States, would have been so gross and dangerous an absurdity, as the [F]ramers of the Constitution never could have been guilty of.

*Id.* at 1672 (quoting 10 Annals of Cong. 130). Ultimately, the bill failed to pass and no efforts were ever made to grant Congress the same levels of power proposed therein. *See id.* at 1673.

problem arose with the electoral count).[2] Even during the Joint Session of Congress on January 6, 2021, despite numerous objections being raised concerning the electoral votes, the objections were overruled without consideration of any evidence or testimony to support the allegations. *See* 167 CONG. REC. H79, 105-06, 108, 111 (2021) and 167 CONG. REC. S16, 25, 32 (2021) (where legislators requested, but did not receive authority to open investigation regarding electoral certificates).

Contrast this process involving the election proceedings against another separate function where Congress *does* operate in an adjudicatory function: the power afforded Congress under the House Judging Clause found in Article I, Section 5 of the Constitution. *See* U.S. CONST. art. I, § 5. That clause provides that "[e]ach House shall be the Judge of the Elections, Returns and Qualifications of its own Members." *Id.* This has been held to confer upon Congress certain powers that are "judicial in character." *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 613, 49 S. Ct. 452, 455, 73 L. Ed. 867 (1929). No such clause, however, exists in any of the provisions related to the electoral count — not in Article II, Section 1 nor in the Twelfth Amendment.[3] This, at the very least, supports the notion that the Joint

---

[2] The only incident that came remotely close to a situation where the Joint Session arguably acted as a tribunal was during the presidential election of 1876 between Samuel Tilden and Rutherford B. Hayes. After an issue arose regarding the electoral votes of several states and, after mediation failed, Congress created an "Electoral Commission" to resolve the disputed votes. Desavan at 1689. The Commission was to have "the same powers, if any, now possessed . . . by the two Houses." *Id.* at 1690 (quoting Act of Jan. 29, 1877, ch. 37, § 2, 19 Stat. 227, 229). However, there is no indication that the Commission exercised their powers to inquire and investigate by calling for witnesses or other evidence before deciding the electoral count. To the contrary, as it is well documented, the members of the Commission voted along party lines resulting in a victory for the Republican Hayes requiring the "Compromise of 1877" to avert a political crisis. It is also generally accepted that the use of this Commission was unconstitutional. *See* Desavan at 1689, n. 160.

[3] Further, it should be noted that that the House Judging Clause was considered at the Constitutional Convention of 1787 immediately *after* the Electoral College Clause in Article II, Section 1. 2

Session of Congress "does not have the authority to judge the elections, returns, and qualifications of the electors" and that it "is not a judicial tribunal with the power to investigate" the same. Desavan at 1752; *see also* 2 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1464, at 317 (1833) (discussing the electoral college clause of the Constitution and how "no provision is made for the discussion or decision of any questions, which may arise") and 3 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 831, at 294–95 (1833) (explaining how, on the other hand,  the House Judging Clause was viewed as necessary to safeguard the liberties of the people).

In sum, little to nothing about the election certification proceedings make it "court-like" or an "adjudicative proceeding." This is not only supported by the language of the Constitution but is also consistent with both the Framer's intent and historical practice. Accordingly, it should not fall within that class of proceedings that are considered "official proceedings" as that term is defined in Section 1515 and applied in Section 1512.

## 2.  Examples of "proceedings before Congress" that do qualify as an "official proceeding"

During the hearing, this Court asked counsel for Mr. Knowlton, "What would be an official proceeding before Congress other than impeachment?" as that term is defined by Section 1515. VMH at 10. In addition to the powers discussed above related to the House Judging Clause, part of Article I's powers delegated to Congress

---

THE RECORDS OF THE FEDERAL CONVENTION of 1787, at 502–03 (Max Ferrand ed., 1911). It is no coincidence that the Framers thought not to extend the ability of Congress to "judge" in their own matters as set out in the House Judging Clause to matters related to the electoral count.

also include the power of inquiry and to investigate. *See McGrain v. Daugherty*, 273 U.S. 135, 174–75, 47 S. Ct. 319, 71 L. Ed. 580 (1927); *Watkins v. United States*, 354 U.S. 178, 187, 77 S. Ct. 1173, 1 L. Ed. 2d 1273 (1957) ("The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste. But, broad as is this power of inquiry, it is not un-limited.").

The following are examples of relatively recent, notable "official proceedings" held pursuant to Congress' power of inquiry and to investigate with related prosecu-tions for obstructive conduct:

a. **Watergate Investigation**. H.R Haldeman, who served as President Richard Nixon's first White House chief of staff, was convicted, along with John Mitchell, one of Nixon's attorneys general, in 1975 of conspiracy, obstruction of justice, and perjury related to testimony they gave to the Senate Watergate Committee investigating the cover-up of the Watergate break-in at the Dem-ocratic National Committee's headquarters. Haldeman was sentenced to a maximum of 8 years in prison, which was later reduced to one to four years. *See generally United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976).

b. **Iran-Contra Affair**. Several members of the National Security Staff, the Central Intelligence Agency, and the Departments of the State and Defense were investigated and charged with various offenses related to their testimo-ny before Congress about their roles in the Iran-Contra scandal during the Reagan administration, in which officials sold arms to the Iranian govern-ment to support militant rebels in Nicaragua. *See generally* Understanding the Iran-Contra Affair, available at https://www.brown.edu/Research/ Under-standing_the_Iran_Contra_Affair/prosecutions.php.

c. **House Oversight and Government Reform Committee Investigation on Steroid Use in Major League Baseball**. In 2005, after the release of a report by former Senator George Mitchell detailing the extensive use of steroids and other performance enhancing drugs in Major League Baseball, the House Government Reform Committee opened an investigation and issued subpoenas for several witnesses, including former Major League Baseball players. Several testified, including former pitcher, Roger Clemens. Clemens was subsequently indicted for lying to Congress and ultimately acquitted. *See generally* Del Quentin Wilbur, "Roger Clemens Acquitted of all Charges" Wash. Post, June 18, 2002, available at https://www.washingtonpost .com/local/crime/roger-clemens-trial-verdict-reached/2012/06/18/gJQAQxvzlV _story.html.

d. **Senate Committee on Russian Interference in the 2016 Election**. In 2017, the Senate Select Committee on Intelligence began investigating Russian interference in the 2016 United States elections, possible incriminating links between members of the Russian government and members of Donald Trump's presidential campaign team, and the security of election processes in the United States. Multiple individuals associated with Donald Trump and his presidential campaign team were convicted of lying to the Committee and its staff as part of their investigation including Roger Stone and Michael Cohen. *See generally* Ryan Teague Beckwith, "Here Are All of the Indictments, Guilty Pleas and Convictions From Robert Mueller's Investigation," Time, March 22, 2019, available at https://time.com/5556331/mueller-investigation-indictments-guilty-pleas/.

Further, as referenced at the hearing, this Court can also consider, as an example, the Senate Committee on Banking, Housing, and Urban Affairs and the House Committee on Financial Services holding multiple hearings in late 2001 and into 2002 inquiring into the Enron scandal and related accounting and investor protection issues. As Defendants discussed in their Memorandum in Support of their Motion to Dismiss Count Ten, this Congressional investigation ultimately led to the passage of the Sarbanes–Oxley Act of 2002 which, in turn, resulted in the passage of Section 1512(c)(2). This is where that Act's legislative history becomes relevant.

As discussed in Defendants' Memorandum of Law, the Act was created to "provide for criminal prosecution and enhanced penalties of persons who defraud investors in publicly traded securities or alter or destroy evidence *in certain Federal investigations*." S. REP. NO. 107-146, at 2 (2002) (emphasis added). This arguably included Congress' own ability to investigate such illegal activity. Stated differently, when Congress created Section 1512(c)(2), not only was it concerned with "[w]hen a person destroys evidence with the intent of obstructing any type of investigation and the matter is within the jurisdiction of a federal agency," *id.* at 6–7, it wanted to make it where such a person could be held accountable when that investigation was conducted by Congress themselves pursuant to their power of inquiry and to investigate.

This Court may ask, how does this comport with Defendants' position that the proceeding must relate to the administration of justice? In simplest terms, justice is based on the notion that when a person engages in conduct that violates the law, they must be held accountable in one form or another. *See* JUSTICE, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The legal system by which people and their causes are judged; esp., the system used to punish people who have committed crimes."; "The fair and proper administration of laws."). While Congress has often, as reflected in the examples *supra*, referred suspected criminal activity that occurs in proceedings held before it pursuant to their power of inquiry to the Department of Justice for prosecution, it is also worth considering that, when those proceedings are held pursuant to Congress' power of inquiry and to investigate, those proceedings

are necessarily held to help aid Congress *make the laws* that define what action is legal and illegal. In that sense, Congress' passing of laws is the first and essential step in the administration of justice.[4] No action can violate the law — and require the administration of justice — if there is no law to proscribe the conduct in the first place.

The legislative history behind Section 1515 provides the further assurances to this Court that Congress intended to have Section 1515's definition of "official proceeding" apply only to proceedings related to the administration of justice and, more specifically, to proceedings before Congress only when it was exercising its power of inquiry (as opposed to any proceeding taking place before it).

Section 1515's definition of "official proceeding" was made law as part of the Victim and Witness Protection Act of 1982. *See* PUB. L. 97-291, § 4(a), Oct. 12, 1982, 96 Stat. 1252. As reflected in the Senate Judiciary Committee's Report on Senate Bill 2420, the bill as originally proposed created Section 1512 to create "offenses against witnesses, victims, or informants which occur before the witness testifies or the informant communicates with law enforcement officers," and used what was originally intended to be Section 1514 to define the terms used in Section 1512 and 1513, including "official proceeding." S. REP. 97-532 at 14, 22. In discussing the interplay between a proposed "broad residual clause" included within Section 1512

---

[4] Of course, in this sense, Congress not acting in an "adjudicatory" capacity. But looking back at the definition of "tribunal" from Black's Law Dictionary, it gives as an additional definition for an "administrative tribunal," "[a] governmental division established to implement legislative policy," such as Congress. TRIBUNAL, BLACK'S LAW DICTIONARY (11th ed. 2019). Hence, both definitions can be harmonized to apply to all the Congressional proceedings discussed *supra* acting in their capacity as a "tribunal."

and the definition of "official proceeding" in Section 1514, as reflected in the report,
the legislation intended to make it an offense if a person "corruptly, by threats of
force, or by any threatening letter or communication, intentionally influences, ob-
structs, or impedes or attempts to influence, obstruct, or impede the *enforcement
and prosecution of federal law* under which an official proceeding is being conduct-
ed, or *the exercise of a legislative power of inquiry*." *Id.* at 17 (emphasis added). As
the report continued, the proposed legislation was

> an outgrowth of congressional recognition of the variety of corrupt
> methods by which the proper administration of justice may be impeded
> or thwarted, a variety limited only by the imagination of the criminally
> inclined.
>
> In the committee's view, this observation leads to the conclusion that
> the purpose of preventing an obstruction or miscarriage of justice can-
> not be fully carried out by a simple enumeration of the commonly pros-
> ecuted obstruction offenses. There must also be protection against the
> rare type of conduct that is the product of the inventive criminal mind
> and which also thwarts justice. Some examples of such conduct, actual-
> ly prosecuted under the current residual clauses, which would proba-
> bly not be covered in this series without a residual offense clause, are
> as follows:
>
> (i)    a conspirator arranging to have an unnecessary abdominal op-
>        eration in order to cause a mistrial of an ongoing trial in which
>        he was a defendant.
> (ii)   persons plying the illiterate administrator of an estate with liq-
>        uor and obtaining documents from him which they then used in
>        an effort to have a civil case dismissed.
> (iii)  the defendant planting an illegal bottle of liquor on the victim's
>        premises in order to discredit the victim, who was planning on
>        being a witness against the defendant in a separate case.
> (iv)   a conspiracy to cover up the Watergate burglary and its after-
>        math by having the central intelligence agency seek to interfere
>        with an ongoing FBI investigation of the burglary.
>
> In order to reach such cases, as well as the example previously referred
> to in which the conduct was found not to come within the scope of the

current residual clause, the committee determined to include subsection (a)(3). The committee does not intend that the doctrine of *ejusdem generis* be applied to limit the coverage of this subsection. Instead, *the analysis should be functional in nature to cover conduct the function of which is to tamper with a witness, victim, or informant in order to frustrate the ends of justice.* For example, a person who induces another to remain silent or to give misleading information to a federal law enforcement officer would be guilty under subsection (a)(3), irrespective of whether he employed deception, intimidation, threat, or force as to the person.

The first branch of the proposed subsection, referring to the 'enforcement and prosecution of federal law' is designed to carry forward the basic coverage in 18 U.S.C. 1503. *The latter two branches of the subsection, referring to the 'administration of a law under which an official proceeding is being conducted' and to the 'exercise of a legislative power of inquiry,'* are designed to continue the general scope of the final paragraphs of 18 U.S.C. 1505.

*Id.* at 18-19 (emphasis added). Despite this extensive consideration, the proposed "broad residual clause" was ultimately removed from the proposed legislation. *See* 128 Cong. Rec. 26810 (statement by Sen. John Heinz: "Subsection (3) of section 1512(a) of the Senate passed bill, general obstruction of justice residual clause of the intimidation section, was taken out of the bill as beyond the legitimate scope of this witness protection measure. It also is probably duplicative of obstruction of justice statutes already in the books.").[5] However, the proposed definition of "official proceedings" that was part of what was originally intended to be Section 1514 remained intact and moved to its current location in Section 1515. *See id.* at 26807

---

[5] This arguably demonstrated that Congress wanted to exercise restraint when enacting its obstruction statutes and was considerate of the fact that other obstruction statutes were available to proscribe other types of obstructive conduct. Both of those points should resonate with this Court, concerned with whether "Congress was saying, look, the courts have repeatedly cut back on everything we do when we adopt an obstruction statute; and we want a very broad provision here, because we want to make clear that we're really intending to reach everything that is obstructing an official proceeding." VMH at 7.

(showing how amended version of bill moved Section 1514's definitions to Section 1515).

Reading through the entire legislative history, therefore, one can clearly see that Section 1515 was meant to apply solely to the protection of witnesses who brought forth evidence as part of the administration of justice. That Section 1515 included "a proceeding before Congress" within its definition of "official proceeding," as the legislative history further confirms, Congress did so only with the intention of that protection applying when evidence was presented as an "exercise of a legislative power of inquiry." S. REP. 97-532 at 17.

While all the Congressional proceedings given as examples *supra* were unequivocally held pursuant to Congress' power of inquiry and to investigate — and hence, any corrupt obstruction of them could arguably be prosecuted under Section 1512(c)(2) — it cannot be overlooked that the Government has conceded that the election certification proceedings of January 6, 2021 at issue here were not a part of that Congressional function. *See, e.g., United States v. William Pepe*, 21-cr-52, ECF No. 55, p. 8 n. 3 (D.D.C. 2021) ("[T]he certification of the Electoral College vote is *not an 'inquiry or investigation.'*") (emphasis added); 167 CONG. REC. H79, 105-06, 108, 111 (2021) and 167 CONG. REC. S16, 25, 32 (2021).

Accordingly, whether a proceeding is viewed as something taking place before a "tribunal" acting either as an "adjudicatory body" with "court-like decision-making authority," or "[a] governmental division established to implement legislative policy," the electoral certification proceedings of January 6 fall into none of those cate-

gories. There were no witnesses subpoenaed to testify or bring evidence before Congress. There was no sworn testimony given. There was no inquiry or investigation by Congress. The election certification proceedings should not be considered as an "official proceeding" based on that phrase's legal interpretation as used in Section 1515 and applied in Section 1512, its legislative history, or its purpose. Count Ten of the indictment alleging a violation of Section 1512(c)(2) should therefore be dismissed.

## B.   "Otherwise obstructs" and how the Defendants' alleged actions goes well beyond the reach of Section 1512(c)(2)

At the beginning of the hearing, this Court also raised what it termed "the real question:" what the phrase "otherwise obstructs, influences or impedes" means. VMH at 5. The Court correctly noted, "That sentence follows a sentence which is focused on the alteration, destruction, mutilation or concealment of a record, document or other object." *Id.*; *see* 18 U.S.C. § 1512(c). This leads to the more critical question, as this Court stated, "whether the otherwise clause needs to be construed in light of what comes before it to do two things" that is (1) "actually add[ing] something and to be meaningful in addition to what is in clause one" or (2) "whether it needs to be also construed in a similar vein to the terms that are in clause one." VMH at 5–6.

The answer to that question not only comes from, as this Court correctly identified, the Supreme Court decision in *Begay*, but ironically from the former Attorney General for the United States. *See* Memorandum from William Barr to Deputy Attorney General Rod Rosenstein and Assistant Attorney General Steve Engel

of June 8, 2018 (hereafter Barr Memo), available at https://s3.documentcloud.org/
documents/5638848/June-2018-Barr-Memo-to-DOJ-Muellers-Obstruction.pdf.   Rely-
ing on *Begay* and *Yates*, the former Attorney General offered a well-reasoned an-
swer to this Court's question:

> [I]t is clear that use of the word 'otherwise' in the residual clause [of
> Section 1512(c)(2)] expressly links the clause to the forms of obstruc-
> tion specifically defined elsewhere in the provision. Unless it serves
> that purpose, the word 'otherwise' does no work at all and is mere sur-
> plusage. [An] interpretation of the residual clause as covering any and
> all acts that influence a proceeding reads the word 'otherwise' out of
> the statute altogether. But any proper interpretation of the clause
> must give effect to the word 'otherwise'; it must do some work.

Barr Memo at 4. After discussing *Begay* and *Yates*[6] and how those cases emphasized

that "specific examples enumerated prior to the residual clause are typically read as

refining or limiting in some way the broader catch-all term used in the residual

clause," he continued,

> Consequently, under the statute's plain language and structure, the
> most natural and plausible reading of 1512(c)(2) is that it covers acts
> that have the same kind of obstructive impact as the listed forms of ob-
> struction — i.e., impairing the availability or integrity of evidence —
> but cause this impairment in a different way than the enumerated ac-

---

[6] Although *Yates* was a plurality opinion, Justice Alito's concurring opinion also supports the former
Attorney General's and the Defendants' position. According to Justice Alito, the statute's list of
nouns, its list of verbs, and its title all stood out as showing that the statute in question did not reach
the conduct of the defendant in that case. *Yates*, 574 U.S. at 549 (Alito, J., concurring). Regarding the
nouns, Justice Alito considered the application of both *noscitur a sociis* and *ejusdem generis* to find
that the term "tangible object" should refer to "something similar to records or documents." *Id.* at
549–50. In this case, Section 1512(c)(1) refers to "a record, document, or other object." There is no
allegation that Defendants interfered with any such item, much less any evidence. Justice Alito then
looked at the verbs and noticed some glaring problems trying to apply those verbs to any tangible
object. *Id.* at 551 ("How does one make a false entry in a fish?"). Because there was no evidence inter-
fered with by the Defendants (nor will there ever be), the verbs in Section 1512(c) have no object to
reference. Finally, Justice Alito pointed to the title of the statute: "Destruction, alteration, or falsifi-
cation of *records* in Federal investigations and bankruptcy" and noted "This too points toward file-
keeping, not fish." *Id.* at 552 (emphasis added). As Defendants have already addressed in their
Memorandum, the title of Section 1512 clearly supports a finding that it was not intended to apply to
all forms of obstructive conduct. *See* Def. Memo at 8.

tions do. Under this construction, then, the "catch all" language in clause (c)(2) encompasses *any conduct*, even if not specifically described in 1512, that is *directed at undermining a proceeding's truth-finding function through actions impairing the integrity and availability of evidence.*

*Id*. at 4–5 (emphasis added).

Similar to what Defendants pointed out in their Memorandum of Law, the former Attorney General noted that caselaw reflects this application of the residual clause as only applying to "attempts to interfere with, or render false, evidence that would become available to a proceeding" or "to prevent the flow of evidence to a proceeding." *Id*. at 5 (citing *United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014) (soliciting tips from corrupt cops to evade surveillance); *United States v. Phillips*, 583 F.3d 1261 (10th Cir. 2009) (disclosing identity of undercover agent to subject of grand jury drug investigation)), *cf.* Defendants Memorandum in Support of their Motion to Dismiss Count Ten of the Indictment (hereafter Def. Memo), ECF No. 39-1 at 8–9 (cases cited therein); *see also e.g. United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (involving false testimony to a grand jury); *United States v. Jefferson*, 751 F.3d 314, 321 (5th Cir. 2014) (involving intentional false statements to court during a preliminary injunction hearing); *United States v. Lucas*, 499 F.3d 769, 780–81 (8th Cir.2007) (involving a defendant having others falsely claim ownership of a firearm); *United States v. Mintmire*, 507 F.3d 1273, 1290 (11th Cir. 2007) (involving defendant's "attempt[s] to orchestrate" grand jury witness's testimony by sending notes to an attorney who in turn "coached" the witness); *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (involving false statements in a court pro-

ceeding); *United States v. Pugh*, 945 F.3d 9, 28 (2d Cir. 2019) (involving destruction of several USB drives and deletion of data).

This view is what distinguishes this case from the arguments made in *United States v. Ring*, 628 F. Supp. 2d 195 (D.D.C. 2009), referenced by the Government at the hearing. *See* VMH at 27–28. In *Ring*, the defendant argued that Section 1512(c)(2) "applies only to acts involving 'tampering with documents and physical evidence'" and thus "cannot be properly applied to allegedly false statements to private individuals." *Ring*, 628 F. Supp. 2d at 224; *see also United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237, 250 (S.D. Tex. 2020) (addressing the same argument and citing to other district courts addressing the same). Defendants would concede that reading Section 1512(c)(2) to apply only to the corrupt obstruction of documents and physical evidence is too restrictive. However, as the former Attorney General correctly observed, "the natural and plausible reading of 1512(c)(2)" still requires some conduct that impairs the integrity and availability of *some evidence*.[7]

This is entirely consistent with the legislative history of Section 1512(c)(2) as noted by the former Attorney General and as Defendants pointed out in their Memorandum of Law. As the former Attorney General noted, the legislative history of Section 1512(c)(2) "was expressly designed to 'clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records.'" Barr Memo at 5–6 (quoting S. REP. NO.

---

[7] The Government apparently acknowledged all this at the hearing — how the statute and caselaw requires the impairment of some evidence — but then leapt to how the "forcible storming and breaching of the Capitol is an obstructive act that falls within the scope of (c)(2)" without any explanation of how that alleged act impaired the "flow of evidence." VMH at 30–31.

107-146, at 14–15), *cf.* Def. Memo at 10–11. Stated differently, "The legislative history thus confirms that § 1512(c) was not intended as a sweeping provision supplanting wide swathes of obstruction law, but rather as a targeted gap-filler designed to strengthen prohibitions on the impairment of evidence." Barr Memo at 6.

The former Attorney General also addressed this Court's concern of whether interpreting Section 1512(c)(2)'s residual clause broadly does "in fact render superfluous virtually every other provision of title 73." VMH at 9. As he correctly explained, "[R]eading the residual clause as an all-encompassing proscription cannot be reconciled either with the other subsections of § 1512, or with the other obstruction provisions in Title 18 that must be read *in pari passu* with those in § 1512." Barr Memo at 5. If this Court were to interpret Section 1512(c)(2) as the Government wants to — as an all-encompassing catch-all to include something so unique as protesting the election certification proceedings — "clause (c)(2) would render all the specific terms in clause (c)(1) surplusage; moreover, it would swallow up all the specific prohibitions in the remainder of § 1512 — subsections (a), (b), and (d)." *Id.* And, as he continued, "More than that, it would subsume virtually all other obstruction provisions in Title 18. . . . It is not too much of an exaggeration to say that, if § 1512(c)(2) can be read as broadly as being proposed, then virtually all Federal obstruction law could be reduced to this single clause." *Id.*; *see also Marx v. General Revenue Corp.*, 568 U.S. 371, 386, 133 S. Ct. 1166, 1178, 185 L. Ed. 2d 242 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

In sum, the canons of construction employed by the Court in *Begay* and *Yates*, the text, structure, and the practical application of Section 1512(c)(2) as demonstrated in caselaw, as well as its legislative history all support a holding that "the otherwise clause" in Section 1512(c)(2) must be, as this Court suggested, "construed in a similar vein to the terms that are in clause one." VMH at 6. There must be some allegation that the Defendants' conduct undermined a proceeding's "truth-finding function through actions impairing the integrity and availability of evidence." Barr Memo at 4–5. Because no such allegation exists in the indictment here (nor can there ever be one), this Court should dismiss Count Ten of the indictment alleging a violation of Section 1512(c)(2).

## C.     The electoral certificates are not "evidence"

Because Section 1512(c)(2) is designed to protect the integrity and availability of evidence in a proceeding related to the administration of justice, Defendants must further address a point posed by the Court to counsel for Mr. Knowlton at the hearing, namely, whether the electoral college votes themselves are "evidence." *See* VMH at 11 ("But here there was evidence; the evidence was in the form of the electoral returns from the states.").

As counsel for Mr. Knowlton correctly responded at the hearing, the certificates of the electoral college votes are not the same as evidence that is protected by Section 1512 — or the rest of the Title 73 offenses related to the obstruction of justice, for that matter. The basis for that comes from an understanding of what "evi-

dence" is and the understanding of what the electoral certification proceedings before Congress are designed to do.

"Evidence" is defined as "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged *fact*; anything presented to the senses and offered to prove the existence or nonexistence of a *fact*." EVIDENCE, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). A "vote," on the other hand, is defined as "[t]he expression of one's preference or *opinion* in a meeting or election by ballot, show of hands, or other type of communication." VOTE, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). While "fact" and "opinion" are sometimes difficult to distinguish, *see e.g. Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984) (setting out the four factors used in this jurisdiction to determine whether a defendant has stated a fact or an opinion relative to a defamation action), in this context, it is relatively simple. At its very core, the electoral certificates presented to the Joint Session of Congress are a certification of who the electors believe should be President of the United States. *See* 3 U.S.C. §§ 6, 9, 11 & 15. It is a record of what is unequivocally the "opinion and will of the People." But it is not a certification of a fact. Thus, it is not "evidence" in the traditional sense.

The electoral certificates are also not "evidence" used in the administration of justice. It is not testimony from an informant or witness to an alleged crime. It is not a document or record used to establish whether some conduct has violated the law. It is not some tangible object that can be used to prove some fact that is true. It is none of the things that several of the statutes within Title 73 aim to protect in or-

der to preserve and maintain the proper administration of justice. More important-ly, there is no language in any of the statutes within Title 73 or anything in its leg-islative history that demonstrate that they were to provide protection for something like the electoral certificates.

If there is a question about the validity of an electoral certificate, as provided by the ECA, there are procedures for confirming the validity of that certificate. But, at the end of the day, all the President of the Senate and the Joint Session of Con-gress are doing is certifying what is the "opinion and the will of the People" and, again, not some fact. *See e.g.* 3 U.S.C. § 15. This again is consistent with the consti-tutional mandates set out in Article II, Section 1 and the Twelfth Amendment which only obligate the President of the Senate, in the presence of the Senate and House of Representatives, to "open all the certificates and the votes shall then be counted." U.S. CONST. amend. XII; *see also* U.S. CONST. art. II, § 1.

Although its impact and import come nowhere close, the duties of the Presi-dent of the Senate and the Joint Session of Congress during the election certifica-tion proceeding are no different than that of a court clerk. By way of example, Fed-eral Rule of Appellate Procedure 27(d) requires that, for a petition for writ of man-damus, an original and three copies of the petition must be filed with the clerk of the court. FED. R. APP. P. 27(d). When those documents are delivered to the clerk of the court, the clerk is to confirm that there is an original and the three copies are indeed three copies of the original petition. If they are not, the clerk will reject the filing and require the party to correct the filing to comply with the rule. No one

would or could ever argue that the petition itself is evidence and, more importantly, that the clerk is making a decision regarding the admissibility of evidence or otherwise trying to decide on the existence or nonexistence of the *facts* alleged in the petition. The President of the Senate and the Joint Session of Congress do essentially the same thing. They are confirming that the electoral certificates are what they are supposed to be: an accurate reflection of the opinion and will of the people as confirmed before the electoral colleges of each State, based on the votes cast in each of the States.

Based on the plain meaning of the term, the statutory language of the ECA and related Constitutional provisions, all of Title 73, its context, and legislative history, the electoral certificates that the President of the Senate counts as part of their constitutional function are not evidence and, more importantly, not the type of object that would be protected by Section 1512.

## D. "Corruptly obstructs, influences, or impedes any official proceeding " and the lack of a limiting principle makes Section 1512(c)(2) unconstitutionally vague as applied based on the allegations in the indictment

This Court also raised a prodigious concern by noting

[T]here may be a constitutional vagueness problem that you walk into at that point in time if you can't articulate to the Court sort of what 'corruptly' means in a way that would put the average person on notice of when they're violating this statute versus engaged in trespass or unlawful parading; and you say oh, at this point I am now moving from committing a misdemeanor to committing a felony. And unless we can tell the public where that line is, there's a problem."

VMH at 40. As this Court indeed correctly noted, the allegation of "corruptly" is all that takes the charges against the Defendants from an offense punishable up to six

months imprisonment to an offense punishable by up to twenty years imprison-ment. *Cf.* Indictment, Count Seven (charging Defendants with knowingly engaging "in disorderly and disruptive conduct within the United States Capitol Grounds and in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress and either House of Congress, and the or-derly conduct in that building of a hearing before or any deliberation of, a commit-tee of Congress or either House of Congress") and Count Ten (charging Defendants with attempting to, "and did, *corruptly* obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol without authority and committing an act of civil disorder and engaging in disorderly and disruptive conduct.").

In order to comply with the requirements of due process, a statute must give fair warning of the prohibited conduct. *Bouie v. City of Columbia*, 378 U.S. 347, 351, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964). A statute is unconstitutionally vague under the due process clause if "it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. Unit-ed States*, 576 U.S. 591, 595–96, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015); *see also Kolender v. Lawson*, 461 U.S. 352, 357–58, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983)) ("a penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct it prohibits, and do so in a manner that does not invite arbitrary and discriminatory enforcement by which 'policemen, prosecutors, and juries ... pursue their personal predilections.'"); *Connally v. Gen-*

*eral Construction Company*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.). The allegations against Defendants in Count Ten of the indictment fail in both respects.

### 1. Problems with using the term "corruptly" to limit the Defendants' conduct

Although "corruptly" is defined in Section 1515 as "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information," as set out in that same section, that definition is *only applicable to Section 1505*. 18 U.S.C. § 1515(b). Congress has never amended Section 1515 to define "corruptly" as used in Section 1512. Accordingly, this Court must look elsewhere for that definition. In this Circuit, that discussion starts with *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991).

Like the Defendants here, the defendant in *Poindexter* was charged with a similar offense that involved "corruptly influencing, obstructing, or impeding"; in that case, it was congressional inquiries that were allegedly obstructed by, among other things, making false and misleading statements to members of Congress. *Poindexter*, 951 F.2d at 377. On appeal, the court held the term "corruptly" as used in Section 1505 "is too vague to provide constitutionally adequate notice that it prohibits lying to Congress." *Id*. at 379. In so ruling, the court relied on the definitions

of "corrupt" and "corruptly" applied in *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990):

> '[C]orruptly' is the adverbial form of the adjective 'corrupt,' which means 'depraved, evil: perverted into a state of moral weakness or wickedness ... of debased political morality; characterized by bribery, the selling of political favors, or other improper political or legal transactions or arrangements. A 'corrupt' intent may also be defined as 'the intent to obtain an improper advantage for [one]self or someone else, inconsistent with official duty and the rights of others.'

*Poindexter*, 951 F.2d at 378 (quoting *North*, 910 F.2d at 881–82). The court noted several problems with the use of the term "corruptly." For one, it noted "that, on its face, the word 'corruptly' is vague." *Id.* It further added that "[t]he various dictionary definitions of the adjective 'corrupt' quoted in *North I* do nothing to alleviate the vagueness problem involved in attempting to apply the term 'corruptly' to Poindexter's conduct." *Id.* ("Vague terms do not suddenly become clear when they are defined by reference to other vague terms.").

As further support for its holding, the court also considered the legislative histories of Section 1503, 1505 and 1512, as well as cases interpreting Section 1505, to determine whether those statutes provided a narrowing interpretation of the term "corruptly" to provide adequate notice that it criminalized false and misleading statements to Congress. *Id.* at 379–386. The court ultimately concluded that no such narrowing interpretation was provided by legislative history or case law. *Id.* at 386.[8]

---

[8] Part of the legislative history relied upon by the court to reach this conclusion was the same legislative history discussed *supra* in Section A.2. that Defendants rely upon to show that Congress intended an "official proceeding" to relate to the administration of justice and Congress' power of inquiry to help serve that function.

There are several things worth noting about *Poindexter* before turning to the allegations against the Defendants in Count Ten. First, in noting that the word "corruptly" was vague on its face, the court added, "in the absence of some narrowing gloss, people must 'guess at its meaning and differ as to its application.'" *Id.* at 378. To make its point, the court noted "'corruptly influencing' a congressional inquiry does not at all clearly encompass lying to the Congress, which is, by way of contrast, clearly a violation of § 1001, the False Statements statute.'" *Id.* Second, as the court pointed out, the term "corruptly" "must have some meaning . . . because otherwise the statute would criminalize all attempts to 'influence' congressional inquiries — an absurd result that the Congress could not have intended in enacting the statute." *Id.* at 377–78. Third, the court found that "corruptly" would only not be unconstitutionally vague if one corruptly influenced another person to violate their legal duty. *Id.* at 379 ("Narrowing the transitive interpretation to include only 'corrupting' another person by influencing him to violate his legal duty would both take account of the context in which the term 'corruptly' appears and avoid the vagueness inherent in words like 'immorally.'"). In so finding, however, the court pointed out that either a transitive or an intransitive interpretation of "corruptly" would still be unconstitutionally vague if more specific content is not given to that word. *Id.* ("corrupt" may be used transitively ("A corrupts B," i.e., "A causes B to act corruptly") or intransitively ("A corrupts," i.e., "A becomes corrupt, depraved, impure, etc.")).

Turning to the allegations against the Defendants, we see how all these problems exist in this context as well. Defendants are accused in Count Ten of corruptly obstructing, influencing, and impeding an official proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol without authority and committing an act of civil disorder and engaging in disorderly and disruptive conduct.

Regarding the first problem from *Poindexter* noted *supra*, "in the absence of some narrowing gloss," as argued at the hearing, the Defendants indeed "must 'guess at its meaning and differ as to its application.'" *Id.* at 378. Just as the Court in *Poindexter* exemplified this point by noting "'corruptly influencing' a congressional inquiry does not at all clearly encompass lying to the Congress, which is, by way of contrast, clearly a violation of § 1001, the False Statements statute," the same point can be made here. *Id.* That is, *corruptly* obstructing, influencing, and impeding a proceeding before Congress does not at all clearly encompass entering and remaining in the United States Capitol without authority and committing an act of civil disorder and engaging in disorderly and disruptive conduct. By way of contrast, however, clearly such conduct violates other statutes, namely, 18 U.S.C. § 1752 and 40 U.S.C. § 5104. The hypotheticals raised by this Court at the hearing clearly make this point. For instance, if a person "stands up at a congressional hearing and shouts out in a disruptive way requiring a brief adjournment of the hearing," it is entirely unclear whether that "act of civil disorder" and "disorderly and disruptive conduct" is inherently "depraved," "evil," "immoral," "wicked," or "improper." *See*

31

*Poindexter*, 951 F.2d at 379. The same could be said about "a group of people who are upset about an FCC rule that is being adopted, and they sit in on the front steps and block the entrance to the FCC before a hearing is scheduled to take place," or "somebody who makes an unlawful campaign contribution with the intent of influencing a congressional hearing." VMH at 8. Whether it would "apply to somebody who slashes the tires of the chairman of the committee" might be an easier case, but it still is open to interpretation and worse, invites "arbitrary and discriminatory enforcement by which 'policemen, prosecutors, and juries ... pursue their personal predilections.'" *Id.* at 378 (quoting *Kolender*, 461 U.S. at 357–58). In short, nothing in the allegation in Count Ten provides a "narrowing gloss" making it clear that the Defendants' conduct was indeed corrupt.

This leads to the second problem from *Poindexter* noted *supra*. Allowing the Government to proceed on Count Ten would, similar to what the court pointed out in *Poindexter*, criminalize all attempts to "influence" congressional proceedings — "an absurd result that the Congress could not have intended in enacting the statute." *Id.* at 377–78. This Court recognized this very problem when it stated at the hearing, "I don't think Congress was intending to say we're just going to pass a statute here that makes it unlawful to do anything with a bad purpose that impedes an official proceeding in any way. Because that's just an extremely capacious statute where you would expect them to have said something, and not to have just put it in the obstruction of justice section of the code to do so." VMH at 46. This echoes what the Supreme Court alluded to in *Yates*, noting, "It is highly improbable that

32

Congress would have buried a general spoliation statute covering objects of any and every kind in a provision targeting fraud in financial recordkeeping." *Yates*, 574 U.S. at 546. The allegation in Count Ten does exactly what the court was concerned about in *Poindexter*: it criminalizes any attempts to obstruct any congressional proceeding without any limiting principle.

The third issue from *Poindexter* noted *supra*, further presents a problem here. The only non-vague interpretation of "corruptly," according to *Poindexter*, is when, as applied, the person's action "corruptly influenced another person to violate their legal duty." *Id.* at 379. No such allegation exists in this case (nor can it). The allegation is simply that Defendants corruptly obstructed, influenced, and impeded an official proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol without authority and committing an act of civil disorder and engaging in disorderly and disruptive conduct. There is no allegation that either Defendant (a) influenced others to engage in obstructive behavior or (b) did so in violation of some legal duty. More importantly, there is no context given to what specific conduct they engaged in that made their conduct "corrupt." *See id.* (noting either a transitive or an intransitive interpretation of "corruptly" would still be unconstitutionally vague if more specific content is not given to that word).

While the Government might maintain that these problems were alleviated by amending the definition of "corruptly" in Section 1515, there are two problems with using that definition. First, as mentioned *supra*, that definition is only applicable to Section 1505. 18 U.S.C. § 1515(b). Congress never amended Section 1515 to

define "corruptly" as used in Section 1512 even though it explicitly made other defi-
nitions ("official proceeding," for instance) applicable to that section. *See* 18 U.S.C. §
1515(a); *Bates v. United States*, 522 U.S. 23, 29–30, 118 S. Ct. 285, 139 L.Ed.2d 215
(1997) (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed.
2d 17 (1983)) ("'Where Congress includes particular language in one section of a
statute but omits it in another section of the same Act, it is generally presumed that
Congress acts intentionally and purposely in the disparate inclusion or exclusion.'");
*Duncan v. Walker*, 533 U.S. 167, 173, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001). Sec-
ond, and more importantly, a reading of the definition of "corruptly" in Section 1515
demonstrates that the definition applies to some act that interferes with evidence.
*See* 18 U.S.C. § 1515(b) ("corruptly" means acting with an improper purpose, per-
sonally or by influencing another, including making a false or misleading state-
ment, or withholding, concealing, altering, or destroying a document or other infor-
mation); *Yates*, 574 U.S. at 544 (applying *noscitur a sociis* to interpret Section 1519
as applying to records and documents). Because there is no allegation that Defend-
ants affected the availability and integrity of evidence, Section 1515's definition
serves no purpose here.

Aside from these problems, a real concern also comes from the Government's
own comments on the matter. Multiple times throughout their argument at the
hearing, this Court witnessed "their personal predilections" about the Defendants'
conduct and the conduct of several others taking place on January 6:

- "Now, admittedly this particular type of conduct I'm not aware of hav-
  ing been prosecuted under this statute before. But *I also think* what we

saw on January 6th was unprecedented in scope and violence." VMH at 31 (emphasis added).

- "How about somebody who goes inside a committee hearing -- or something that we will agree is an official proceeding for purposes of the hypothetical, and gets up and yells and shouts and says, "I don't want this thing to go forward." I think it's clear that that person will have acted with intent to obstruct. *I think there's a genuinely hard question about whether there is adequate wrongfulness for us to prosecute that case.*" VMH at 37 (emphasis added)

- "As the Court probably knows, there are north of 500 defendants in the January 6th cases as a whole. Many of those were individuals who went inside the building, and so -- and in so doing, violated a federal law. *But not all of them have been charged, and we have not taken the position that all of them have acted corruptly.* They have all engaged in the actus reus of influencing, impeding or obstructing, so that all falls within the verbs. But it's corruptly there that's doing the limiting principle work." VMH at 37–38.

- "*I'm loathe to kind of articulate a precise point at which someone whose conduct tips over from simply intent to obstruct with sort of willful behavior*, because there is some work that statutes like 18 U.S.C. 1752 and 40 U.S.C. 5104, which are misdemeanor – basically misdemeanor obstruction statutes. *I do think we can build in facts until we get to a point where I think that person probably has acted corruptly.* But the point is that the wrongfulness component of corruptly, as the Government understands the term – and there's not a whole lot of guidance from the D.C. Circuit case law. But kind of understanding it as a matter of first principles, as well as how courts have interpreted it in other circuits, there's got to be some significant act of wrongfulness. So again, thinking about this in the context of these cases: Aggressively confronting a law enforcement officer; going into the actual place where the certification is happening and maybe sitting in the presiding officer's chair and writing something. *These are the types of things that get past sort of the wrongfulness component of the corruptly post.*" VMH at 38-39 (emphasis added)

- "And respectfully, I think ultimately it's not so much a question of vagueness or determination for kind of courts figuring out where the line is, it's a jury question to determine did this person -- right, so I think the standard is intent to obstruct plus wrongfulness. And how much wrongfulness is enough? Well, I mean, ultimately that's a question that's submitted to 12 jurors to determine whether or not that

wrongfulness is felony obstruction as opposed to some kind of a mis-
demeanor, right." VMH at 40.

- "It's a question of the jury determining whether a person's conduct in
  walking inside the Capitol at a time when the certification vote could
  have happened and then leaving, is that adequately wrongful. *You
  know, we as an office have not taken that position at large*." VMH at 42
  (emphasis added).

- "*In our view, charging into an official -- a building where the only thing
  happening there was a joint session of Congress engaged in an official
  proceeding, that is the type of influencing, obstructing or impeding done
  corruptly*. And obviously one has to adduce the relevant facts as to each
  defendant to determine whether that action was adequately corrupt
  and adequately -- and I think frankly the obstructive act -- the actus
  reus is going to be pretty similar in many instances. And then *the ques-
  tion will be what is the -- what is it that distinguishes a defendant's ac-
  tions acting corruptly versus someone who didn't*." VMH at 46–47 (em-
  phasis added).

- "I think there's a strong argument that the types of activities and
  events and conduct that we saw on January 6th is quantitatively and
  qualitatively different from any of the other conduct that was not pros-
  ecuted under 1512(c)(2)." VMH at 54–55.

All these statements fly in the face of the Supreme Court's well-founded and well-
established concern that a penal statute cannot "invite arbitrary and discriminatory
enforcement by which policemen, prosecutors, and juries ... pursue their personal
predilections." *Kolender*, 461 U.S. at 357–58. And this Court certainly recognized
that concern when it stated, "So what troubles me a little bit about that argument is
it's a sort of trust us argument: We're only going to charge this in cases that we
think are really bad." VMH at 39.

   To exemplify this point, Defendants have previously pointed to *United States
v. Barry*, No. MAG 18-00111 (RMM), 2019 WL 2396266, at *1 (D.D.C. June 5, 2019),
where an individual was arrested and charged for obstructing the Senate judicial

confirmation hearing for Supreme Court Justice Brett Kavanaugh. Of course, the defendant there was never accused of "corruptly" obstructing that proceeding in violation of Section 1512(c)(2). *See id.* Beyond that particular case, however, Defendants would direct this Court to additional incidents that occurred during the course of those "unprecedented" proceedings. For one, prior to the Senate vote on Justice Kavanaugh's confirmation, "[p]rotesters broke through Capitol Police barricades and rushed up the steps to the Capitol Rotunda." *See* "Kavanaugh protestors ignore Capitol barricades ahead of Saturday vote," Roll Call, Oct. 6, 2018, available at: https://www.rollcall.com/2018/10/06/kavanaugh-protesters-ignore-capitol-barricades -ahead-of-saturday-vote/. There is no record or indication that any of them were charged with "corruptly" obstructing that proceeding in violation of Section 1512(c)(2). Prior to that, during the confirmation hearings, hundreds of protestors were prowling around the offices of Senators who were targeted for their support of the Supreme Court nominee, including the office of Senate Judiciary Committee Chairman Chuck Grassley and others. *See* "Kavanaugh protests escalate, over 120 arrested on Capitol Hill," ABC News, Sept. 24, 2018, available at: https://abcnews.go.com/Politics/kavanaugh-protests-escalate-120-arrested-capitol-hi ll/story?id=58048599. Video depicting protestors "taking control" of Senator Grassley's office depict scenes similar in some ways to those of January 6 defendants in Congressional offices. *See* "Kavanaugh protestors take over Sen. Grassley's office," Wash. Post., Sept. 6, 2018, available at: https://www.washingtonpost.com/video /politics/kavanaugh-protesters-take-over-sen-grassleys-office/2018/09/06/9732de44-

b1ef-11e8-8b53-50116768e499_video.html. The video is notable in that protestors admitted on camera that their intent was to disrupt the "official proceedings," chanting "*The system is corrupt, and that's why we disrupt, the system is corrupt, and that's why we disrupt.*" *Id.* Again, there is no record or indication that any of these individuals were charged with "corruptly" obstructing that proceeding in violation of Section 1512(c)(2).

At the conclusion of the hearing, this Court inquired whether there had ever been a case successfully prosecuted that involved obstructing, influencing, or impeding of a proceeding based on disruptive behavior such as "calling in a bomb threat to the courthouse so everyone had to leave the courthouse; or preventing a proceeding before the FCC from going forward by standing in front of the building not letting anyone enter . . . or anything like that?" VMH at 53–54. As the Government correctly responded, there has never been such a case. *Id.* at 54.

This begs the question then: why prosecute the Defendants and treat their conduct as "corrupt?" They allegedly broke through Capitol Police barricades, rushed up the steps on the Capitol, and enter protected areas within the Capitol building — no differently than those hundreds of individuals who did so with the intent to disrupt the confirmation hearings for Justice Kavanagh. None of the individuals arrested and charged during that "unprecedented" event were ever charged with violating Section 1512(c)(2). When there has never been a case where someone has been charged with the "corrupt" obstructing, influencing, or impeding of a pro-

ceeding based on disruptive behavior, how is one ever to know when that line is crossed and more importantly, where that line even is?

The lack of precedent has to carry some weight in establishing the vagueness problems that exist when trying to decide whether someone is corruptly obstructing, influencing, or impeding a proceeding. Defendants should not have to climb into the mind of a creative Government prosecutor to decide whether their conduct will cross some imaginary line of when their conduct is considered "corrupt." More importantly, this question should not just be "submitted to 12 jurors to determine whether or not that wrongfulness is felony obstruction as opposed to some kind of a misdemeanor, right?" VMH at 40.

In sum, the allegation in Count Ten of the indictment against the Defendants should be dismissed as unconstitutionally vague as applied in these unique circumstances.

### 2. "Corruptly" as "obstructing justice"

As an alternative to finding that Section 1512(c)(2)'s prohibition against "corrupt" obstructing, influencing, or impeding of a proceeding based on the disruptive behavior alleged here is unconstitutionally vague, this Court could consider an alternative definition of "corruptly."

During the hearing, the Government referenced the Seventh Circuit pattern jury instruction for "corruptly," stating, "So we think that the jury instruction that the Seventh Circuit uses to interpret 'corruptly' is helpful." VMH at 41. It is indeed helpful — for the Defendants. The pattern instruction defining "corruptly" as that

term is used in Section 1512(c)(2) states that, "A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the *due administration of justice*." THE WILLIAM J. BAUER PATTERN CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT (2020 Ed.), 18 U.S.C. § 1512 Definition of "Corruptly" at 629 (emphasis added). This is consistent with the Ninth Circuit which defines "corruptly" as one acting "with the purpose of *obstructing justice*." *See United States v. Bonds*, 784 F.3d 582, 583 (9th Cir. 2015) (citing *United States v. Rasheed*, 663 F.2d 843, 852 (9th Cir. 1981)). This, of course, brings us back to the arguments raised *supra* that, in order to prove a violation of Section 1512(c)(2), there must be something to show the corrupt obstruction of a proceeding related to the administration of justice. But it is also consistent with what this Court suggested at the hearing:

> I suppose one way to get at what's concerning me may be to look at this through the lens, at least partially, that Mr. Sullivan has been advocating. I'm not sure it gets ultimately to the result that Mr. Sullivan is advocating; it may or it may not. But it also may be a way of giving the statute some greater meaning and clarity in that the obstructive conduct has to be in the nature of the types of things that we think of typically as obstruction of justice. And that you don't really think of a sit in, and it's not traditionally understood, for example, to be in the nature of obstruction of justice.

VMH at 44. This is a fair, non-vague interpretation because typically when someone is obstructing justice by interfering with the flow of evidence to law enforcement, there is something inherently wrong about that conduct. *See, e.g. United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017) ("the wrongdoing alleged here [namely, pressuring a witness to lie to investigators], falls comfortably within the ambit of the statute"); *United States v. Jones*, 207 F. Supp. 3d 576, 584 (E.D.N.C. 2016) (at-

tempting to cause a federal magistrate judge to compel a phone company to produce text messages to a law enforcement officer for which no law enforcement basis exists is understood to be proscribed by the statute).

Of course, as discussed *supra*, there is no allegation (nor could there ever be one) that Defendants conduct interfered with the flow of evidence or otherwise impeded a proceeding related to the administration of justice on January 6. Thus, if this Court were to adopt the Seventh Circuit's definition of "corruptly" as that term is applied in Section 1512(c)(2), the allegation in Count Ten of the indictment would still be insufficient and its dismissal would still be required.

### E.   The allegations against the Defendants based on a violation of Section 1512(c)(2) are unconstitutionally overbroad.

As an alternative ground for dismissing Count Ten of the indictment against Defendants, as alluded to at the hearing, there is also a concern with the allegations against the Defendants based on a violation of Section 1512(c)(2) being unconstitutionally overbroad.

Constitutional overbreadth is a familiar and straight forward principle requiring courts to determine whether the reach of a challenged statute extends to constitutionally protected conduct. *Osborne v. Ohio*, 495 U.S. 103, 112, 110 S. Ct. 1691, 109 L. Ed. 2d 98 (1990). Here, Section 1512(c)(2) can burden a citizen's First Amendment rights. That is, as evidenced in Defendants' case, the government avers as evidence words — even strong words — deployed by protestors as circumstantial evidence of their intent to violate Section 1512(c)(2). This is a classic example of a

statute that may pass constitutional muster in some contexts, but burdens the exercise of a constitutional right in others.

Doctrinally, there is a long and unbroken line of cases that stands for the proposition that the conduct involving the First Amendment is protected by a strict judicial scrutiny. *See e.g., Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015); *R.A.V. v. St. Paul*, 505 U.S. 377, 395, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 118, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991). That is, when the First Amendment is implicated, statutes are subject to facial challenges of overbreadth. *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008). Indeed, the overbreadth doctrine prohibits any ban on unprotected speech that chills or prohibits a substantial amount of protected speech in the process. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002); *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 575–76, 107 S. Ct. 2568, 96 L. Ed. 2d 500 (1987).

The instant matter quintessentially places protected speech at the center of the analysis. Defendants, for example, are not accused of breaking down a door or destroying evidence. Rather, the thrust of the allegations against both Mr. Knowlton and Mr. Montgomery in respect to violating Section 1512(c)(2) are their *verbal* interactions with law enforcement. That protestors engage in speech — even sharp, challenging speech cannot elevate conduct to a violation of Section 1512(c)(2). Such

a threat of prosecution has the effect of chilling constitutionally protected speech, which is the policy justification for prescribing the "strong medicine" declaring a statute unconstitutional under the overbreadth doctrine. *See Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973). The point here is that if the Court can imagine clearly constitutionally protected speech subject to the reach of Section 1512(c)(2), then the statute has a substantial likelihood of burdening First Amendment rights.

The foregoing demonstrates that First Amendment overbreadth doctrine interfaces with Defendants' constitutional vagueness arguments discussed *supra*. On either doctrine, Defendants do not have notice as to what conduct is criminal and what conduct is permissible or even constitutionally protected. Hence, on either ground, this Court can find that the allegation in Count Ten should be dismissed.

**F.    The rule of lenity also can be used to find that the allegation in the indictment falls outside the scope of Section 1512(c)(2)**

Finally, if recourse to any of the "traditional tools of statutory construction leaves any doubt" about the meaning of "corruptly obstructing, influencing, or impeding a proceeding before Congress," as those terms are used in Section 1512(c)(2), this Court could also, as Defendants suggested at the hearing, invoke the rule that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates*, 574 U.S. at 547–48 (quoting *Cleveland v. United States*, 531 U.S. 12, 25, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000), in turn quoting *Rewis v. United States*, 401 U.S. 808, 812, 91 S. Ct. 1056, 28 L. Ed. 2d 493 (1971)). As it was in *Yates*, "[t]hat interpretative principle is relevant here, where the Government urges a

reading of [Section 1512(c)(2)] that exposes individuals to 20–year prison sentences" for obstructing any proceeding before Congress in any manner that it deems "corrupt." *Id.* (citing *Liparota v. United States*, 471 U.S. 419, 427, 105 S. Ct. 2084, 85 L. Ed. 2d 434 (1985)) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability."). "In determining the meaning of "corruptly obstructing, influencing, or impeding a proceeding before Congress," as those terms are used in Section 1512, as it was for the Court in interpreting Section 1519 in *Yates*, it would also be "appropriate, before [choosing] the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Id.* (quoting *Cleveland*, 531 U.S. at 25 in turn quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 222, 73 S. Ct. 227, 97 L. Ed. 260 (1952)). Because they failed to do so and the Government has accused Defendants such that it is not "clear and definite" that their conduct violates Section 1512(c)(2), this Court should dismiss Count Ten of the indictment against them.

There is no question that there are other more definitive statutes available to charge Defendants for their alleged obstructive conduct (and they have, in fact, been charged with violating those other statutes). The Government's attempts to over-charge them using a statute that, by any interpretation, does not apply to their conduct does no justice. It goes against precedent, legislative history, its own Manual, its former Attorney General, and violates multiple constitutional protections.

As this Court aptly noted, obviously whatever this Court says "on this is going to be far from the last word on this question." VMH at 48. Nevertheless, Defendants want this Court's first word to be the correct one and submit the authority and arguments herein to aid this Court in accomplishing that goal.

Based on the grounds alleged in their original motion to dismiss and the grounds laid out herein, Defendants respectfully request this Court grant their motion to dismiss Count Ten of the indictment against them.

Date: <u>September 17, 2021</u>                    Respectfully Submitted,

RONALD SULLIVAN LAW, PLLC

by: <u>/s/ Ronald S. Sullivan Jr.</u>
RONALD S. SULLIVAN JR.
D.C.D.C. Bar ID 451518
rsullivan@ronaldsullivanlaw.com

1300 I Street NW
Suite 400 E
Washington, DC 2005
Tel.: (202) 935-4347
Fax: (617) 496-2277

MAYR LAW, P.C.

by: <u>/s/ T. Brent Mayr</u>
T. BRENT MAYR
Texas State Bar Number 24037052
D.C.D.C. Bar ID TX0206
bmayr@mayr-law.com

5300 Memorial Dr., Suite 750
Houston, TX 77007
Tel.: 713-808-9613
Fax: 713-808-9613

WAGNER PLLC

by: /s/ Camille Wagner
CAMILLE WAGNER
DC Bar No. 1695930
law@myattorneywagner.com

1629 K Street NW, Suite 300
Washington, DC 20006
(202) 630-8812

ATTORNEYS FOR THE DEFENDANT,
BRADY KNOWLTON

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

by: /s/ Dani Jahn
DANI JAHN
Assistant Federal Public Defender

625 Indiana Avenue, N.W., Ste 550
Washington, D.C. 20004
Tel: (202) 208-7500
Fax: (202) 501-3829

ATTORNEY FOR THE DEFENDANT,
PATRICK MONTGOMERY

46

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of this reply was sent to Counsel for the Government, Elizabeth Kelley, James Pearce, and James Peterson on September 17, 2021, via CM/ECF and email.

/s/ T. Brent Mayr
T. BRENT MAYR