# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **v.** | § | **Case No. 21-CR-00046-RDM** |
| | § | |
| **PATRICK MONTGOMERY and** | § | |
| **BRADY KNOWLTON,** | § | |
| | § | |
| *Defendants* | § | |

### DEFENDANTS' REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANTS' JOINT SUPPLEMENTAL BRIEF ON DEFENDANTS' MOTION TO DISMISS

RONALD SULLIVAN LAW, PLLC

by: /s/ Ronald S. Sullivan Jr.
RONALD S. SULLIVAN JR.
D.C.D.C. Bar ID 451518
rsullivan@ronaldsullivanlaw.com

1300 I Street NW
Suite 400 E
Washington, DC 2005
Tel: (202) 935-4347
Fax: (617) 496-2277

ATTORNEY FOR BRADY KNOWLTON

MAYR LAW, P.C.

by: /s/ T. Brent Mayr
T. BRENT MAYR
Texas State Bar Number 24037052
D.C.D.C. Bar ID TX0206
bmayr@mayr-law.com

5300 Memorial Dr., Suite 750
Houston, TX 77007
Tel: (713) 808-9613
Fax: (713) 808-9613

ATTORNEY FOR BRADY KNOWLTON

WAGNER PLLC

by: /s/ Camille Wagner
CAMILLE WAGNER
DC Bar No. 1695930
law@myattorneywagner.com

1629 K Street NW, Suite 300
Washington, DC 20006
(202) 630-8812

ATTORNEY FOR BRADY KNOWLTON

A.J. KRAMER, FED. PUBLIC DEFENDER

by: /s/ Dani Jahn
DANI JAHN
Assistant Federal Public Defender
Dani_Jahn@fd.org

625 Indiana Avenue, N.W., Ste 550
Washington, D.C. 20004
Tel: (202) 208-7500
Fax: (202) 501-3829

ATTORNEY FOR PATRICK MONTGOMERY

# TABLE OF CONTENTS

A.    This was not an "official proceeding" as that term has been interpreted. The Government has no authority to support its position that it includes the electoral certification proceedings. ...................................................................... 3

B.    Section 1512(c)(2) is not just limited to document destruction or physical evidence tampering, but there still has to be some impact on the integrity and availability of evidence. ...................................................................................... 7

C.    The multiple flaws with the Government's application of "corruptly" and its vagueness analysis............................................................................................ 8

D.    The Government's position that Congress "deliberates" over "physical or documentary evidence" as part of the electoral certification proceedings dangerously gives validity to the former President's incredulous claims. ..... 21

# TABLE OF AUTHORITIES

## Cases

*Arthur Andersen LLP v. United States*, 544 U.S. 696, 125 S. Ct. 2129, 161 L. Ed. 2d 1008 (2005)..................................................................................................... 9

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 102 S. Ct. 3245, 3252, 73 L. Ed. 2d 973 (1982) .................................................................................................. 12

*Hall v. United States*, 566 U.S. 506, 132 S. Ct. 1882, 182 L. Ed. 2d 840 (2012) ......... 5

*Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S. Ct. 317, 112 L. Ed. 2d 275 (1990) ... 5

*United States v. Batten*, 226 F. Supp. 492 (D.D.C. 1964).............................................. 6

*United States v. Friske*, 640 F.3d 1288 (11th Cir. 2011) ............................................... 9

*United States v. Gordon*, 710 F.3d 1124 (10th Cir. 2013) ............................................. 9

*United States v. Jefferson*, 751 F.3d 314 (5th Cir. 2014)............................................... 2

*United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994).............................................. 5, 6

*United States v. Phillips*, 583 F.3d 1261 (10th Cir. 2009) ............................................ 2

*United States v. Pugh*, 945 F.3d 9 (2d Cir. 2019) ......................................................... 2

*United States v. Ring*, 628 F. Supp. 2d 195 (D.D.C. 2009)........................................ 10

*United States v. Sutton*, 732 F.2d 1483 (10th Cir. 1984) ............................................. 6

*United States v. Vixie*, 532 F.2d 1277 (9th Cir. 1976) .................................................. 6

*United States v. Watters*, 717 F.3d 733 (9th Cir. 2013)................................................ 9

*United States v. Young*, 916 F.3d 368 (4th Cir. 2019) ................................................ 10

## Statutes

18 U.S.C. § 1512(c)........................................................................................................ 1

## Other Authorities

"US House Democrats stage gun violence sit-in," C-SPAN, June 22, 2016, available at https:// www.c-span.org/video/?411500-1/us-house-democrats-stage-sit-gun-violence................................................................................................................. 11

167 CONG. REC. H79, 105-06, 108, 111 (2021) ............................................ 23

167 CONG. REC. S16, 25, 32 (2021) ..................................................................... 23

David M. Herszenhorn and Emmarie Huetterman, "House Democrats' Gun-Control Sit-In Turns Into Chaotic Showdown With Republicans," N.Y. Times, June 22, 2016, available at https://www.nytimes.com/2016/06/23/us/politics/house-democrats-stage-sit-in-to-push-for-action-on-gun-control.html ............................ 11

Donovan Slack and Deborah Barfield Berry, "Democrats continue gun control sit-in after House adjourns," USA Today, June 23, 2016, available at https://www.usatoday.com/story/news/politics/ 2016/06/22/house-democrats-stage-sit-in-over-gun-legislation/86241864/ ...................................................................... 11

Reena Flores, "Democrats stage sit-in on House floor over gun control," CBS News, June 22, 2016, available at https://www.cbsnews.com/news/democrats-stage-sit-in-on-house-floor-over-gun-control/ ............................................................................ 11

THE WILLIAM J. BAUER PATTERN CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT (2020 Ed.), 18 U.S.C. § 1512 Definition of "Corruptly" at 629 ................... 2

TO THE HONORABLE RANDOLPH D. MOSS, UNITED STATES DISTRICT
JUDGE FOR THE DISTRICT OF COLUMBIA:

Over and over again, page after page, and case after case, the Government
fails to recognize what Section 1512(c)(2) truly requires to establish a violation of
that statute. It is not just *any* obstruction of *any* official proceeding as the Govern-
ment states multiple times throughout its response.[1] It is the *corrupt* obstruction,
influencing, or interfering with an official proceeding — a distinction that should not
be taken lightly. *See* 18 U.S.C. § 1512(c). Further, it is not just *any* corrupt obstruc-
tion, influencing, or interfering with *any* official proceeding. As demonstrated by (a)
the text, structure, and the practical application of Section 1512(c)(2), (b) caselaw
interpreting and applying the same, and (c) its legislative history, the statute has
(and always should be) applied to conduct undermining a proceeding's truth-finding
function through actions impairing the integrity and availability of evidence. Stated
differently using the Seventh Circuit's Pattern Jury Instruction, there must be a
showing that the defendants acted "with the purpose of wrongfully impeding the due
administration of justice." THE WILLIAM J. BAUER PATTERN CRIMINAL JURY INSTRUC-
TIONS OF THE SEVENTH CIRCUIT (2020 Ed.), 18 U.S.C. § 1512 Definition of "Corruptly"

---

[1] *See, e.g.* Gov't Response at 6 ("In Section 1512(c)(2), Congress comprehensively prohibited conduct that intentionally and wrongfully obstructs official proceedings"; "A defendant who, acting with the necessary *mens rea*, obstructs (or attempts to obstruct) Congress's certification of the Electoral College vote, commits a crime under Section 1512(c)(2)"), 7 ("Section 1512(c)(2), by contrast, applies more generally to any acts that "otherwise obstruct[], influence[], or impede[]" an official proceeding"), 8 ("Section 1512(c)(2), in other words, "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense involving documents or records under Section 1512(c)(1)."), 16 ("Section 1512(c)(2) criminalizes a defendant's firsthand obstructive conduct that otherwise impedes or influences an official proceeding (though not necessarily through another person)."), 38 ("Section 1512(c)(2)'s text, structure, history, and purpose make clear that it functions as a broad catch-all prohibition on obstructive conduct that covers "otherwise obstructive behavior that might not constitute a more specific" obstruction offense."),

at 629. Whether that is destroying physical evidence to prevent its discovery by investigators, *see United States v. Pugh*, 945 F.3d 9, 28 (2d Cir. 2019), disclosing the identity of an undercover agent to the subject of a grand jury investigation, *see United States v. Phillips*, 583 F.3d 1261 (10th Cir. 2009), or making false statements to a court during a preliminary injunction hearing, *see United States v. Jefferson*, 751 F.3d 314, 321 (5th Cir. 2014), all those things fall within the statute's reach as they all undermine the truth-finding function of a proceeding before a tribunal through actions impairing the integrity and availability of evidence. The Government simply turns a blind eye to this critical element.

What the statute does not apply to — and, as the Government acknowledges, has never been applied to — is any obstructive conduct in an otherwise unique proceeding before Congress where there are no witnesses, no evidence, no investigation, or no deliberation over a fact of some occurrence. The Government not only disregards the historical and constitutional basis behind the electoral certification proceedings, it treads on dangerous ground by trying to suggest that the Joint Session of Congress and Vice President serve in a position other than a ministerial one during those proceedings.

The real flaw in the Government's response, however, comes in how it interprets "corruptly" and believes it should be applied. Under the Government's interpretation, Democratic representatives who staged a sit-in on the House floor in 2016 could be prosecuted for violating Section 1512(c)(2). Additionally, as proof that "corruptly" does not limit the arbitrary application of Section 1512(c)(2), this Court

simply can look at the Government's arbitrary charging decisions in other cases of individuals charged for their "obstructive" conduct at the United States Capitol on January 6.

The Government's arbitrary and unfounded approach to prosecuting the Defendants for violating a vague, overbroad statute must be put to a stop. The correct decision in this case is to grant the Defendants' Motion to Dismiss Count Ten of the indictment and permit them to move forward on more applicable charges relative to the Defendants' alleged conduct.

## A.   This was not an "official proceeding" as that term has been interpreted. The Government has no authority to support its position that it includes the electoral certification proceedings.

Defendants opened their briefing by going to great lengths explaining why the electoral certification proceedings do not fall under Section 1515's definition of an "official proceeding." Def. Supp. Brief at 3–18. They relied on judicial precedent, the grammatical context of the statute, the broader statutory context, *noscitur a sociis*, and legislative history to establish that an "official proceeding" involves a "tribunal" acting in some "judicial" or "quasi-judicial" function. *Id.* at 3–10.

The Government has nothing to base its response upon. In quixotic fashion, it simply maintains repeatedly that the language is plain and clear and that the certification proceedings are a "proceeding before Congress" without any real regard for any of the authorities relied upon by the Defendants.[2]

---

[2] Gov't Response at 3 ("Section 1515(a)(1)(B) defines an "official proceeding" as a "proceeding before the Congress," which encompasses the certification proceeding undertaken by the Joint Session on January 6, 2021."), 4 ("while the *noscitur a sociis* canon can provide clarity to a provision of "obscure

Even worse, it entirely disregards the historical and constitutional basis for the electoral certification proceedings, instead treating it like "an adjudicative setting" and suggesting that the joint members are like "a jury" without any basis for doing so. Gov't Response at 5. How does one overlook one of the Founding Fathers proclaiming that any attempt to give Congress "even when assembled in convention, a right to reject or admit the votes of States," is "so gross and dangerous an absurdity, as the [F]ramers of the Constitution never could have been guilty of"? *See* Def. Supp. Brief at 7–8, fn.1. How does one ignore the immediacy principle of the Twelfth Amendment that "militates against the deliberative aspects of counting and judging of the electoral votes? *See id.* at 8. How does one discount the fact that, in the over 100 years of practice since the Electoral Act was put into effect, Congress has never engaged in any full-blown investigation with the calling of witnesses to give testimony, requests for records, or consideration of other evidence in order to decide the electoral count? *See id.* at 8–9. The Government treats this historical context and the Constitution like it is a mere afterthought.[3]

This Court asked for examples of when Congress was acting in its capacity as an "official proceeding" as that term is defined in Section 1515. Defendants not only

---

or doubtful meaning," it has no role to play where, as here, the term in question—"a proceeding before the Congress," § 1515(a)(1)(B)—is clear)

[3] In a footnote, the Government simply states, "The defendants' discussion (Supp. Br. 9-10) of the House Judging Clause, U.S. Const. art. 1, § 5, sheds no light on the certification of the Electoral College vote under the ECA and the Twelfth Amendment." Sheds no light? This just flat out ignores the point made by the Defendants, namely, that for a constitutional provision considered at the Constitutional Convention of 1787 immediately after consideration of the Electoral College Clause to explicitly give Congress adjudicative powers is proof positive that Congress "does not have the authority to judge the elections, returns, and qualifications of the electors" and that it "is not a judicial tribunal with the power to investigate" the same. *See* Def. Supp. Brief at 9–10.

provided several examples, they demonstrated how Congress' exercise of their power of inquiry and to investigate — a function concededly not at issue on January 6 — was exactly the type of "official proceeding" Congress sought to protect by pointing to the legislative history behind Section 1515 and 1512(c)(2). *See* Def. Supp. Brief at 10–18. Again, the Government summarily dismisses all this and instead maintains that, had "Congress sought to limit 'the official proceeding' definition" to Congress' power of inquiry and to investigate "it could have—but did not—import precisely that language from 18 U.S.C. § 1505 . . . ." Gov't Resp. at 5.

This, of course, ignores the interpretative canon that a court must "assume that Congress is aware of existing law when it passes legislation," *Hall v. United States*, 566 U.S. 506, 516, 132 S. Ct. 1882, 182 L. Ed. 2d 840 (2012) (quoting *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32, 111 S. Ct. 317, 112 L. Ed. 2d 275 (1990)). When Section 1512(c)(2) was codified, the "official proceeding" definition — and more specifically, its applicability to "proceedings before Congress" — had never been used, applied, or interpreted to apply to any context outside of a Congressional inquiry or investigation. More importantly, it had never been applied to a proceeding outside of the "due administration of justice." Hence, there was no reason, as the Government posits, for there to be some limit to its application beyond that.

More interestingly, it should be noted that the Government has previously *agreed* that "a parallel should be drawn" between Section 1505 and 1512's meaning and application of the term "proceeding." *See United States v. Kelley*, 36 F.3d 1118, 1128 (D.C. Cir. 1994). In that respect, the court held that the matter at issue in that

case — an investigation by the Office of Inspector General — did qualify as a "proceeding" because it possessed the quintessential qualities that an obstruction of justice offense served to protect: "adjudicative power" and "the power to enhance their investigations through the issuance of subpoenas or warrants." *Id.* at 1127.[4] Neither of those functions, again, were at issue in the electoral certification proceedings.

The Government nevertheless says, "The broader language Congress used in Section 1515(a)(1)(B) thus covers a broader range of proceedings than 'inquir[ies] or investigation[s]' covered in Section 1505—including the Joint Session that meets to certify the Electoral College vote." Gov't Resp. at 6. But it provides no authority or support for that position. Now we know why. There is none. No caselaw. No legislative history. Nothing.

An "official proceeding" must be one where Congress is serving in its capacity as a "tribunal," considering testimony and documentary evidence, and acting either in the due administration of justice, its capacity to inquire and investigate legislation, or its constitutionally defined powers to judge its own members. This is supported by judicial precedent, the grammatical context of the statute, the broader statutory context, *noscitur a sociis*, legislative history, as well as the constitutional text and history regarding the electoral college. Because the election certification proceedings do not qualify as an "official proceeding" as that term is defined in

---

[4] In so holding, the court relied on ample precedent for this definition of "proceeding": *United States v. Sutton*, 732 F.2d 1483, 1490 (10th Cir. 1984) (Department of Energy investigation including issuance of administrative subpoena was proceeding under § 1505); *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976) (IRS investigation including issuance of subpoena was a proceeding under § 1505); *United States v. Batten*, 226 F. Supp. 492, 493 (D.D.C. 1964) (SEC investigation with authority to issue subpoenas and administer oaths was "proceeding" under § 1505).

Section 1515 and applied in Section 1512, the Defendant's motion to dismiss must be granted.

**B.   Section 1512(c)(2) is not just limited to document destruction or physical evidence tampering, but there still has to be some impact on the integrity and availability of evidence.**

The Government then goes entirely off-argument. After a lengthy discussion of cases all involving Section 1512(c)(2)'s application to the corrupt obstruction of proceedings where there was some nexus to the administration of justice and the gathering of evidence to establish some violation of the law, the Government then gives a non sequitur and states the Defendants' conduct violated that same statute. *See* Gov't Response at 6–9 ("Section 1512(c)(2) also applies to the defendants' alleged conduct, which involved trespassing into the restricted Capitol area, confronting and assaulting law enforcement officers, and penetrating into the Gallery of the Senate Chamber to prevent a Joint Session of Congress from certifying the results of the 2020 Presidential election."). Demonstrating that it failed to recognize the Defendants' argument, it then diverts into multiple reasons why Section 1512(c)(2) was not limited to obstructive acts akin to the document destruction or evidence tampering captured in Section 1512(c)(1). *See* Gov't Brief at 10–13.[5] Maybe by putting it in bold and a block quote, the Government will realize it entirely missed the point:

> **Defendants would concede that reading Section 1512(c)(2) to apply only to the corrupt obstruction of documents and**

---

[5] Defendants take no issue with the Government's detailed discussion of the legislative history behind Section 1512 or 1512(c)(2). *See* Gov't Response at 13–17. As that account affirms, Section 1512 has always been aimed at conduct that impairs the integrity and availability of evidence in some form or fashion. What that history does not even hint at is any intent to curb the corrupt obstruction of other proceedings wholly unrelated to the administration of justice such as the electoral certification proceedings.

> physical evidence *is too restrictive*. **However, as the former Attorney General correctly observed, "the natural and plausible reading of 1512(c)(2)" still requires some conduct that impairs the integrity and availability of** *some evidence.*

Def. Supp. Brief at 21 (emphasis added). Therein lies the true failure of the Government's response and position. Nowhere does the Government point to any authority or reason to dispute this position. Again, that is because there is none. On the contrary, Defendants have demonstrated, consistent with the position taken by the former Attorney General, that based on (1) the canons of construction employed by the Court in *Begay* and *Yates*, (2) the text, structure, and the practical application of Section 1512(c)(2) demonstrated in caselaw, and (3) the statute's legislative history, "the otherwise clause" in Section 1512(c)(2) must be, as this Court suggested, "construed in a similar vein to the terms that are in clause one." *See* Def. Supp. Brief at 18–23. There must be some allegation that the Defendants' conduct undermined a proceeding's "truth-finding function through actions impairing the integrity and availability of evidence." *Id.* When the Joint Session of Congress met on January 6, there was no "truth to be found" and, more importantly, there was no evidence to be considered. They were simply there to count and affirm what had already been decided by the electoral colleges of each state.

## C.  The multiple flaws with the Government's application of "corruptly" and its vagueness analysis.

By the middle of its response, the Government finally appears to recognize that a violation of Section 1512(c)(2) requires, not just some obstructive conduct, but the critical element that the conduct be "corrupt." *See* Gov't Response at 17–22. Of course, just when it appears the Government is moving back on course (and on

argument), they jump right back off the rails trying to claim any "vagueness problems" are cured because corrupt conduct can simply be established by showing "consciousness of wrongdoing." *Id.* at 18–20. And, once again, they resort to non sequitur, insisting this is demonstrated by the Defendants' conduct on January 6. *Id.* at 19–20.

Repeatedly, they cite to cases discussing the "corrupt" element of a Section 1512(c)(2) offense. *Id.* at 17–22. But every time they fail to point out that, in each and every one of those cases, there was some alleged corrupt obstruction of *evidence being sought in an effort to administer justice. See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (where the alleged corrupt obstruction involved disposing and hiding assets involved in a forfeiture proceeding); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (where the alleged corrupt obstruction involved creation of false documents "for the corrupt purpose of redirecting the government, based upon false pretenses, away from property that it was trying to seize . . . in an official proceeding."); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (where the corrupt obstruction involved defendant's plan and attempt to obtain a forged receipt to show the legitimate purchase of stolen vehicles); *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007) (where the corrupt obstruction involved the concealing of a firearm used in the commission of a possible offense); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 125 S. Ct. 2129, 161 L. Ed. 2d 1008 (2005) (where the alleged corrupt obstruction involved the destruction of financial records sought for regulatory and criminal proceedings and investigations); *United*

*States v. Young*, 916 F.3d 368, 375 (4th Cir. 2019) (where the alleged corrupt obstruction involved misleading investigators and sending fake text messages to cover up activity); *United States v. Ring*, 628 F. Supp. 2d 195, 224 (D.D.C. 2009) (where the alleged corrupt obstruction involved providing false statements to cause those misrepresentations to be provided to a grand jury and Indian Affairs Committee).

The closest they come is by citing to the Seventh Circuit Pattern Criminal Jury Instruction for Section 1512(c)(2). As the Defendants pointed out in the brief, however, that instruction is actually helpful to them because it requires that, in order to establish "corrupt obstruction" a person "acts with the purpose of wrongfully impeding the due administration of justice." THE WILLIAM J. BAUER PATTERN CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT (2020 Ed.), 18 U.S.C. § 1512 Definition of "Corruptly" at 629. The Government wholly fails to explain how the Defendants' actions in any way obstructed, interfered with, or impaired the due administration of justice. *See* Gov't Response at 19, fn. 6.

To demonstrate the real problem with the Government's position here — that they can establish corrupt obstruction of a proceeding before Congress simply by showing "consciousness of wrongdoing" — this Court should consider the actions of several Democratic Representatives back in June 2016. After gun control measures failed to pass in the United States Senate in the aftermath of the Orlando nightclub shooting, Democratic lawmakers, including Representative John Lewis and roughly

60 others, staged a sit-in on the House floor in Congress.[6] In what was considered "unprecedented" action, Lewis and several others moved to the well of the House and announced they would "occupy the floor until there is action" on their legislation.[7] Representative Ted Poe "attempted to gavel the House into order at noon, but when the Democrats refused to quiet, he gaveled the House into recess instead."[8] The "extraordinary protest" continued for "more than 20 hours after [the] sit-in brought legislative business to a halt and triggered a chaotic, late-night showdown."[9] Representative Maxine Waters proclaimed, "I am prepared to stay here until hell freezes over."[10] "As Democrats fought for control of the floor, they pressed against the speaker's dais, waving signs with the names of gun victims and chanting 'No bill! No break!' as Mr. Ryan repeatedly banged his gavel in an attempt to restore order."[11] Worth noting for this particular "insurrection," the Representatives were knowingly acting in contravention of House rules.[12]

---

[6] Reena Flores, "Democrats stage sit-in on House floor over gun control," CBS News, June 22, 2016, available at https://www.cbsnews.com/news/democrats-stage-sit-in-on-house-floor-over-gun-control/.

[7] *See* "US House Democrats stage gun violence sit-in," C-SPAN, June 22, 2016, available at https://www.c-span.org/video/?411500-1/us-house-democrats-stage-sit-gun-violence (referenced action seen at 1:18:15).

[8] Donovan Slack and Deborah Barfield Berry, "Democrats continue gun control sit-in after House adjourns," USA Today, June 23, 2016, available at https://www.usatoday.com/story/news/politics/2016/06/22/house-democrats-stage-sit-in-over-gun-legislation/86241864/.

[9] *Id.*

[10] *Id.*

[11] David M. Herszenhorn and Emmarie Huetterman, "House Democrats' Gun-Control Sit-In Turns Into Chaotic Showdown With Republicans," N.Y. Times, June 22, 2016, available at https://www.nytimes.com/2016/06/23/us/politics/house-democrats-stage-sit-in-to-push-for-action-on-gun-control.html.

[12] *Id.* (noting the Democrats' use of internet broadcasting services to skirt the C-Span television blackout violated House rules which bans cameras or other electronic devices on the floor).

By the Government's logic, each of the Democratic representatives who participated in these events could be charged with violating Section 1512(c)(2). They unequivocally acted to "obstruct, influence, impede", "block", "make difficult", and "hinder" subsequent legislative proceedings. *See* Gov't Response at 7 (using that language). They did so with "the intent to obstruct, impede, or influence" those proceedings. *See* Gov't Response at 17 (same). Most notably, they did so with "consciousness of their wrongdoing," disregarding House rules and the Speaker's call to order, intent on continuing their "wrongful" conduct until "hell freezes over." This example should demonstrate the absurdity of the Government's interpretation of Section 1512(c)(2). *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S. Ct. 3245, 3252, 73 L. Ed. 2d 973 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

The Government's failed argument continues with its efforts to further respond to the vagueness problems presented in this case. They state, "Whatever the 'uncertainty around the edges,' . . . Section 1512(c)'s 'corruptly' element provided ample notice to the defendants that *their conduct* was criminal." Gov't Resp. at 26. Regarding that conduct, the Government states:

> In this case, the defendants are alleged to have entered the Capitol alongside a mob of rioters, who then destroyed property, broke into Congressional offices, and assaulted law enforcement officers. One defendant, Montgomery, is also alleged to have assaulted an officer. The defendants proceeded all the way to the Gallery of the Senate Chamber, the very location where the certification proceeding should have been occurring. This was all part of their effort to stop Congress from certifying the Electoral College vote. Along the way, the defendants

> harassed and berated law enforcement officers inside and outside the
> Capitol building.

*Id.* The Government then dismisses the Defendants' attempt to point to their "personal predilections" regarding certain hypothetical scenarios discussed at the motion hearing, as well as the Defendant's reference to the case of Tighe Berry, noting "the exceptional violence and destruction on January 6, which involved more than a hundred assaults on law enforcement officers, assaults on members of the media, broken windows and doors, graffiti, and other extensive damage to government and private (including media) property, qualitatively and quantitatively distinguishes it from other 'protest' events at the Capitol." *Id.* at 26–27. Fair enough. Maybe we should then look to the Government's actions to prosecute other defendants for exactly the same conduct they engaged in at the Capitol on January 6?

The Government says Mr. Montgomery engaged in the corrupt obstruction of an official proceeding because he allegedly assaulted a law enforcement officer. Consider then the case of Robert M. Reeder. *See United States v. Robert M. Reeder*, 21-CR-166. Per his Rule 11 Statement of Offense, Reeder entered the Capitol Building twice, leaving the first time and returning a subsequent time. He made statements about how, "We had to do...ah... battle with the Police inside. It was crazy...absolutely insane." Sentencing in his case initially had to be cancelled as a video emerged depicting Reeder attempting to punch police officers. (See Doc. 33 at pg. 1, Case 1:21-cr-00175-TJK). Nevertheless, the Government persisted with sentencing pursuant to a plea agreement to plead to misdemeanor parading in the Capitol in violation of

40 U.S.C. § 5104(e)(2)(G). Reeder was never charged with violating Section 1512(c)(2) despite his attempts to assault law enforcement officers.

Or consider the case of Brittany Angelina Dillon. See *United States v. Brittany Angelina Dillon*, 21-CR-360. Per her Rule 11 Statement of Offense, Dillon attempted to enter the U.S. Capitol building through the Senate Carriage Door entrance. "Attempting to enter the building, [Dillon] pushed through a crowd, then fell at or near the threshold of the Senate Carriage Door," then "stood back up, briefly pushed forward against law enforcement officers, and was repelled." In text messages with another person arrested in connection with their actions at the Capitol, Dillon stated, "I fought hard...I fell in the door and they tried to beat me with batons so I backed off and they pepper sprayed my eyes[.]" Despite her use of physical force against law enforcement officers, Dillon was not charged with violating Section 1512(c)(2). Dillon instead pleaded guilty pursuant to a plea agreement to misdemeanor disorderly conduct in a Capitol building or grounds, in violation of 40 U.S.C § 5104(e)(2)(D).

Or consider the case of Bradley Rukstales. *See United States v. Bradley Rukstales*, 21-CR-41. Per his Rule 11 Statement of Offense, Rukstales confronted U.S. Capitol Police and was present when "rioters threw chairs and hurled unknown substances at the officers." Video surveillance then captured how officers retreated and, "moments later, Rukstales descended the stairwell, picked up one of the chairs at the bottom of the stairwell, and threw it in the direction of where the officers had retreated down the corridor." Rukstales then "proceeded down the corridor closer to where the officers had formed their line" and when rioters refused their commands

to leave the building, they began arresting individuals including Rukstales. In attempting to arrest him, "Rukstales's arm stretched out in the officer's direction." Despite his use of physical force against officers, Rukstales was never charged with violating Section 1512(c)(2). Rukstales instead pleaded guilty pursuant to a plea agreement to misdemeanor parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G).

The Government says the Defendants engaged in the corrupt obstruction of an official proceeding because the Defendants "proceeded all the way to the Gallery of the Senate Chamber, the very location where the certification proceeding should have been occurring." Consider then the case of Anthony Mariotto. *See United States v. Anthony Mariotto*, 21-CR-94. Per his Rule 11 Statement of Offense, Mariotto "entered the U.S. Capitol through a door that had previously had its glass windows broken." He then entered "the gallery of the Senate Chamber and took a self-photograph, also known as a 'selfie'" and then "later posted the selfie photograph on Facebook with the following caption: "I'm in [sic] And there are just a few [sic] This is our house." Despite him "proceed[ing] all the way to the Gallery of the Senate Chamber, the very location where the certification proceeding should have been occurring," Mariotto was not charged with violating Section 1512(c)(2). Mariotto instead pleaded guilty pursuant to a plea agreement to misdemeanor parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G).

The Government says the Defendants engaged in the corrupt obstruction of an official proceeding because "[a]long the way, the defendants harassed and berated

law enforcement officers inside and outside the Capitol building." Consider then, not only the cases of Reeder, Dillon, and Rukstales, discussed *supra*, but also the cases of Abram Markofski and Brandon Nelson. *See United States v. Abram Markofski & Brandon Nelson*, 21-CR-344. Per their Rule 11 Statements of Offense, Markofski and Nelson both entered the Capitol Building. At one point, Markofski texted Nelson, "We stormed the Capitol and shut it down. Currently still insider." Later, Nelson texted Markofski, "We held the line . . . No backing down." Markofski replied, "Fuck. Yeah, brother is Patriots won't go down without a fight." Nelson responded, "Not I." Despite their actions, neither Markofski nor Nelson were charged with violating Section 1512(c)(2). Both instead pleaded guilty pursuant to a plea agreement to misdemeanor parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G).

Maybe the Government will say the Defendants engaged in the corrupt obstruction of an official proceeding because one of the Defendants was "clad in a tactical vest." *See* Gov't Response at 2. Consider then the case of Kevin Cordon. *See United States v. Kevin Cordon*, 21-CR-277. Per his Rule 11 Statement of Offense, Cordon entered the U.S. Capitol by climbing through a broken window on the west side, Senate wing of the Capitol. Per his complaint, he was dressed in an American flag and was wearing a black, ballistic vest and then, at one point, donned a black gas mask. During an interview with the Finnish newspaper *Ilta Sanomat,* Cordon told the interviewer:

> We're here to take back our democratic republic. It's clear that this election is stolen, there's just so much overwhelming evidence and the establishment, the media, big tech are just completely ignoring all of it. And we're here to show them we're not having it. We're not- we're not

just gonna take this laying down. We're standing up and we're taking our country back. This is just the beginning.

When the interviewer asked Cordon why he entered the Capitol, Cordon responded:

> It was um, it was a once in a lifetime opportunity to show that the people of this country are not gonna take this corruption laying down. And we're gonna show that we have the power. We have the power in numbers, we have the power in spirit to show them that they can't just push us around and take over our country with their corruption. So we had to actually step foot in their building that they think their [sic] own. And that's why everybody was shouting, "this is our house." Because it is! This is for the people, by the people, of the people government. And we needed to remind them because--and we need to remind ourselves. I needed to remind myself and I needed to remind the rest of the public that this is our country. This country was founded on individuals having their own sovereignty over their own lives and I think a lot of the public has forgotten that. And we're back to show that we're - we're reawakening to that reality that this is our country and we're not gonna take that nonsense.

Cordon was initially charged with violating Section 1512(c)(2). That count, however, was dropped as part of his plea agreement to plead to entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1).

If the Government maintains that Cordon's plea agreement does not reflect that there was ample evidence to charge a violation of Section 1512(c)(2), then consider the case of Derek Jancart. *See United States v. Derek Jancart*, 21-CR-148. Per the Government's sentencing memorandum in his case, Jancart

> prepared for violence by bringing a gas mask and two-way radios to Washington, D.C"; (2) was aware of the potential for violence because he responded to the Capitol only after hearing it had been "breached"; (3) he laughed and cheered while the forward line of the rioters broke through the police line and posted a video to Facebook of [his co-defendant] screaming "we have you surrounded" at the police officers attempting to hold the line around the Capitol; (4) he penetrated the U.S. Capitol

all the way to the Speaker's conference room; (5) his statements on Facebook after January 6 reveal a total lack of remorse; (6) he actively spread propaganda on social media by falsely downplaying the violence on January 6; (7) he likely destroyed evidence by deleting videos and message threads from his phone; and (8) his social media statements reveal he believes a revolution is coming and suggest the possibility of future violence by this defendant.

Despite this "obstructive" behavior, Jancart was not charged with violating Section 1512(c)(2) and instead pleaded guilty pursuant to a plea agreement to the misdemeanor offense of disorderly conduct in a capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D).

Or consider the case of Andrew Hatley. *See United States v. Andrew Hatley*, 21-CR-98. Per the complaint in his case, Hatley entered the Capitol Building on January 6 wearing a gas mask. After January 6, Hatley attempted to mislead investigators and the public by posting to his Facebook page: ""It has come to my attention that there was someone who looks like me at the Capitol. I'd like to set the record straight. I don't have that kind of motivation for lost causes. I just don't care enough anymore, certainly not enough for all that." Investigators, however, were able to find multiple sources of evidence to establish that Hatley, indeed, was the person depicted in multiple photographs taken of him wearing a gas mask inside of the Capitol Building. Despite his "obstructive" behavior and actual attempts to conceal evidence of his wrongdoing, Hatley was not charged with violating Section 1512(c)(2). Hatley instead pleaded guilty pursuant to a plea agreement to misdemeanor parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G).

Maybe if the Defendants smoked marijuana inside the Capitol, that would have made it where their actions were not viewed as the corrupt obstruction of an official proceeding. After all, consider the case of Eduardo Nicolas Alvear Gonzalez. *See United States v. Eduardo Nicolas Alvear Gonzalez*, 21-USC-115. Per his Rule 11 Statement of Offense, after entering the Capitol Building Rotunda, Gonzalez proceeding to smoke marijuana and then distribute marijuana to other individuals inside of the Capitol building. Per the complaint filed in his case, Gonzalez video recorded and transmitted his interaction within the Capitol, at one point, proclaiming that "we're taking out country back" and, at other points, laughing and saying, "yeah, this is the most protected building." Gonzalez was not charged with violating Section 1512(c)(2). Gonzalez instead pleaded guilty pursuant to a plea agreement to misdemeanor parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G).

Likewise, consider the case of James Bonet. *See United States v. James Bonet*, 21-CR-121. Per his Rule 11 Statement of Offense, as Bonet approached the entrance to the Capitol Building, he stated, "[w]e made it in the building bitches! We're taking it back! We are taking it back, we made it in the building!" Then, once inside the Capitol Building, Bonet "walked into" the "office of Senator Jeff Merkley" and "smoked a marijuana cigarette." Although Bonet was initially charged with violating Section 1512(c)(2), that count was dropped as part of his plea agreement to plead to entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). One must wonder how Gonzalez or Bonet were *not* "conscious of their wrongdoing."

Maybe the Government will say the Defendants engaged in the corrupt obstruction of an official proceeding because they are males, not females. After all, consider the case of Dawn Bancroft. *See United States v. Dawn Bancroft*, 21-CR-271. Per her Rule 11 Statement of Offense, Bancroft entered the Capitol Building through a separate, broken out window just to the south of the Senate Wing Door. After exiting, Bancroft filmed a "selfie style video of herself" stating, "We broke into the capitol, we got inside, we did out part, we were looking for Nancy *to shoot her in the frickin' brain*, but we didn't find her," presumably referring to Speaker of the House, Nancy Pelosi. Despite her entering the Capitol through a broken window and then explicitly threatening to inflict serious bodily injury on the Speaker of the House, Bancroft was not charged with violating Section 1512(c)(2). Bancroft instead pleaded guilty pursuant to a plea agreement to misdemeanor parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G). Or consider the case of Jenny Louise Cudd. *See United States v. Jenny Louise Cudd*, 21-CR-68. Per the complaint filed in her case, Cudd entered the Capitol Building and made multiple recordings of her actions therein. In those recordings, Cudd made the following comments:

- "we just pushed, pushed, pushed, and yelled go and yelled charge. We just pushed and pushed, and we got it."
- "We did break down the Nancy Pelosi's office door and somebody stole her gavel and took a picture sitting in the chair flipping off the camera."
- "They had to evacuate it before we charged the Capitol."
- "….fuck yes, I am proud of my actions, I fucking charged the Capitol today with patriots today. Hell, yes I am proud of my actions."

In an interview with a local news station two days after the events of January 6, Cudd again boasted, "we the Patriots did storm the U.S. Capitol," and, in reference

20

to entering the Capitol, stated, "Yes, I would absolutely do it again." While Cudd was initially charged with violating Section 1512(c)(2), that count was dropped as part of her plea agreement. On October 13, 2021, Cudd pleaded to entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). To be abundantly clear, the Defendants are not accusing the Government of gender discrimination. But the point should be coming into focus by now.

As all these cases demonstrate, even the Government's own parameters for charging and prosecuting individuals for their actions of January 6 is entirely arbitrary, entirely unclear, and entirely vague. It is "arbitrary enforcement" at its worst and exactly what the due process clause prohibits. *See Johnson v. United States*, 576 U.S. 591, 595–96, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015). This Court should grant the Defendant's motion to dismiss on this ground alone.

**D.  The Government's position that Congress "deliberates" over "physical or documentary evidence" as part of the electoral certification proceedings dangerously gives validity to the former President's incredulous claims.**

The Government, in a last-ditch effort to save its case, concludes its response by addressing the Defendants' position that the electoral certificates are not evidence. *See* Gov't Response at 40–43. Again, this argument fails for a similar reason their other, previous responses fail. They do not address the critical element that Section 1512(c)(2) — and all other Title 73 offenses for that matter — is geared toward protecting a specific type of evidence, namely, evidence of some violation of the law that requires the due administration of justice. *See* Def. Supp. Brief at 24–25.

From beginning to end, the Government fails to even surmise how the electoral certificates are part of the administration of justice.[13]

Even worse, the Government reverts to its attempts to treat the electoral certification proceedings as something more than a ministerial function, positing that Congress operates through a "deliberative" process involving "a full and fair examination of physical or documentary evidence." *See* Gov't Resp. at 41.

Let there be no mistake about the danger in what the Government is trying to do. By attempting to convince this Court that the electoral certification proceedings are like "an adjudicative setting" or suggest that the joint members are like "a jury," the Government is providing weight and credibility to former President Trump's incredulous claims that the Vice President or the members of Congress could override the will of the people through some deliberative or "adjudicative" process. The Joint Session of Congress was not a judicial body. It was not an investigative body. Its role on January 6 had absolutely nothing to do with the due administration of justice. It was not engaged in a "truth-finding function." If this Court finds that this was an "official proceeding" as that term was meant to be used in Title 73 or that Congress "deliberates" over "physical or documentary evidence" during the election certification proceedings, this Court's decision will be treated as a divine edict by former President Trump and his followers to continue their efforts to

---

[13] The closest that they arguably come is where they state, "Witness testimony and documents need not be incriminating to qualify as evidence; admissible evidence may, for example, establish a person's presence in a certain location or a potential motive for criminal conduct." Gov't Response at 42. This feeble attempt to respond fails, however, because, incriminating or not, the evidence is being used to prove a fact that is necessary to establish whether certain conduct violated some law. That never takes place in the electoral certification proceedings.

override the will of the people by turning the certification proceedings into a mecha-nism for doing so.[14] This Court should do as Vice President Mike Pence did and resist any attempts to treat the electoral certification proceeding as anything more than a ministerial act.[15]

Based on the grounds alleged in their original motion to dismiss and the grounds laid out herein and in their supplemental brief, Defendants respectfully re-quest this Court grant their motion to dismiss Count Ten of the indictment against them.

Date: <u>October 22, 2021</u>              Respectfully Submitted,

RONALD SULLIVAN LAW, PLLC

by: <u>/s/ Ronald S. Sullivan Jr.          </u>
RONALD S. SULLIVAN JR.
D.C.D.C. Bar ID 451518
rsullivan@ronaldsullivanlaw.com

1300 I Street NW
Suite 400 E
Washington, DC 2005
Tel.: (202) 935-4347
Fax: (617) 496-2277

MAYR LAW, P.C.

by: <u>/s/ T. Brent Mayr              </u>

T. BRENT MAYR

---

[14] Contrary to the Government's belief that their actions were intended to prevent the electoral certi-fication from occurring, Mr. Montgomery and Mr. Knowlton maintain that was never their intention then or now. Both intended to utilize their First Amendment rights to free speech and assembly in hopes that, by speaking out, Congress would be empowered to use its power to investigate voting processes and insure they were a true reflection of the will of the people. But they never intended to stop the certification proceedings.

[15] *See* 167 CONG. REC. H79, 105-06, 108, 111 (2021) and 167 CONG. REC. S16, 25, 32 (2021) (where legislators requested, but did not receive authority to open investigation regarding electoral certifi-cates).

Texas State Bar Number 24037052
D.C.D.C. Bar ID TX0206
bmayr@mayr-law.com

5300 Memorial Dr., Suite 750
Houston, TX 77007
Tel.: 713-808-9613
Fax: 713-808-9613

WAGNER PLLC

by: /s/ Camille Wagner
CAMILLE WAGNER
DC Bar No. 1695930
law@myattorneywagner.com

1629 K Street NW, Suite 300
Washington, DC 20006
(202) 630-8812

ATTORNEYS FOR THE DEFENDANT,
BRADY KNOWLTON

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

by: /s/ Dani Jahn
DANI JAHN
Assistant Federal Public Defender
Dani_Jahn@fd.org

625 Indiana Avenue, N.W., Ste 550
Washington, D.C. 20004
Tel: (202) 208-7500
Fax: (202) 501-3829

ATTORNEY FOR THE DEFENDANT,
PATRICK MONTGOMERY

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of this reply was sent to Counsel for the Government, Elizabeth Kelley, James Pearce, and James Peterson on October 22, 2021, via CM/ECF and email.

/s/ T. Brent Mayr
T. BRENT MAYR