## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **v.** | § | **Case No. 21-CR-00046-RDM** |
| | § | |
| **PATRICK MONTGOMERY and** | § | |
| **BRADY KNOWLTON,** | § | |
| | § | |
| *Defendants* | § | |

### DEFENDANTS' NOTICE OF NEW AUTHORITY IN
### *U.S. v. SANDLIN*, 21-CR-88-DLF AND *U.S. v. REFFITT*, 21-CR-32-DLF
### AND RESPONSE THEREO

TO THE HONORABLE RANDOLPH D. MOSS, UNITED STATES DISTRICT
JUDGE FOR THE DISTRICT OF COLUMBIA:

PATRICK MONTGOMERY and BRADY KNOWLTON, the Defendants in the
above styled and numbered cause, by and through their respective, undersigned coun-
sel, submit the following to place this Court on notice that a judge in this district has
denied a January 6 defendant's motion to dismiss a charge alleging a violation of 18
U.S.C. § 1512(c)(2), *U.S. v. Ronald Sandlin*, 21-cr-88-DLF, ECF No. 63 (D.D.C. 2021),
while at the same time deferring consideration of another under the vagueness doc-
trine. *U.S. v. Guy Reffitt*, 21-cr-32-DLF, Minute Order 12/11/21 (D.D.C. 2021). De-
fendants seek to explain why following these decisions would lead this Court into
error on their same motion. They will also show that, either way, the decisions in both
cases do not apply here on their own terms.

### Official proceeding

In *Sandlin*, the Court began by acknowledging that the term "proceeding" in

Section 1512(c)(2)'s "official proceeding" should not be construed in the lay sense but "understood narrowly, in a 'legal' sense." Mem. Op., p. 6. For this distinction, the Court relied on *United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013). *Id.* However, after determining that *Ermoian* correctly rejected the lay meaning, the *Sandlin* Court did not then identify the legal-sense definition ultimately settled on by the court of appeals. Mem. Op., p. 6. That definition was: "'the business done in courts.'" *Ermoian*, 752 F.3d at 1170 (quoting BLACK'S LAW DICTIONARY 1241 (8th ed. 2004)). The *Sandlin* Court did not note that the court of appeals went on to elaborate that "the use of the preposition 'before'" — as, for example, in the phrase "a proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B) — "suggests an appearance in front of [an] agency *sitting as a tribunal.*" *Id.* at 1171 (emphasis added). In *Ermoian*, an FBI investigation did not "occur 'before a Federal Government Agency'" because it was not "like a hearing or trial . . ." *Id.* The *Sandlin* Court omitted that the court of appeals held that Section 1512's terms, including "attendance," "testimony," "production," and "summon," "strongly impl[y] that some formal hearing *before a tribunal* is contemplated." *Id.* (emphasis added).

Instead, the *Sandlin* Court determined that a legal-sense definition of "proceeding" might be satisfied by mere "formality" per se, which need not entail adjudication or even investigation itself. Mem. Op., p. 6. Here, however, this Court will notice several things.

First, the *Sandlin* Court cites no authority for the proposition that a legal-sense "proceeding" may occur absent adjudicative procedures or any investigation. In

over a century of obstruction of justice jurisprudence, there is none.

Second, the *Sandlin* Court omitted from its analysis this Circuit's binding decision in *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994). There, the D.C. Circuit identified two qualities that turn an investigation into a Chapter 73 "proceeding": "adjudicative power or . . . the power to enhance the[] investigation[] through the issuance of subpoenas or warrants." *Id.* at 1127. Notice that three of the attributes defining a Chapter 73 "proceeding" in *Kelley*, binding on this Court, are absent from the January 6 joint session of Congress: (i) no investigation; (ii) no adjudicative power;[1] and (iii) no power to issue subpoenas or warrants. Notice, too, that the *Sandlin* Court omits that the Government stipulated in *Kelley* that "proceedings" under Section 1505 (entailing congressional investigations and inquiries) are "parallel" to those in Section 1512.[2]

Third, the Court will notice how the *Sandlin* Court arrived at its holding that "official proceeding" is satisfied by "some formal[ity]. . ." Mem. Op. p. 6 (citing *United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008)). It quotes *Ramos*: "That [a] proceeding occurs 'before' an agency implies 'some formal convocation of the agency in which parties are directed to appear, instead of any informal investigation conducted by any

---

[1] By not addressing adjudicative power under *Kelley*, the *Sandlin* Court thus avoided whether the "formal" (not to say "adjudicative") procedures under the Electoral Count Act of 1887 permit Congress to adjudicate the outcome of a non-deadlocked presidential election contrary to the Constitution's Elector Clause and the Twelfth Amendment, and whether the ECA was nonbinding on Congress (whose actions on January 6 were therefore not intrinsically adjudicative) as a piece of unconstitutional legislative entrenchment. *U.S. v. Winstar Corp.*, 518 U.S. 839, 872 (1996).

[2] The Government might be expected to recall this key stipulation. The appellate lawyer who personally stipulated to the Section 1505-1512 "parallel" was Merrick Garland.

member of the agency.'" *Id.* (quoting *Ramos*, 537 F.3d at 462-63). This Court will re-call that, in one of the many supplements the Government has submitted in this and other cases they quoted *Ramos*'s "some formal convocation" formula — and omitted the connected phrase "in which parties are directed to appear." The *Sandlin* Court appropriately included the latter phrase. But the inclusion defeats the Court's for-mality per se definition: "parties" are by definition those opposed in an adjudicatory proceeding to which they "are directed to appear." 537 F.3d at 462–63. Notice, too, that *Ramos*, like *Kelley*, presumes the Chapter 73 "proceeding" will involve some in-vestigation into some violation of the law. All of the relevant case law does.

Fourth, although the *Sandlin* Court concludes that an "official proceeding" must at least "be akin to a formal *hearing*," it does not define "hearing." Mem. Op., p. 7 (emphasis added). However, courts define "hearing" as "'a proceeding of relative formality . . . generally public, *with definite issues of fact or of law to be tried*, in which *witnesses are heard and parties proceeded against have the right to be heard . . .*'" *U.S. ex rel. Health Choice All.*, *LLC v. Eli Lilly & Co.*, 4 F.4th 255, 264 (5th Cir. 2021) (quoting *Hearing*, BLACK'S LAW DICTIONARY (5th ed. 1979))(emphasis added). The Court's description of the ECA's electoral certificate-counting procedures does not en-tail "issues of fact or law" to be decided, "in which witnesses are heard and parties proceeded against have the right to be heard." Mem. Op., p. 7. Put another way, the adjudicative problem cannot be solved by sweeping it under a rug called "hearing," even if one places the adjective "formal" before it. Perhaps understanding this, the Court hedges the word "hearing" with qualifiers like "trappings of" and "akin to" and

"analogous." Mem. Op., pp. 7–8. But there is no such crime as "obstruction of the 'trappings' of justice" or "obstructing something 'akin to' a justice-like analogy." Until January 6, federal laws have not been construed to criminalize on the plane of simile and metaphor.

Fifth, the *Sandlin* Court found that "a related provision in the same chapter of Title 18 makes clear that congressional proceedings under § 1512(c) need not be 'court-like.'" Mem. Op., p. 8. Specifically, the Court noted that under Section 1503 it is unlawful to corruptly obstruct "the due administration of justice." *Id.* To avoid redundancy with "official proceeding" in Section 1512(c), the Court declined to "read an 'administration of justice' requirement into 'official proceeding'" and so "official proceeding" must be broader. *Id.* Here, the Court incorrectly assumed that the "due administration of justice" term reaches all adjudicatory proceedings and proceedings involving investigations. It does not. Every circuit that has defined the "due administration of justice" has held that its meaning is coterminous with judicial proceedings.[3] But a proceeding may be adjudicative or at least involve an investigation even if it is not judicial: for example, the Iran-Contra proceedings in Congress. Thus, the "due administration of justice" phrase in Section 1503 is not a basis for defining "official proceedings" short of adjudicatory procedures or investigations.

[3] *United States v. Richardson*, 676 F.3d 491, 502-503 (5th Cir. 2012) ("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."); *United States v. Brenson*, 104 F.3d 1267, 1279–80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); *United States v. Warlick*, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir. 1981) ("administration of justice" commences with "a specific judicial proceeding").

Finally, the *Sandlin* Court did not address a determinative canon of statutory construction. Courts "assume Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). A party must clearly overcome that assumption to establish that Congress intended a change to the meaning given legal terms by related statutes and their judicial gloss. *Hubbard v. United States*, 514 U.S. 695, 700 (1995). "When Congress uses the language of one statute in another statute it usually intends both statutes to have the same meaning." *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1249 (D.C. Cir. 2004). And when interpreting statutes, the "assumption is that Congress knows the law – by which the Supreme Court means judicial decisions." *Id.* Put another way, when it comes to interpreting statutory terms, "meaning is use"; statutory meaning is not a just-this-once definition arrived at ex post ("some formal[ity]. . ." Mem. Op. p. 6).

How has the term "proceeding" been *used* in the context of Chapter 73? In a century or more of obstruction of justice jurisprudence predating the passage of the Sarbanes-Oxley Act of 2002 (SOX), the obstruction of justice term "proceeding" had never been construed to encompass any "formal" meeting of people lacking adjudicative power or an investigation. To the contrary, the D.C. Circuit had held at least twice before SOX's passage that those qualities are required of a Chapter 73 "proceeding." *Kelley*, 36 F.3d at 1127; *United States v. Poindexter*, 951 F.2d 369, 380-82 (D.C. Cir. 1991). Thus, because there is no evidence of a contrary understanding of "proceeding" prior to Section 1512(c)(2)'s codification, the *Sandlin* Court should have "assumed" that Congress did not intend a *sub silentio* amendment to the historical

sense of that term as used in the statute. *Avocados Plus Inc.*, 370 F.3d at 1249. When novel, just-so constructions are placed on criminal statutes after the fact — and in such a noticeable way — it creates a regrettable impression in the public's mind of outcome-oriented decision making.

### *"Section 1512(c)(2) is not limited to acts affecting evidence"*

The *Sandlin* Court allowed that the subsections of Section 1512 "surrounding" subsection (c)(2) "focus on documentary, tangible, and testimonial evidence." Mem. Op. p. 10. However, the Court determined that subsection (c)(2), uniquely, "is not limited to acts affecting evidence." *Id.*

The Court did not identify any other subsection in Section 1512 — titled, "Tampering with a witness, victim or informant"[4] — that is similarly unbound by any relationship to evidence in a proceeding. But the actus reus verbs in (c)(2) — "obstruct," "influence," and "impede" — are "expansive and seemingly encompass all sorts of actions that affect or interfere with official proceedings, including . . . halting the occurrence of the proceeding altogether." Mem. Op. p. 9.

The Court acknowledged that it must consider "the broader context of the statute as a whole." Mem. Op. p. 10. It began with subsection (c)(1). The Court allowed that (c)(1) is indeed "limited to acts affecting evidence," namely, altering, destroying or concealing documents and other objects "with the intent to impair the object's integrity or availability for use in an official proceeding." *Id.* It also acknowledged that

---

[4] The *Sandlin* Court prefers the pre-codification title of the "relevant section in [the SOX legislation]. . ." Mem. Op., p. 13.

"Subsections (c)(1) and (c)(2) are linked by the word 'otherwise,'" resulting in "interplay between" the subsections. *Id.*

However, one page after concluding that (c)(1) and (c)(2) are "linked," the Court determined they are, simultaneously, "plainly separate and independent." Mem. Op. p. 11. The Court did not explain how things can be linked and separate at the same time. But it did find that (c)(2) was "independent" from (c)(1) because it is "set off by both a semicolon and a line break." *Id.*

The judicial purpose of interpreting statutory text is to understand its meaning, as distinguished from its visual appearance as such. The Court did not explain how a semicolon and line break somehow altered the meaning of (c)(2)'s "otherwise" phrase which, as the Court correctly noted, "links" it to the meaning of (c)(1). Stated differently, the question of meaning involves grammar, not page format. Subsection (c)(2) is a clause dependent on (c)(1) for its meaning because the predicate "or otherwise obstructs, influences, or impedes any official proceeding, or attempts to. . . ." is not a complete sentence. That distinguishes the relationship between (c)(1) and (c)(2) from the relationship between the two statutory sections in the case relied on by the *Sandlin* Court, *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021). For convenience, Defendants reproduces here the two sections from that case that the *Sandlin* Court compares to (c)(1) and (c)(2) of Section 1512:

> To participate in the H-2A program, an employer must first certify to the Secretary of Labor that:
>
>   A. there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, ["subsection

A"] and

B.  the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the
United States similarly employed ["subsection B"].

*Overdevest Nurseries, L.P.*, 2 F.4th at 983 (quoting 8 U.S.C. § 1188(a)(1)(A)-(B)).

As this Court will see, each of the provisions in the case relied on by the *Sandlin* Court is a complete sentence, unlike subsections (c)(1) and (c)(2) of Section 1512. Thus, they are grammatically independent in a way that (c)(1) and (c)(2) are not. The same grammatical point distinguishes Justice Scalia's finding in *United States v. Aguilar*, on which the *Sandlin* Court relies, that the *ejusdem generis* canon did not apply to Section 1503's "omnibus clause." 515 U.S. at 615–16 (finding that the omnibus clause is "independent" of the rest of Section 1503 in a grammatical sense: it stands alone as a complete sentence).

Contrary to the *Sandlin* Court's understanding, line breaks and semicolons do not necessarily alter the meaning of the clauses that follow in a sentence. One simple example would seem to suffice:

> The reticent volcano keeps
> His never slumbering plan;
> Confided are his projects pink
> To no precarious man.

In the sentence above, the line break between "The reticent volcano keeps/His never slumbering plan" does not indicate that the second line is grammatically "independent" of the first. To the contrary, the phrase containing the pronoun "his" cannot be understood without reference to its antecedent in the first line. Similarly, the same pronoun following the semicolon cannot be understood without reference to the

first line. Just so with (c)(2)'s "; or otherwise obstructs . . ."

The *Sandlin* Court's mistake in paradoxically finding (c)(2) "linked" to, but "independent" of (c)(1) led it to erroneously distinguish *Begay v. United States*, 553 U.S. 137 (2008). Mem. Op. pp. 10–11. As in *Begay*, the "otherwise" clause in (c)(2) following (c)(1)'s "alter[ing], destroy[ing], mutilat[ing] or conceal[ing] a record, document or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding. . ." must only cover "similar" crimes. 553 U.S. at 142. If (c)(2) reaches acts as unrelated to object evidence destruction as appearing in Congress without permission, it covers activities such as trespass or harassment. Those crimes are no more "similar" to the document destruction in (c)(1) than the DUI offense was to violent crime in *Begay*. The way in which the *Sandlin* Court distinguished *Begay* was to incorrectly find (c)(2) "independent of" (but "linked to") (c)(1). Mem. Op. pp. 10–11.

The *Sandlin* Court's treatment of *Yates v. United States*, 574 U.S. 528 (2015) contained similar errors concerning application of the *noscitur a sociis* canon and the avoidance of surplusage. Consider *noscitur a sociis* first. The *Sandlin* Court found that the Court in *Yates* "was troubled by the fact that some of the provision's verbs— like 'falsifies' and 'makes a false entry in'—would not make sense as applied to fish." Mem. Op. p. 13. But, the *Sandlin* Court added, that "is not a problem [in connection with January 6 and § 1512(c)(2)], where obstructing, influencing, or impeding an official proceeding naturally come in numerous forms, including both evidence impairment and the halting of the proceeding altogether." *Id.*

10

*Yates*'s reasoning under *noscitur a sociis* was more holistic than the isolated point cited by the *Sandlin* Court. *Yates* found that "tangible object" in Section 1519 was "in the company of" terms relating to "record[s] [or] document[s.]" 574 U.S. at 544. "Tangible object," therefore, was "appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects . . . used to record or preserve information." *Id.* The Court was also "[m]indful that in Sarbanes-Oxley, Congress trained its attention on corporate and accounting deception and cover ups." *Id.* at 532. Reading "tangible object" to cover objects like a fish that did not record or preserve information would "cut § 1519 loose from its financial-fraud mooring." *Id.* It is not enough, the Court held, to simply contend that Section 1519 "extends beyond the principal evil motivating its passage" and that the statute is a "general ban on the spoliation of evidence" going by dictionary definitions of "tangible" and "object" in isolation. *Id.* at 536.[5]

The Government's argument that Section 1512(c)(2) is the only provision in the statute that criminalizes acts unrelated to evidence integrity and availability is significantly more offensive to *noscitur a sociis* than the Government's interpretation in *Yates*. As the *Sandlin* Court itself allowed, the subsections of Section 1512 "surrounding" subsection (c)(2) "focus on documentary, tangible, and testimonial evidence." Mem. Op. p. 10. Just as in *Yates*, those Section 1512 provisions all concern "information" destined for a proceeding. Allowing (c)(2) to cover acts having no relationship to information in a proceeding would, like applying "tangible object" to a fish, not only

---

[5] The *Sandlin* Court's holding directly conflicts with this part of *Yates*: "Statutes often reach beyond the principal evil that animated them." Mem. Op. p. 17.

11

"cut § [1512(c)(2)] loose from its financial-fraud mooring," but from the rest of the statutory scheme as well. *Yates*, 574 U.S. at 532. The Government's error in *Yates* is in the same nature as its error here: it applies an obstruction of justice concept in the wrong category.

The *Sandlin* Court's surplusage analysis was also mistaken. Mem. Op. p. 14. The Court determined that the Government's construction of (c)(2) — criminalizing any act that obstructs/influences an official proceeding — "does not entirely subsume numerous provisions within the chapter." *Id*. That is incorrect. The Government's interpretation plainly swallows the rest of Section 1512 as well as Sections 1503 and 1505.

The *Sandlin* Court determined that "§ 1512(a)(1)(C), (a)(2)(C), (b)(3), and (d)(2)–(4) proscribe conduct unrelated to an 'official proceeding'" and thus that surplusage is avoided.  Mem. Op. p. 14. Notice, first, that the Court implicitly acknowledged that the Government's construction of (c)(2) render useless Sections 1512(a)(1)(A), 1512(a)(1)(B), 1512(a)(2)(A), and 1512(a)(2)(B). But the Court was incorrect that the sub-sub-sections it emphasizes are "unrelated to an 'official proceeding'" and thus that the Government's interpretation of (c)(2) does not render them superfluous. When a person kills (Section 1512(a)(1)(C)), or uses physical force (Section 1512(a)(2)(C)) on, or threatens (Sections 1512(b)(3)) someone to "prevent [their] communication . . .to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense. . .," this is not unconnected to an official proceeding. For "an official proceeding need not

be pending or about to be instituted at the time of the offense." 18 U.S.C. § 1512(f)(1). The nexus element merely requires that obstruction of a specifically contemplated official proceeding, even if not then instituted, be the intended outcome of the obstructive act. Therefore, if a defendant assaults a person to prevent their communication to law enforcement of the time and location of a particular drug transaction, the nexus requirement to a specific but not-yet-instituted official proceeding may be satisfied. Thus, the Government's interpretation of (c)(2) has not avoided surplusage in Sections 1512(a)(1)(C), 1512(a)(2)(C), and 1512(b)(3).

The Court's surplusage mistake also extends to sub-Section (d)(2)–(4). Harassment designed to prevent a person from reporting to law enforcement or a judge ((d)(2)), from arresting a person "in connection with a federal offense" ((d)(3)), or from "causing a criminal prosecution . . . to be sought or instituted" ((d)(4)) is very much conduct related to an official proceeding, because, again: official proceedings "need not be pending or about to be instituted at the time of the offense," 18 U.S.C. § 1512(f)(1), and all of those actus reus contemplate official proceedings.

The Court says the Government's construction of (c)(2) creates no surplusage of Sections 1503 and 1505 because those latter statutes "prohibit obstructive acts related to the 'due administration of justice' and congressional inquiries or investigations, respectively, which may have no relation to an official proceeding." Mem. Op. p. 14. Not so. As explained previously, every circuit that has defined the "due administration of justice" has held that its meaning is coterminous with judicial proceedings. Judicial proceedings are also "official proceedings." 18 U.S.C. § 1515(a)(1)(A). As

for congressional inquiries or investigations, if, as the *Sandlin* Court believes, an "official proceeding" is merely any formal proceeding, congressional inquiries or investigations would qualify by definition.

The *Sandlin* Court cites the counter-canon that, sometimes, forbidden surplusage is merely tolerable "overlap." Mem. Op. p. 14. But while the Court cites a dissenting rather than a controlling opinion in support, it omits that in the past six years the Supreme Court has rejected the "mere overlap" counter-canon in the context of "catchall" provisions in obstruction statutes — precisely the scenario here. *Marinello v. United States*, 138 S. Ct. 1101, 1107-08 (2018); *Yates*, 574 U.S. at 544.

"More important" than the "mere overlap" counter-canon, added the *Sandlin* Court, was that defendants' construction of subsection (c)(2), "which would limit its scope to acts affecting evidence, would also[6] overlap with the rest of § 1512." Mem. Op. p. 14. Aha, holds the Court, "committing an act that affects evidence in a proceeding fully encompasses 'alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object' for its use in a proceeding," too. Here the Court conflates the Defendants' argument against the Government's overbroad construction (it even reaches conduct unrelated to evidence) with the Defendants' positive construction of (c)(2).

Defendants do not argue that (c)(2) covers "any act concerning the impairment or availability of evidence." Instead, they contend that (c)(2) criminalizes "ob-

---

[6] Notice the "also." The *Sandlin* Court impliedly admits that the Government's interpretation of § 1512(c)(2) engulfs "the rest of § 1512."

struct[ing], influenc[ing], or imped[ing] any official proceeding" by "impair[ing] [evidence's] integrity or availability for use in an official proceeding" in a manner other than "detroy[ing], mutilate[ing], or conceal[ing] a record, document or other object. . ." *See* 18 U.S.C.§ 1512(c)(1). Examples would include interfering with non-object evidence, such as occurs in all the Section 1512(c)(2) cases on which the *Sandlin* Court relies. Mem. Op. pp. 15–16.

Finally, the *Sandlin* Court cites to a case which "affirmed a § 1512(c)(2) conviction where the defendant's obstructive conduct did not relate to evidence." Mem. Op. p. 6 (citing *United States v. Reich*, 479 F.3d 179 (2d Cir. 2007)). The Court's reliance on *Reich* is misplaced. For one thing, the obstructive conduct *did* "relate to evidence." The defendant faxed a fake court order to his litigation opponent in a civil case — to prevent the court from considering a motion for summary judgment. *Reich*, 479 F.3d at 182. By definition, motions for summary judgment involve a review of evidence. FED. R. CIV. P. 56(a). Second, the defendant did not even argue that, and the court of appeals did not consider whether, Section 1512(c)(2) only covers acts related to evidence impairment or availability. *Id.*

### The Sandlin Court's analysis of vagueness doctrine, the rule of lenity, and the novel construction principle

The *Sandlin* Court determined that, although no court before January 6 had applied a Chapter 73 statute outside the context of adjudicatory proceedings and investigations, and although no court had applied Section 1512(c)(2) to acts unrelated to evidence, the vagueness doctrine and the rule of lenity did not prevent the Court from placing those new constructions on the statute and applying them to conduct

that occurred before the interpretations had been decided. Mem. Op. p. 17. Its analysis of those doctrines was misguided.

The Court reasoned that Section 1512(c)(2)'s "verbs plainly cover obstructive acts aimed at official proceedings." Mem. Op. p. 17. However, the question was not whether the verbs cover obstructive acts generally but obstructive acts unrelated to evidence impairment or availability — like every other part of Section 1512. Because no court had ever held so, it is hard to see how a reasonably intelligent person would have notice that (c)(2) "plainly cover[s]," for example, appearing in Congress without permission. Moreover, the Court did not address how or why a reasonably intelligent person would be on notice that a Chapter 73 obstruction statute would be applied to a "proceeding" not involving an investigation, evidence, or adjudication. Indeed, over a century of obstruction of justice jurisprudence would put such a person on notice that the joint session of Congress on January 6 was not a Chapter 73 "proceeding" because it did not involve an investigation, evidence, or adjudication.

The *Sandlin* Court added, "there is little question that violent assaults on law enforcement officers of the nature charged here constitute obstructive acts. The defendants were on notice of the illegality of their alleged conduct." Mem. Op. p. 17. If the (frivolous) issue were whether defendants were on notice of assault charges, the *Sandlin* Court would be quite right. However, the question instead is whether they were on notice of a different crime, obstruction of justice under Section1512(c)(2). "Violent assaults," while plainly deplorable, do not have some intrinsic connection to the meaning of "proceeding" or whether all of Section 1512's sections concern evidence

16

impairment or availability. The Court was addressing a straw man.

The *Sandlin* Court briefly addressed the arbitrariness component of vagueness doctrine as follows: "'Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.'" Mem. Op. p. 17 (quoting *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016)).

That analysis of the significant evidence of arbitrariness inherent in the Government's use of Section 1512 in the January 6 cases is unfortunately abbreviated. It is also mistaken. Over 100 times, the Government has entered into Class B misdemeanor plea agreements with defendants whose conduct on January 6 is identical to that of defendants charged under Section 1512 who are facing up to 20 years in prison. The Government has ventured no explanation whatsoever to distinguish why a person falls into the misdemeanor category versus the serious felony one. No fair and impartial court system can respond to this enormous problem with drastic consequences for people's lives by citing one highly generalized statement about judicial review. Fortunately, the vagueness doctrine does indeed address the situation where a vague interpretation of a criminal statute enables arbitrary and discriminatory enforcement.

As Justice Gorsuch recently explained, the vagueness doctrine, which is rooted in the due process clause of the Fifth Amendment, is applied specifically to prevent "the exercise of arbitrary power." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1224 (2018)

(Gorsuch, J., concurring). For vague laws "leav[e] people in the dark about what the law demands and allow[] prosecutors and courts to make it up." *Id.*

The *Fokker Servs. B.V.* decision, relied on by the *Sandlin* Court, does not hold otherwise. *See* Mem. Op. p. 17–18. That case did not concern vagueness doctrine. The Government and defendant entered into a deferred prosecution agreement and filed a motion to toll the Speedy Trial Act to make it work. *Fokker Servs. B.V.*, 818 F.3d at 737. The district court denied the motion on the ground that it was unhappy with deferred prosecution and would hold out on the Speedy Trial Act until it got the charges it wanted. *Id.* The D.C. Circuit reversed, holding that courts do not have the power to hold a Speedy Trial Act motion hostage on such grounds. *Id.* This uncontroversial and quite easy decision has nothing to say about the scope of vagueness doctrine.

Here, by contrast, the point is not that the Court should direct the Government which charges to file. The perspective, rather, is that of a reasonably intelligent defendant. If the Government is charging hundreds of people with a Class B misdemeanor for the same conduct that randomly results in a felony charge punishable by 20 years of prison time, the issue is whether the crimes are sufficiently demarcated to put a defendant on notice of his dramatically increased criminal liability. In these cases, the Government has provided no notice, much less fair notice, of when or why a defendant moves from a Title 40 offense to a Section 1512 charge. This is a gross absence of "standards to govern the actions of police officers, prosecutors, juries and judges," *Dimaya*, 138 S. Ct. at 1212, which cannot be effectively resolved by citations

to generalized principles outside the relevant constitutional doctrine.

Finally, the *Sandlin* Court addressed the rule of lenity in two sentences. Mem. Op. p. 18. Although no court before *Sandlin* had applied Section 1512(c)(2) to proceedings not involving adjudication or investigations and to acts unrelated to evidence, and although multiple courts in the district have acknowledged that the issues are challenging and difficult, the *Sandlin* Court found no "grievous ambiguity." *Id.* (citing *Barber v. Thomas*, 560 U.S. 474, 488 (2010)). This was in error. In the first place, in the *Yates* decision, the Court applied an "any doubt" standard of ambiguity, not the "grievous ambiguity" standard. 574 U.S. at 548 ("[I]f our recourse to traditional tools of statutory construction *leaves any doubt* about the meaning of 'tangible object,' . . . we would invoke the rule [of lenity].") (emphasis added). *Yates* postdates *Barber. See also Abramski v. United States*, 573 U.S. 169, 204 (2014) (Scalia, J., dissenting) ("[C]ontrary to the miserly [grievous ambiguity] approach, the rule of lenity applies whenever, after all legitimate tools of interpretation have been exhausted, a reasonable doubt persists regarding whether Congress has made the defendant's conduct a federal crime.") (cleaned up). Here, as explained, courts have already expressed "doubt" about the Government's novel construction of Section 1512(c)(2). In any case, even if the "grievous" ambiguity standard were correct, it would have to apply here. If the rule of lenity does not apply to multiple novel and strained interpretations piled on top of each other that leave lawyers and courts in the dark after hundreds of pages of briefing, lenity would never apply. In addition, although the *Sandlin* Court cites to *United States v. Lanier*, 520 U.S. 259 (1997), it did not address that decision's novel

construction principle. Even if the Government's interpretations of Section 1512(c)(2) were somehow unambiguously correct and not void-for-vagueness, they still concededly lack any supporting precedent. It is a violation of the due process clause to apply them retroactively to conduct that occurred before any court had adopted those understandings of the statute. *Lanier*, 520 U.S. at 266 (citing *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964)).

**Sandlin's *Interpretation of "Corruptly"***

The Court began its analysis of Section 1512(c)(2)'s term "corruptly" by treating the defendants' arguments there as though they were a *facial* challenge to that term. Mem. Op. pp. 18-19. According to the  Court, they argued that (1) as a matter of statutory construction, "corruptly" does not mean "wrongfully, immorally or in a depraved manner" and (2) *the Government's* definition of the term *applied in the January 6 cases* is unconstitutionally vague.

When the Court turned to an as-applied challenge, it erred. As in the Government's analysis, the confusion arises from declining to address or acknowledge the distinction between different types of proceedings, i.e., the context in which a word is used. The Court allowed that in *Poindexter*, the D.C. Circuit found that equating "corruptly" with moral purpose definitions like "wrongfully" would be unconstitutionally vague and therefore held that "corruptly" must be interpreted transitively to require proof that a defendant influenced another person to violate their legal duty and thereby obstruct a congressional proceeding. Mem. Op. p. 20 (citing *Poindexter*, 951 F.2d at 379). But the Court then found that "Courts have since cabined *Poindexter*'s

holding to its facts and have not read it as a broad indictment of the use of the word 'corruptly' in the various obstruction-of-justice statutes." Mem. Op. p. 20. What the *Sandlin* Court failed to acknowledge or notice is that all the post-*Poindexter* decisions it cites for that proposition occur in the irrelevant context of *judicial* proceedings, not *congressional* ones. *Id.* (citing cases). (Irrelevant because the Court was simultaneously assuming that investigations and evidence are not required for a Chapter 73 "proceeding").

The next steps in the Court's analysis are difficult to assess. The Court cited to virtually the same dictionary definitions of "corrupt" on which the *Poindexter* court relied.  Mem. Op. p. 21. Like *Poindexter*, the *Sandlin* Court noted the distinction between transitive and intransitive meanings. *Id.* The Court then went on to hold that "the plain meaning of 'corruptly' encompasses both corrupt (improper) *means* and corrupt (morally debased) *purposes*." *Id.* (emphasis original). Citing decisions from the judicial proceedings context, it "agree[d] that § 1512(c)'s proscription of knowing conduct undertaken with the specific intent to obstruct, impede or influence the proceeding provides a clear standard to which the defendant can conform his behavior." *Id.* at 23. However, not only is a corruptly-is-merely-the-intent-to-obstruct standard plainly foreclosed by *Poindexter*, it is rejected by Judge Silberman's concurrence in *U.S. v. North*, on which the *Sandlin* Court itself relies. 910 F.2d 843, 940–41 (D.C. Cir. 1990) (an intent-to-obstruct definition "reads the word 'corruptly' out of the statute).

To make matters more confusing, the *Sandlin* Court then appeared to hold

that "defining 'corruptly' to involve 'wrongfulness' presents a closer question because it may be subject to the same infirmities that *Poindexter* found in the words 'immoral' and 'improper.'" Mem. Op. p. 21. The Court appeared to resolve this problem by narrowing "wrongful" to "independently criminal conduct." *Id.* at 24. The sole authority it cites is a nonbinding concurrence in *North*. *Id.* But in applying this standard to the facts at issue, the Court appeared to indicate that "independently criminal conduct" may practically mean "very severe independently criminal conduct." For the Court found that "forcibly breach[ing] the Capitol Building, assault[ing] Capitol police officers, and encourag[ing] others to steal laptops and paperwork from the Senate Chamber" are acts that "fall on the *obviously* unlawful side of the line." Mem. Op. p. 24 (emphasis added).

The *Sandlin* Court's definition of "corruptly" is neither consistent with D.C. Circuit precedent nor workable in practice. "Corruptly" cannot mean "independently criminal conduct" for various reasons. In the first place, it was rejected by *Poindexter*, a point the *Sandlin* Court did not address. Poindexter's false *statements* to Congress predicated charges under *both* Section 1001 and Section 1505. Poindexter, 951 F.2d at 371. The D.C. Circuit reversed the Section 1505 conviction on the ground that the Government had not proven the "corruptly" element. *Id.* It rejected, however, Poindexter's challenge to his Section 1001 conviction. *Id.* at 387. If a defendant's intent to obstruct a proceeding "while" committing an "independent violation of the law" were a proper definition of "corruptly," Poindexter's Section 1505 conviction would not have been vacated.

Practically, this definition does not resolve the vagueness identified by the Court itself. If obstructing/influencing Congress is "corruptly" done whenever the defendant at the same time commits "independent criminal conduct" there remains the problem of an incomprehensible boundary between Class B misdemeanor and felony conduct. The Government contends that every single protester who entered the Capitol on January 6 *ipso facto* committed a crime: entering a "restricted area," Title 40 "parading," or both. Yet in hundreds of cases, that conduct is classified as a misdemeanor even when it involved "influencing" or "obstructing" or "impeding" Congress.

To its credit, the Court appeared sensitive to this extremely serious concern of notice and fairness. After deciding *Sandlin* the Court entered an order in the *Reffitt* case holding that the vagueness doctrine may prohibit a Section 1512(c)(2) charge as applied in that case. *United States v. Guy Wesley Reffitt*, 21-cr-32-DLF, Minute Order 12/11/21. The Court therefore appeared to be defining "independent criminal conduct" to mean, perhaps, "violent independent criminal conduct" or "felonious independent criminal conduct." While that distinction may matter in fairness terms, it does not appear to have anything to do with the meaning of the term "corruptly."

All these quandaries are avoided simply and without creating unnecessary distortions in the law. When a defendant assaults law enforcement — they have committed the offense of assault of law enforcement. 18 U.S.C. § 111. When a defendant steals property from the Capitol — they have committed the offense of theft of government property. 18 U.S.C. § 641. When a defendant destroys something at the Cap-

itol — they have committed a separate offense still. 18 U.S.C. § 1361. All the vagueness and confusion enters the analysis because the Government insists on creating a novel offense that parasitically sits on top of these traditional crimes. The effect is to punish no separate category of conduct at the cost of distortion of legal concepts and criminal statutes.

The *Sandlin* Court does not address the distinction between how "corruptly" is interpreted in judicial proceedings versus congressional ones. How does one, for instance, to use an example previously submitted to this Court, distinguish between Democrat representatives staging a sit in on the House floor in violation of House rules as they did in 2016 where they waved signs with the names of gun violence victims and chanting, "No bill! No break!" thereby obstruction proceedings before Congress? More importantly, the *Sandlin* court does not address the Seventh Circuit's Pattern Jury Instruction of "corrupt obstruction" as involving a person acting "with the purpose of wrongfully impeding the due administration of justice." THE WILLIAM J. BAUER PATTERN CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT (2020 Ed.), 18 U.S.C. § 1512 Definition of "Corruptly" at 629. The *Sandlin* court never once even attempted to explain how the alleged actions of the defendants there impeded the due administration of justice.

Based on this Court's comments on these issues, Defendants have faith in this Court to properly consider and apply the law and, despite the Court's ruling in *Sandlin*, grant the Defendant's Motion to Dismiss Count Ten of the Second Superseding Indictment.

Date:  <u>December 12, 2021</u>              Respectfully Submitted,

RONALD SULLIVAN LAW, PLLC

by: <u>/s/ Ronald S. Sullivan Jr.</u>
RONALD S. SULLIVAN JR.
D.C.D.C. Bar ID 451518
rsullivan@ronaldsullivanlaw.com

1300 I Street NW
Suite 400 E
Washington, DC 2005
Telephone: (202) 935-4347
Fax: (617) 496-2277

MAYR LAW, P.C.

by: <u>/s/ T. Brent Mayr</u>
T. BRENT MAYR
Texas State Bar Number 24037052
D.C.D.C. Bar ID TX0206
bmayr@mayr-law.com

5300 Memorial Dr., Suite 750
Houston, TX 77007
Telephone: 713-808-9613
Fax: 713-808-9613

WAGNER PLLC

by: <u>/s/ Camille Wagner</u>
CAMILLE WAGNER
DC Bar No. 1695930
law@myattorneywagner.com

1629 K Street NW, Suite 300
Washington, DC 20006
(202) 630-8812

ATTORNEYS FOR THE DEFENDANT,
BRADY KNOWLTON

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

by: /s/ Dani Jahn

DANI JAHN
Assistant Federal Public Defender

625 Indiana Avenue, N.W., Ste 550
Washington, D.C. 20004
(202) 208-750

ATTORNEY FOR THE DEFENDANT,
PATRICK MONTGOMERY

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this motion was sent to Counsel for the

Government, Elizabeth Kelley, James Peterson, and James Pearce, on December 12,

2021, via CM/ECF and email.

/s/ T. Brent Mayr

T. BRENT MAYR