## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>PATRICK MONTGOMERY, BRADY KNOWLTON,<br><br>*Defendants*. | Criminal Action No. 21-46 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendants Patrick Montgomery and Brady Knowlton are charged in a ten-count indictment with various crimes related to the breach of the United States Capitol on January 6, 2021. Dkt. 74 (second superseding indictment). Both move to dismiss Count 10 pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B). Dkt. 80; *see also* Dkt. 39; Dkt. 40; Dkt. 44; Dkt. 47; Dkt. 48; Dkt. 59; Dkt. 60; Dkt. 66. That count charges Defendants with "corruptly obstruct[ing], influenc[ing], and imped[ing] an official proceeding, that is, a proceeding before Congress"—or attempting to do so—in violation of 18 U.S.C. § 1512(c)(2). Dkt 74 at 5.

Defendants raise three principal arguments. First, they contend that Count 10 is deficient as a matter of law because the joint session of the U.S. Senate and House of Representatives "to verify the certificates and count the votes of the electors of the several States for President and Vice President of the United States," 167 Cong. Rec. H76 (daily ed. Jan. 6, 2021), does not constitute an "official proceeding" for purposes of Section 1512(c). Dkt. 39-1 at 2–3. Second, they argue that, even if the certification of the electoral vote constitutes an "official proceeding," Section 1512(c) applies only to actions that "impair[] the availability or integrity of evidence"

and does not apply to conduct that physically impedes the proceeding itself.  Dkt. 60 at 25–30.

Finally, Defendants argue that Section 1512(c)(2), as applied in this case, is unconstitutionally

vague or overbroad.  *Id*. at 33–54.

The question before the Court is a narrow one.  The Court is not asked to review the

sufficiency of the evidence against Defendants, which the government has yet to offer.  Nor is

the Court asked to craft jury instructions on the elements of Section 1512(c)(2), which the parties

have yet to propose and which may turn, in part, on the evidence not yet offered.  Instead, the

sole question before the Court is the legal sufficiency of the indictment, and the Court's role in

considering that question "is limited to reviewing the face of the indictment and, more

specifically the language used to charge the crimes."  *United States v. Thomas*, No. 17-194, 2019

WL 4095569, at *3 (D.D.C. Aug. 29, 2019) (quotation marks omitted).  In the present context,

that means that the Court must determine whether Section 1512(c)(2) applies to the charged

conduct, *see* Fed. R. Crim. P. 12(b)(3)(B)(v), and, if so, whether the statute is unconstitutionally

vague or overbroad as applied to that conduct, *see United States v. Eshetu*, 863 F.3d 946, 952

(D.C. Cir. 2017), *vacated on other grounds*, 898 F.3d 36 (D.C. Cir. 2018) ("The defense of

failure of an indictment to charge an offense includes the claim that the statute apparently

creating the offense is unconstitutional." (quoting *United States v. Seuss*, 474 F.2d 385, 387 n.2

(1st Cir. 1973))).  The Court, in other words, need decide only whether the offense that the

indictment charges—corruptly obstructing, influencing, or impeding "Congress's certification of

the Electoral College vote" or attempting to do so—is, in fact, a crime, and, if so, whether

Section 1512(c)(2), as applied to that charge, comports with due process and the First

Amendment.

As explained below, the indictment clears these initial hurdles.  The Court will, accordingly, **DENY** Defendants' motion to dismiss Count 10 of the second superseding indictment, Dkt. 80.

## I.

## A.

At 1:00 p.m. on January 6, 2021, Congress convened in a joint session, as required by the Twelfth Amendment and the Electoral Count Act, 3 U.S.C. § 15, to certify the Electoral College vote in the 2020 presidential election.  Dkt. 1-1 at 1 (Apr. 1, 2021).[1]  Then-Vice President Mike Pence, as President of the Senate, presided over the session.  *Id.*  Around 1:30 p.m., the Senate returned to its own chamber so that the House and Senate could separately consider an objection to the Electoral College vote from the State of Arizona.  *Id.*  While the certification process was ongoing, a crowd marched toward the Capitol from a rally at which then-President Trump and others had spoken.  *Id.*; *see also United States v. Munchel*, 991 F.3d 1273, 1275–76 (D.C. Cir. 2021); *United States v. Hale-Cusanelli*, No. 21-3029, 2021 WL 2816245, at *1 (D.C. Cir. July 7, 2021).

The Capitol and its exterior plaza were closed to members of the public that day.  Dkt. 1-1 at 1 (Apr. 1, 2021).  The United States Capitol Police had erected barriers around the Capitol

---

[1] The facts in this section are provided for background purposes only; they do not inform the Court's analysis of Defendants' motion to dismiss, which must be limited to "the four corners of the indictment."  *United States v. Safavian*, 429 F. Supp. 2d 156, 161 n.2 (D.D.C. 2006).  Factfinding, moreover, is the province of the jury.

The government initially filed separate criminal complaints against Montgomery and Knowlton, before the grand jury indicted them as co-defendants in a single case.  When the separate dockets were combined in the Court's Case Management/Electronic Case Files system, something went awry with the numbering on the electronic docket.  At times, the numbers appear out of order, and several numbers are used twice.  To avoid confusion, the Court will include dates in its citations to docket entries that include duplicate numerical designations.

grounds, and the exterior doors of the Capitol were locked. *Id.* As the crowd outside the Capitol swelled, the protest turned into a violent riot. The mob pushed past police barriers and, around 2:00 p.m., breached the Capitol. *Id.* Twenty minutes later, "[t]hen-Vice President Pence, Senators, and Representatives were all forced to halt their constitutional duties and [to] flee the House and Senate chambers for safety." *Trump v. Thompson*, No. 21-5254, 2021 WL 5832713, at *1 (D.C. Cir. Dec. 9, 2021). "The rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol." *Id.* Of particular relevance here, the rampage also required Congress to suspend the electoral vote certification proceedings for over five-and-a-half hours. It was not until 3:40 a.m. the next day that Congress ultimately certified "the ascertainment and counting of the electoral votes" and reported "that Joe Biden and Kamala Harris will be the President and Vice President, according to the ballots that have been given to us." 167 Cong. Rec. at H114–15.

According to the government, "body-worn camera footage from the Metropolitan Police Department . . . shows Knowlton and Montgomery [together] outside the Capitol at around 2:00 p.m." on January 6, 2021. Dkt. 41 at 3. During the melee, Montgomery allegedly "tried to grab a Metropolitan Police Department officer's baton, wrestled him to the ground for it, and then kicked the officer in the chest." Dkt. 31 at 4. Knowlton wore a "tactical vest," Dkt. 1-1 at 2 (Apr. 1, 2021), and, with Montgomery standing behind him, yelled at the police officers, "You took an oath! You took an oath! . . . Are you our brothers?" Dkt. 41 at 3. Video footage then shows Defendants entering the Capitol "through a door on the Upper West Terrace at approximately 2:25 p.m.," before proceeding to the Rotunda and then the Rotunda Lobby. Dkt. 1-1 at 3–4 (Apr. 1, 2021). From there, Defendants made their way to the third floor and entered the Senate Chamber Gallery. *Id.* at 5. Later, "after leaving the Gallery, . . . [D]efendants

encountered additional law enforcement officers." Dkt. 63 at 12. Body-worn camera video shows both Defendants "confronting officers inside the Capitol in a hallway near Senate Majority Leader [Charles] Schumer's office" and "direct[ing] officers to move out of the way." Dkt. 41 at 3. At one point, the government alleges, "Knowlton told the officers, 'This is not about us. This is bigger than me, it's bigger than you. It's about everyone's right to self-government. . . . This is happening. Our vote doesn't matter, so we are here for change.'" Dkt. 63 at 12. Montgomery added: "You gotta quit doing your job and be an American." *Id.*

The following day, an acquaintance emailed Montgomery to inform him that he had been reported to the authorities. Dkt. 1-1 at 3 (Jan. 13, 2021). Montgomery responded that he was "not a scared cat or running from anything" and that he was "so deeply covered by the best Federal Defense lawyers in the country in case you chicken shit cry boys don't want [to do what] it takes to defend our freedom from these corrupt politicians." *Id.* Montgomery also posted photos of the riot to his Facebook page, including photos showing him and Knowlton at the Capitol. *Id.* at 6. He wrote: "This is Americans fighting for their country!" *Id.* He also posted a photograph from inside the Senate chamber, with the caption "[w]e stormed the Senate . . . [and] opened those Chamber door[s] for Transparency." *Id.* at 7.

**B.**

Defendants are charged in the second superseding incitement with ten counts, only the last of which is at issue here. Dkt. 74. The first four counts name only Montgomery and relate to his alleged assault of a Metropolitan Police Department officer. *Id.* at 2–3. In those counts, Montgomery is charged with assaulting, resisting, or impeding certain officers in violation of 18 U.S.C. § 111(a)(1); civil disorder in violation of 18 U.S.C. § 231(a)(3); engaging in physical violence in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(4); and an act of

physical violence in the Capitol grounds or buildings in violation of 40 U.S.C. § 5014(e)(2)(F).

*Id.* The remaining six counts charge both Montgomery and Knowlton with entering and remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(D); parading, demonstrating, or picketing in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G); entering and remaining in the gallery of Congress in violation of 40 U.S.C. § 5104(e)(2)(B); and, finally, obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) and aiding and abetting the obstruction of an official proceeding in violation of 18 U.S.C. § 2.  Dkt. 74 at 3–5.

On June 18, 2021, Knowlton filed a motion to dismiss the obstruction-of-an-official-proceeding charge in Count 10, Dkt. 39, and, on June 23, 2021, Montgomery moved to join in that motion, Dkt. 40.  Section 1512(c)(2) makes it a felony, punishable by up to 20 years in prison, to "obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so."  For purposes of Section 1512(c), an "official proceeding" includes, among other things, "a proceeding before the Congress."  18 U.S.C. § 1515(a)(1)(B).  In his motion to dismiss, Knowlton argued that the indictment was deficient (1) because it failed to specify which official proceeding Defendants allegedly obstructed and (2) because Section 1512(c)(2) prohibits obstruction of proceedings before Congress only when those proceedings relate to "the administration of justice"—a category that does not, according to Defendants, include the certification of the Electoral College vote.  Dkt. 39-1 at 3–14.  Events occurring after Knowlton and Montgomery filed their initial motions, however, have shifted (and expanded) the focus of the inquiry pending before the Court.

First, the Court raised a series of questions regarding the scope and meaning of Section 1512(c)(2) at oral argument, *see* Dkt. 53, and, in light of the parties' responses, the Court granted Defendants leave to supplement their motion, *id.* at 64–65; *see also* Dkt. 60. Many of the arguments now before the Court first appeared in that supplemental filing. Second, after Defendants filed their initial motions, the grand jury returned a second superseding indictment, which now specifies that the "official proceeding" that Defendants allegedly obstructed was "Congress's certification of the Electoral College vote as set out in the Twelfth Amendment to the United States Constitution and 3 U.S.C. §§ 15–18." Dkt. 74 at 5. That amendment mooted Defendants' contention that the earlier indictment was invalid for lack of specificity. The amendment also, more broadly, mooted Knowlton's motion to dismiss Count 10 of the earlier indictment and Montgomery's request to join in Knowlton's *earlier* motion. *See* Min. Order (Dec. 6, 2021). Because both Knowlton and Montgomery have now jointly moved to dismiss Count 10 of the second superseding indictment, Montgomery's request for leave to join in Knowlton's motion, Dkt. 40, is also moot. *See* Min. Order (Dec. 6, 2021). As a result, only one motion is now before the Court, Dkt. 80, although that motion incorporates much of the parties' prior briefing.[2]

## II.

Defendants argue that Count 10 should be dismissed for three overarching reasons. Each of their arguments, however, turns on a common theme: in Defendants' view, each of the key terms contained in Section 1512(c)(2)—"official proceeding," "otherwise obstructs, influences,

---

[2] With leave of Court, the parties have also filed copies of (and responses to) pleadings from other cases that have raised similar challenges, *United States v. Nordean*, No. 21-cr-175 (D.D.C.); *United States v. Reffitt*, No. 21-cr-32 (D.D.C.), to shed further light on the questions presented in this case. *See* Dkt. 72; Dkt. 73; Dkt. 76; Dkt. 77; Dkt. 78; Dkt. 81; Dkt. 82.

or impedes," and "corruptly"—must be construed in a manner that limits the reach of Section 1512(c)(2) to tampering or interfering with the availability or presentation of evidence in a judicial or quasi-judicial proceeding.  To construe the terms otherwise, they add, would render the statute unconstitutionally vague or overbroad as applied in this case.  Because that is not what the statute says, and because Defendants' constitutional and other non-textual arguments are unpersuasive, the Court will deny Defendants' motion.

**A.**

Defendants first argue that Count 10 fails to state an offense because a joint session of Congress to certify the results of a presidential election does not qualify as an "official proceeding" within the meaning of 18 U.S.C. § 1512(c)(2).  In pressing this argument, Defendants acknowledge that the phrase "official proceeding" can be read broadly and that "the election certification proceedings may . . . have the 'trappings' of a judicial proceeding."  Dkt. 60 at 10–12.  But they urge the Court to adopt a "technical" reading of the statute and to limit the reach of Section 1512(c)(2) to formal hearings before a tribunal that resemble the business done in courts.  *Id.* at 11.  That is, according to Defendants, to qualify as an "official proceeding" for purposes of Section 1512(c)(2), a proceeding before Congress must be "court-like," *id.* at 17, or "must relate to the administration of justice," *id.* at 20.  Although Defendants are correct that not every action taken within the walls of Congress constitutes an "official proceeding" within the meaning of Section 1512(c), a joint session of Congress convened to verify and count the electoral vote for President and Vice President of the United States does.

The Court begins, as it must, with the text.  Section 1512(c)(2) makes it unlawful for anyone to "corruptly . . . obstruct[], influence[], or impede[] *any official proceeding*, or attempt[] to do so."  18 U.S.C. § 1512(c)(2) (emphasis added).  The provision's use of the word "any"

provides the first clue as to the text's meaning.  Unlike the other provisions of Section 1512, Section 1512(c)(2) applies to the obstruction of "*any* official proceeding," *id.* § 1512(c)(2) (emphasis added).  *Compare id.*, *with id.* § 1512(g)(1) (referring to "the official proceeding before a judge, court, magistrate judge, grand jury or government agency"), *and id.* § 1512(a)(1)(A)–(B), (a)(2)(A)–(B), (b)(1)–(2), (c)(1), (d)(1) (all referring to "*an* official proceeding" (emphasis added)).  "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)); *accord Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008).  It follows that Section 1512(c)(2) reaches not just a subset of "official proceedings," but all "official proceedings" "of whatever kind."

That, of course, leads to the more significant question:  What does the phrase "official proceeding" mean?  In answering that question, the Court's effort is aided (at least somewhat) by the fact that Congress adopted a statutory definition.  Section 1515 provides that, for purposes of Section 1512, "the term '*official proceeding*' means—(A) a proceeding before a judge or court of the United States . . . or a Federal grand jury; (B) *a proceeding before the Congress*; (C) a proceeding before a Federal Government agency which is authorized by law; or (D) a proceeding involving the business of insurance . . . before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of a[] person engaged in the business of insurance."  18 U.S.C. § 1515(a)(1) (emphases added).  Reading Sections 1512(c)(2) and 1515(a)(1)(B) together, then, the statute prohibits someone from corruptly obstructing any proceeding before Congress.

The statutory definition, however, only advances the Court's inquiry so far, because the definition is "somewhat circular[]" with respect to the meaning of the word "proceeding."

*United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013).  Section 1515 specifies, as relevant here, that an "official proceeding" is "a proceeding before the Congress," but it does not define the term "proceeding."  The Court must, accordingly, look to other sources to define that term.

As Defendants acknowledge, the word "proceeding," when read most broadly, means "[a]n act or step that is part of a larger action."  *Proceeding*, Black's Law Dictionary (11th ed. 2019); *see also Proceeding*, Oxford English Dictionary (3d ed. 2007) (defining "proceeding" as "[t]he carrying on of an action or series of actions").  There are good reasons, however, to conclude that Congress did not use the word in this sweeping sense.  Most notably, in each iteration of Section 1515's definition of "official proceeding," the word "proceeding" is followed by the preposition "before."  The "proceeding" must be "before" a judge, court, or grand jury; "before" the Congress of the United States; "before" a federal agency conducting a matter "authorized by law"; or "before" an insurance regulator or examiner.  That structure provides two insights into the meaning of "official proceeding."  First, it indicates that the actions or events that constitute the "proceedings" at issue must comprise part of the official business of the enumerated body.  The fact that the defined term contains the adjective "official" merely reinforces this conclusion.  18 U.S.C. §§ 1512(c) & 1515(1)(1).  Second, the phrase "proceeding before" suggests that the body has convened in some formal respect for the purpose of conducting that business.  The Court, accordingly, concludes that "a proceeding before the Congress" requires more than "an action or series of actions" and that not every event occurring within the walls of Congress constitutes an "official proceeding."  The "proceeding" must involve a formal assembly or meeting of Congress for the purpose of conducting official business.  This interpretation accords with commonly accepted legal definitions of the word

"proceeding," which define the word to mean, among other things, "[t]he business conducted by . . . [an] official body." *Proceeding*, Black's Law Dictionary (11th ed. 2019).

Defendants agree that Section 1515's definition of "official proceeding" embraces a technical meaning of "proceeding." Dkt. 60 at 11. But they go beyond that and urge the Court to adopt an even narrower technical interpretation. In their view, the term "proceeding" in Section 1515 refers only to proceedings that are "quasi-judicial" in nature, *id.* at 14, "court-like" or "adjudicative," *id.* at 17, or that relate "to the administration of justice," *id.* at 20. Thus, according to Defendants, the phrase "proceeding before the Congress" covers only "proceedings before Congress related to the administration of justice such as a congressional committee investigating a violation of the law where witnesses are subpoenaed to appear and give testimony or to provide relevant evidence." Dkt. 39-1 at 13. Under this definition of "proceeding before the Congress," Defendants argue, Congress's certification of the electoral vote for President and Vice President does not qualify. *Id.*

There are several problems with Defendants' argument. For one, it ignores the plain language that Congress employed. Had Congress intended to limit the definition of "official proceeding" to judicial and "quasi-judicial" proceedings, to proceedings at which witnesses appear and give testimony, or to proceedings related "to the administration of justice"—as Defendants contend—it could easily have done so. Long before Congress enacted Section 1515(a)(1), it had enacted Section 1503, which prohibits the obstruction of "the due administration of justice," 18 U.S.C. § 1503(a) (originally enacted as Act of Mar. 4, 1909, ch. 321, § 135, 35 Stat. 1088, 1113), and it had enacted Section 1505, which prohibits the obstruction of "the due and proper exercise of the power of inquiry or investigation . . . by either House, or any committee of either House or any joint committee of the Congress," *id.* § 1505

(originally enacted as Antitrust Civil Process Act, Pub. L. No. 87-664, § 6(a), 76 Stat. 548, 552 (1962)).  Congress had the necessary vocabulary at hand and could have easily defined an "official proceeding" to include "a proceeding before the Congress" involving the "administration of justice," a proceeding at which evidence is taken, or a proceeding involving "the power of inquiry or investigation."  But it did not include any of the limitations that Defendants now ask the Court to adopt.

Defendants invoke three precedents—*United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013); *United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008); and *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994)—in support of their contention that the phrase "a proceeding before the Congress" means a "quasi-judicial" proceeding or a proceeding involving the "administration of justice."  None of those cases, however, involved "a proceeding before the Congress," and none supports Defendants' constricted reading of that phrase.

Of these cases, Defendants rely most heavily on the Ninth Circuit's decision in *Ermoian*. In that case, the court rejected the government's contention that "an FBI investigation qualifies as an 'official proceeding' under the statute criminalizing obstruction of justice."  752 F.3d at 1168.  But that conclusion is neither remarkable nor in tension with the government's position here: an ongoing law enforcement investigation of a criminal enterprise bears no resemblance, as a matter of form or content, to the official process mandated by the Twelfth Amendment and the Electoral Count Act for certifying the electoral vote for President and Vice President.  And, as a matter of common usage, it is as natural to refer to the joint session of the Senate and House of Representatives to certify the electoral vote as "an official proceeding" as it is odd to use that label to refer to an ongoing criminal investigation.

The Court, moreover, agrees with several of the Ninth Circuit's general observations about the meaning of the term "official proceeding."  The Ninth Circuit started its analysis, as the Court does here, by noting that the term "proceeding" "has been defined in various ways, ranging from the broad to the specific."  *Id.* at 1169.  Then, again as the Court does here, the Ninth Circuit rejected the broadest reading—that is, "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior."  *Id*. (quoting *Proceeding*, Oxford English Dictionary (3d ed. 2007)).  And, the Ninth Circuit further noted that "the descriptor 'official' indicates a sense of formality normally associated with legal proceedings," *id.* at 1170, a premise with which this Court also agrees—although the Court notes that the certification of the electoral vote pursuant to the Twelfth Amendment and the Electoral Count Act is, if anything, a *more* formal (and, indeed, solemn) occasion than most "legal proceedings."

Beyond these general observations, the Ninth Circuit did not endeavor to adopt one, universal definition of the phrase "official proceeding," but, rather, noted that the "most important[]" factor in its textual analysis was the "clarif[ying]" language that appears in the portion of the definition addressing proceedings before federal agencies but not elsewhere in Section 1515(a)(1): in that portion of the definition, and only there, Congress added the qualification that the proceeding must be "authorized by law."  *Id.* (emphasis omitted) (quoting 18 U.S.C. § 1515(a)(1)(C)).  The Ninth Circuit's focus on that context, moreover, carried over to the list of possible definitions of "proceeding" that the Ninth Circuit catalogued.  This Court agrees that context matters.  Some definitions of the term "proceeding"—like "[t]he regular and orderly progression of a lawsuit," *id.* at 1169 (quoting *Proceeding*, Black's Law Dictionary 1241 (8th ed. 2004))—apply most sensibly to "a proceeding before a judge or court," 18 U.S.C. § 1515(a)(1(A).  But others—most notably, "[t]he business conducted by . . . [an] official body,"

752 F.3d at 1169 (quoting *Proceeding*, Black's Law Dictionary 1241 (8th ed. 2004))—apply most sensibly to "a proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B).  Defendants offer no plausible reason why this Court should look at the range of "legal" or "technical" definitions of "proceeding," choose the one that fits the judicial process most naturally, reject the one that fits the congressional setting, and then conclude that the judicial definition must be forced unnaturally to fit the congressional setting.

There is another reason to decline Defendants' invitation to read "a proceeding before the Congress" to mean a "quasi-judicial" proceeding or a proceeding involving the "administration of justice."  As a matter of separation of powers, that is not what Congress does.  To be sure, Congress's legislative powers include the implicit authority to summon witnesses, to elicit testimony, and to investigate facts about the world.  In other words, "each House has power 'to secure needed information' *in order to legislate*."  *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (emphasis added) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927)).  But, "[b]ecause this power is 'justified solely as an adjunct to the legislative process,' it is subject to several limitations."  *Id.* (quoting *Watkins v. United States*, 354 U.S. 178, 197 (1957)).  Most notably, with two narrow exceptions discussed below, Congress does not engage in adjudicative proceedings (or even quasi-adjudicative proceedings) or in the "administration of justice."  *See id.* at 2032.  Defendants' efforts to read "proceedings before the Congress" to mean proceedings that are "quasi-judicial" or that involve the "administration of justice," accordingly, cannot help but bring to mind the aphorism about square pegs and round holes.  Moreover, even assuming that Defendants are merely arguing by analogy, the analogy is inapt.  Section 1515(a)(1) reaches all three branches of government, and the definition of "official proceeding" is properly understood in the unique context of each branch.  Most naturally construed, the phrase "a

14

proceeding before a judge or court" refers to a "judicial proceeding;" the phrase "a proceeding before the Congress," refers to a "congressional proceeding;" and the phrase "a proceeding before a Federal Government agency which is authorized by law" refers to an "administrative proceeding."

Defendants counter that the Constitution does, in fact, provide for two situations in which Congress acts in a "quasi-judicial" capacity: when it investigates and tries cases of impeachment, U.S. Const. art. I, § 2, cl. 5; *id.* art. I, § 3, cl. 6, and when it acts as a "Judge of the Elections, Returns and Qualifications of its own Members," *id.* art. I, § 5, cl. 1. Dkt. 60 at 16–17. Defendants fail to confront the fact, however, that to the extent the Constitution is a guide, it uses the term "proceedings" broadly—and in the more natural sense—to refer to the business conducted before "[e]ach House" of the Congress. U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings"). But, more importantly, had Congress intended to limit Section 1515(a)(1)(B) to impeachment and qualification proceedings, it easily could—and surely would—have done so. When it comes to statutory interpretation, it is generally a bad idea to assume that Congress used a general phrase to refer to an exceedingly narrow set of circumstances, which Congress could just as readily have described in place of the general phrase.

Another argument that Defendants press, which they again draw from *Ermoian*, Dkt. 60 at 12, also fails to translate to the congressional setting. According to *Ermoian*, Section 1515(a)(1)(c)'s "use of the preposition 'before' suggests an appearance in front of [an] agency sitting as a tribunal." 752 F.3d at 1171. For that premise, the Ninth Circuit cited the Fifth Circuit's decision in *Ramos*, which held that the definition of "official proceeding" found in Section 1515(a)(1)(c) "does not apply to routine agency investigations of employee misconduct."

537 F.3d at 462.  Quoting *Ramos*, the *Ermoian* court observed: "[U]se of the preposition 'before' in connection with the term 'Federal Government agency' implies that an 'official proceeding' involves some formal convocation of the agency in which parties are directed to appear, instead of any informal investigation conducted by any member of the agency."  752 F.3d at 1171 (alterations omitted) (quoting *Ramos*, 537 F.3d at 462–63).  From this, Defendants argue that a joint session of the Senate and House of Representatives to certify the electoral vote is not an "official proceeding" because "no person is directed to appear and give testimony during the certification proceedings," and, indeed, "the interested party—the winner of the electoral college vote—does not appear to observe the proceedings."  Dkt. 60 at 12.

Defendants overstate the holdings of *Ermoian* and *Ramos* and misread the statutory text. The passing assertion in *Ramos* (quoted in *Ermoian*) that "parties are directed to appear" at "official proceedings," 537 F.3d at 462–63, may make perfect sense when talking about administrative proceedings before federal agencies, which is all that was at issue in those cases. The same assertion would make little sense, however, if extended to congressional proceedings, which are not adjudicatory (or even quasi-adjudicatory) and do not involve "parties" to a dispute. But, even more importantly, Defendants misread the statute: the preposition "before" follows the word "proceeding" and precedes the nouns "judge or court," "the Congress," and "a Federal Government agency."  18 U.S.C. § 1515(a)(1).  The statute, accordingly, does not require that any *witness or party* appear *before* a particular body or tribunal; it requires that the *proceeding* take place *before* a judge or court, the Congress, or a Federal Government agency.

One need not look far to appreciate what it means for a proceeding to take place *before* the Congress, and neither the appearance of an interested "party" nor the taking of evidence is a necessary condition.  To take an example from the year Congress enacted Section 1515, a

markup was held "*Before* the Committee on Foreign Affairs" on six resolutions concerning human rights in the former Soviet Union. *H. Res. 200; H. Con. Res. 218; H.J. Res. 230; H. Con. Res. 205; H.J. Res. 373; H. Res. 269: Markup Before the H. Comm. on Foreign Affs. and its Subcomm. on Human Rts. & Int'l Orgs.*, 97th Cong. I (1982) (emphasis added). Although that proceeding took place *before* the Committee, "no witnesses" appeared. *Id.* at III. That example, moreover, is far from unusual; proceedings often occur "*before*" congressional committees and without witnesses or "parties." *See*, *e.g*, *Markup to Consider Three Joint Resolutions Relating to Lebanon and the War Powers Resolution: S.J. Res. 159; S.J. Res. 163; and S.J. Res. 166: Hearing Before the S. Comm. on Foreign Rels.*, 98th Cong. I (1983); *NASA Management Reorganization Act of 1993: Markups Before the H. Comm. on Sci., Space & Tech.*, 103rd Cong. I (1993). Congress undoubtedly understood this common usage—that is, its own usage—when it enacted Section 1515(a)(1).

Finally, although both the *Ermoian* and *Ramos* courts endorsed the idea that "'official proceeding' is consistently used throughout § 1512 in a manner that contemplates a formal environment in which persons are called to appear or produce documents," that point is not true for all parts of the statute. *Ramos*, 537 F.3d at 463; *accord Ermoian*, 752 F.3d at 1171–72. To be sure, Section 1512(a)(1)(B) prohibits killing or attempting to kill another person to "prevent the production of a record, document, or other object, in an official proceeding," and Section 1512(a)(2)(A) prohibits the use of physical force or the threat of physical force against a person with the intent to "influence, delay, or prevent the testimony of any person in an official proceeding." But Section 1512(d)(1), in contrast, prohibits hindering "any person from . . . attending . . . an official proceeding," and would thus apply, for example, to efforts to prevent judges, magistrates, members of Congress, and agency officials from attending "official

proceeding[s]"—regardless of whether any "party" is required to attend the proceeding or any "evidence" will be received. The lesson to draw from the varying language used in different portions of Section 1512 is that, when Congress intended to focus on interfering with the "testimony of any person," 18 U.S.C. § 1512(a)(1)(A), (2)(A), "evad[ing] legal process," *id.* § 1512(a)(2)(B)(iii), (b)(2)(c), or "destroy[ing] . . . object[s]," *id.* § 1512(a)(2)(B)(ii), (b)(2)(B), (c)(1), it said so. The Court need not, and should not, construe the broad definition of "official proceeding" contained in Section 1515 to achieve indirectly, and without textual basis, the same ends that Congress achieved with far greater precision (albeit less universality than Defendants might like) in the detailed subsections of Section 1512. Appeals to consistency in the face of inconsistent statutory language fail to credit the choices that Congress made.

The D.C. Circuit's decision in *United States v. Kelley*, is even less on point. The relevant discussion in that case concerns a different statute—Section 1505—and different language—"the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States." 36 F.3d at 1127 (quoting 18 U.S.C. § 1505). When the *Kelley* court did turn its attention to Section 1512, moreover, it merely observed: "We need not decide whether 'proceeding' has the same meaning in both § 1505 and § 1512, since the parties agree that a parallel should be drawn between the two sections." *Id.* at 1128. The D.C. Circuit's acceptance of the parties' concession for purposes of that case does not constitute a holding, nor does it illuminate the issue presented here.

Finally, the other cases on which Defendants rely, *Arthur Andersen LLP v. United States*, 544 U.S. 696, 708 (2005) (explaining that the "intent to obstruct" requires "knowledge that [the defendant's] actions are likely to affect the judicial proceeding" (quotation marks omitted)); *United States v. Sampson*, 898 F.3d 287, 300 (2d Cir. 2018) (noting that Section 1512 "broadly

18

criminalizes various forms of witness tampering"); and *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013) (holding that, although "[o]bstruction of justice occurs when a defendant acts to impede the types of proceedings that take place before judges or grand juries[,] . . . the defendant need not interfere while court is actually in session"), merely stand for the unremarkable and undisputed proposition that Section 1512(c) criminalizes obstruction of proceedings before courts.  None of these cases says anything at all about what types of proceedings *before Congress* fall within the statutory definition of "official proceeding."

Thus, at the end of the day, the Court concludes that the most sensible reading of Section 1515 is that the term "official proceeding" refers to "[t]he business conducted by . . . [an] official body" that has formally convened for the purpose of conducting that business.  *Proceeding*, Black's Law Dictionary (11th ed. 2019).  This definition contemplates a level of formality—a "formal convocation" of the relevant government entity, to borrow the words of the Fifth Circuit in *Ramos*.  537 F.3d at 462.  For present purposes, moreover, the Court need not decide how this definition applies to various congressional proceedings, much less decide how the definition applies to proceedings before courts or administrative agencies.  Even if the Court were inclined to draw lines between different categories of congressional action, the certification of the electoral vote plainly qualifies as an "official proceeding" within the meaning of Section 1512(c)(2).

The certification process undertaken pursuant to the Twelfth Amendment and the Electoral Count Act, 3 U.S.C. § 15, requires the Congress formally to convene to conduct official business, to consider objections, and to render a final decision.  The Act specifies a time, hour, and place for the proceeding: Congress must convene at 1:00 p.m. "on the sixth day of January . . . in the Hall of the House of Representatives."  *Id.*  It identifies the "presiding officer": "the

President of the Senate," that is, the Vice President of the United States. *Id.* It sets a process for opening, presenting and acting upon the "certificates of the electoral votes": two tellers from the Senate and two from the House of Representatives are handed (in alphabetical order) the certificates and all "papers purporting to be certificates" as they are opened, and the tellers are required to read the those materials "in the presence and hearing of the two Houses" and to "make a list of the votes as they shall appear from the said certificates." *Id.* The Act then sets rules for propounding objections: the President of the Senate calls for objections, which, if any, "shall be made in writing, . . . shall state clearly and concisely, and without argument, the ground thereof, and shall be signed by at least one Senator and one Member of the House of Representatives, before" the objection will be "received." *Id.* The Act also sets procedures for resolving any such objections: each House must withdraw to its own chamber to debate the objection; each House must render a "decision;" and the electoral vote from the State at issue may be "rejected" only if both Houses agree that "the vote or votes have not been . . . regularly given by electors whose appointment has been . . . certified" pursuant to 3 U.S.C. § 6. *Id.* The Act further specifies which votes Congress should count if "more than one return or paper purporting to be a return from a State shall have been received," and when votes given by "successors or substitutes" may be counted. *Id.* Finally, the Act directs that once "the two Houses have voted, they shall immediately again meet, and the presiding officer shall announce the decision of the questions submitted." *Id.*

Thus, as Judge Friedrich recently put it, the joint session of the Senate and House of Representatives for purposes of certifying the electoral vote for President and Vice President of the United States has all "the trappings of a formal hearing before an official body." *United Sates v. Sandlin*, No. 21-cr-88, 2021 WL 5865006, at *4 (D.D.C. Dec. 10, 2021). "There is a

presiding officer, a process by which objections can be heard, debated, and ruled upon, and a

decision—the certification of the results—that must be reached before the session can be

adjourned." *Id.*  "[T]he certificates and papers purporting to be certificates of the electoral

votes," 3 U.S.C. § 15, moreover, "are akin to records or documents that are produced during

judicial proceedings, and any objections to these certificates can be analogized to evidentiary

objections," *Sandlin*, 2021 WL 5865006, at *4; *see also United States v. Caldwell*, No. 21-cr-28,

2021 WL 6062718, at *7 (D.D.C. 20, 2021).  As a result, "the congressional certification at issue

here" is, by any reasonable measure, a "proceeding before the Congress."  *Sandlin*, 2021 WL

5865006, at *4.  To conclude otherwise would require a departure from common usage and

common sense.  Hard cases may make bad law.  But easy cases ought not.

For these reasons, the Court rejects Defendants' contention that the joint session of

Congress convened to certify the electoral vote is not a "proceeding before the Congress."

## B.

Sounding similar themes, Defendants also argue that the phrase "otherwise obstructs,

influences, or impedes any official proceeding" in Section 1512(c)(2) does not apply to the

conduct charged in Count 10.  In their view, Section 1512(c)(2), instead, applies only to conduct

"that is directed at undermining a proceeding's truth-finding function through actions impairing

the integrity and availability of evidence."  Dkt. 60 at 27 (quotation marks omitted).[3]  For the

reasons explained below, the Court is unpersuaded.

---

[3] Here, and elsewhere in their briefs, Defendants quote from a memorandum prepared by "the
former Attorney General."  Dkt. 60 at 26; *see also* Dkt. 60 at 26, 27, 28, 29, 30 (quoting
Memorandum from William Barr to Rod Rosenstein, Deputy Att'y Gen., Dep't of Justice (June
8, 2018), *available at* https://s3.documentcloud.org/documents/5638848/June-2018-Barr-Memo-
to-DOJ-Muellers-Obstruction.pdf).  The Court notes, however, that the memorandum was
authored by William Barr before he was appointed to serve as Attorney General in the Trump

The Court, once again, starts with the relevant text.  Section 1512(c) provides:

(c)  Whoever corruptly—

　　(1)  alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

　　(2)  otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c).

Absent good reason, the Court must read the text of Section 1512(c)(2) "in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).  To do so, the Court first looks to the subject, verbs, and object of the operative clause.  The meaning of the *subject* of the clause is noncontroversial—"whoever" is a broad term that indisputably applies to Defendants.  The ordinary and natural meanings of each of the operative *verbs* are also noncontroversial.  "Obstruct" means "[t]o make difficult or impossible; to keep from happening; [to] hinder." *Obstruct*, Black's Law Dictionary (11th ed. 2019); *see also Obstruct*, Webster's Third New International Dictionary 1558 (1993) (defining "obstruct" as "to be or come in the way of; hinder from passing, action, or operation").  "Influence" means "to affect or alter the conduct, thought, or character of by indirect and intangible means." *Influence*, Webster's Third New International Dictionary 1160 (1993); *see also Influence*, Black's Law Dictionary (11th ed. 2019) (defining the noun form of influence as the "[u]se of pressure . . . or power . . . to induce action or change the decisions or acts of another").  And "impede" means "to hold up" or "block." *Impede*, Webster's Third New International Dictionary 1132 (1993).  As the Supreme

─────────────────

Administration (and long after he served as Attorney General in the Bush Administration). Accordingly, any suggestion that the memorandum represents the views of the Department of Justice is inaccurate.

Court recently observed in a similar context, "[t]he statutory words 'obstruct or impede' are broad" and "can refer to anything that 'block[s].'" *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (quoting *Obstruct*, Black's Law Dictionary (10th ed. 2014); and *Impede*, Webster's New International Dictionary 1248 (2d ed. 1954)). Finally, the Court has already addressed the meaning of the *object* of Section 1512(c)(2)—that is, the meaning of "any official proceeding"— and it need not repeat that analysis here. Taking the subject, verbs and object together, then, Section 1512(c)(2) prohibits individuals, like Defendants here, from coming in the way of, blocking, or holding up the business conducted by an official body, such as a court or the Congress, when that body has formally convened for the purpose of conducting that business.

Two other statutory terms, however, further define the offense. The adverb "corruptly" defines the *mens rea* requirement, and a second adverb, "otherwise," introduces Section 1512(c)(2). The Court will address the *mens rea* requirement in Section C, below. For purposes of defining the *actus reus*, then, this leaves the adverb "otherwise," which has occupied much of the parties' debate regarding the scope of Section 1512(c)(2). In Defendants' view, the combination of the word "otherwise" and the overall structure of the statute limits the reach of Section 1512(c)(2) to "the same kind of obstructive impact as the . . . forms of obstruction" listed in Section 1512(c)(1)—that is, "impairing the availability or integrity of evidence." Dkt. 60 at 26 (quotation marks omitted). For support, they invoke the Supreme Court's decisions in *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015), and *Yates v. United States*, 574 U.S. 528 (2015), and they point to a series of court of appeals decisions that have applied Section 1512(c)(2) in cases involving interference with the integrity or availability of evidence in an adjudicative or grand jury proceeding. Dkt. 60 at 25–28. None of these cases supports Defendants' narrow reading of Section 1512(c)(2).

In *Begay*, the Court considered whether driving under the influence was a "violent felony" under the Armed Career Criminal Act ("ACCA").  The ACCA defined a "violent felony" as "any crime punishable by imprisonment for a term exceeding a year" that

(i)     ha[d] as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii)    [was] burglary, arson, or extortion, involve[d] use of explosives, or *otherwise* involve[d] conduct that present[ed] a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B) (2000) (emphasis added).  Parsing this language, the Supreme Court concluded that the examples listed before the residual clause—that is, before the word "otherwise"—"limit[ed] the scope of the clause to crimes that are similar to the examples themselves," *Begay*, 553 U.S. at 143, and that, as a result, the crime of driving under the influence fell "outside the scope" of the ACCA, *id.* at 148.

*Begay* does little to advance Defendants' contention here.  To start, *Begay*'s discussion of the word "otherwise" is remarkably agnostic.  The Supreme Court merely observed that "the word 'otherwise' *can* (we do not say *must*) refer to a crime that is similar to the listed examples in some respects but different in others." *Id.* at 144 (citation omitted).  The Court, accordingly, placed little or no weight on the word "otherwise" in resolving the case.  Moreover, just as it did more recently in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 534 (2015), the Court accepted the dictionary definition of "otherwise"—that is, "otherwise" means "in a different way or manner." *Begay*, 553 U.S. at 144 (quoting *Otherwise*, Webster's Third New International Dictionary 1598 (1961)); *see also id*. at 151 (Scalia, J., concurring in the judgment).  And, even more importantly, the Court suggested (and Justice Scalia stressed in his separate opinion) that the significance of the term "otherwise"

24

is best discerned from the surrounding text.  *Id.* at 141 (majority opinion); *see also id.* at 150–51 (Scalia, J., concurring in the judgment).

Because the majority assigned little significance to Congress's use of the word "otherwise," it merely hinted (in a single sentence) that the word "otherwise" *might* suggest a similarity "in respect to the degree of risk" posed by the crimes listed before "otherwise" and the crimes included in the omnibus clause.  *Id.* at 144 (majority opinion).  Justice Scalia, however, developed this point in greater detail in his separate opinion.  He wrote:

> The Court is correct that the clause "otherwise involves conduct that presents a serious potential risk of physical injury to another" signifies a similarity between the enumerated and unenumerated crimes.  It is not, however, *any* old similarity, such as (to take a random example) "purposeful, 'violent, and 'aggressive' conduct."  Rather, it is the *particular* similarity specified after the "otherwise"— *i.e.*, that they all pose a serious potential risk of physical injury to another.  They need not be similar in any other way.  As the Court correctly notes, the word "otherwise" is this context means "'in a different way or manner.'"  Therefore, by using the word "otherwise" the writer draws a substantive connection between two sets only on one specific dimension—*i.e.*, whatever follows "otherwise."

*Id.* at 150–51 (Scalia, J., concurring in the judgment) (citations omitted).  Here, if one looks to the "particular similarity specified after the 'otherwise'" in Section 1512(c)(2), the link or similarity between the crimes covered by Sections 1512(c)(1) and (c)(2) is that both provisions apply to conduct that—directly or indirectly—"obstructs, influences, or impedes any official proceeding."  Understood in this light, the word "otherwise" does not advance Defendants' argument.

*Begay* does, however, point to another, more substantial interpretative issue.  In narrowly reading the residual clause, *Begay* also relied on the canon against superfluity.  As the Supreme Court framed the question, if Congress intended the residual clause to apply to "*every* crime that 'presents a serious potential risk of physical injury to another,'" what work would be performed

by the examples that preceded the residual clause?  553 U.S. at 142 (quoting 18 U.S.C.

§ 924(e)(2)(B)(ii) (2000)).  In the Court's view, the answer to this question was "none," and that

conclusion, combined with the interpretative goal of "giv[ing] effect . . . to every clause and

word of th[e] statute," led the Court to read the residual clause to cover only those "crimes that

are roughly similar, in kind as well as in degree of risk posed, to" the crimes listed in the

examples clause.  *Id.* at 143 (quotation marks omitted).  Without this limitation, the Court

reasoned, "it is hard to see why [Congress] would have needed to include the examples at all."

*Id.* at 142.  For three reasons, the canon against superfluity does not compel the same conclusion

here.

　　　First, Sections 1512(c)(1) and (c)(2) do not overlap in the same way that the two clauses

of the ACCA overlapped.  Under the version of the ACCA at issue in *Begay*, if the residual

clause was broadly construed, it would encompass all that comes before it.  *See id.* at 142–43.

The Court cannot reach the same conclusion with respect to the clauses in Sections 1512(c)(1)

and (c)(2).  The plain text of Section 1512(c)(1) targets the alteration of *evidence* "with the intent

to impair *the object's integrity or availability* for use in an official proceeding."  18 U.S.C.

§ 1512(c)(1) (emphasis added).  In contrast, Section 1512(c)(2) takes aim at the obstruction of

the official proceeding *itself*.  In other words, while the official proceeding is the indirect object

of the intent requirement in Section 1512(c)(1), it is the *direct* object of the conduct at issue in

Section 1512(c)(2).  Thus, "'otherwise' . . . signals a shift in emphasis," *Inclusive Cmtys.*

*Project, Inc.*, 576 U.S. at 520, from actions directed at evidence to actions directed at the official

proceeding itself.  And although cases will undoubtedly arise that could be brought under either

or both prongs of Section 1512(c), substantial "overlap between . . . two clauses . . . is not

uncommon in criminal statutes," *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014); *see*

*also Aguilar*, 515 U.S. at 616 (Scalia, J., concurring in part and dissenting in part) ("It is not unusual for a particular act to violate more than one criminal statute, and in such situations the Government may proceed under any statute that applies." (citation omitted)); *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009) ("The whole value of a generally phrased residual clause . . . is that it serves as a catchall for matters not specifically contemplated.").

Second, Section 1512(c) differs from the ACCA in another important respect. Congress's challenge in defining a serious, "violent felony" in the ACCA was a substantial one, involving a large and diverse array of federal and state crimes, many of which were recognized (and ever-evolving) at common law. Under those circumstances, it was reasonable for the Court to assume that Congress meant for the residual clause to apply to crimes *like* burglary, arson, extortion, or crimes involving the use of explosives. But here, by contrast, it would have been easy for Congress to craft language to achieve the goal that Defendants now hypothesize. Congress, for example, could have substituted Section 1512(c)(2) with the following: "engages in conduct that otherwise impairs the integrity or availability of evidence or testimony for use in an official proceeding." The fact that Congress, instead, enacted language that more generally— and without the limitations that Defendants now ask the Court to adopt—criminalized efforts corruptly to obstruct official proceedings speaks volumes. Indeed, the detailed proscriptions contained in other provisions of Section 1512 show that, when Congress intended to limit a provision to "the attendance or testimony of any person," or "the production of a record, document, or other object," or the reporting of "the commission or possible commission of" a crime, Congress knew how to do so. *See, e.g.*, 18 U.S.C. § 1512(a)(1)(A)–(C). Just as courts must give meaning to those limitations, they must give effect to the broad language that Congress employed in Section 1512(c)(2).

Finally, the Court is also unpersuaded by Defendants' more general superfluity argument, which posits that, unless Section 1512(c)(2) is narrowly construed, much of Chapter 73 would be rendered superfluous.  Dkt. 60 at 29.  As an initial matter, it bears emphasis that the canon against superfluity is "strongest when an interpretation would render superfluous another part of the same statutory scheme."  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013); *see also Yates*, 574 U.S. at 1084–85 (plurality opinion) ("We resist a reading of § 1519 that would render superfluous an entire provision passed . . . as part of the same Act."); *Freytag v. Comm'r*, 501 U.S. 868, 877 (1991) (noting that the canon against superfluity counsels against reading "a statutory provision so as to render superfluous other provisions of the *same enactment*" (emphasis added) (quotation marks omitted)).  By the same token, the canon is less helpful in cases involving distinct statutory provisions enacted decades apart from one another.

Even more importantly, Chapter 73 inescapably contains numerous overlapping provisions, regardless of how broadly Section 1512(c)(2) is construed.  *See Aguilar*, 515 U.S. at 616 (Scalia, J., concurring in part and dissenting in part) ("The fact that there is now some overlap between [Section] 1503 and [Section] 1512 is no more intolerable than the fact that there is some overlap between the omnibus clause of [Section] 1503 and the other provisions of [Section] 1503 itself.").  Indeed, if the Court were to construe Section 1512(c)(2) in the precise manner Defendants suggest, the second clause of Section 1503(a)—which applies to "[w]hoever corruptly . . . influences, obstructs, or impedes or endeavors to influence, obstruct, or impede, the due administration of justice"—would be superfluous, as would the second clause of Section 1505—which applies to "[w]hoever corruptly . . . influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of law" in any administrative proceeding or "the due and proper exercise of the power of inquiry under which any inquiry or

investigation is being had by either House, or any committee of either House or any joint committee of the Congress."  As a result, the canon against superfluity, alone, does not support Defendants' reading of Section 1512(c)(2), and, in any event, that canon cannot trump the plain meaning of the statute.  *See Hubbard v. United States*, 514 U.S. 695, 714 n. 14 (1995) (opinion of Stevens, J.) ("Congress may, and often does, enact separate criminal statutes that may, in practice, cover some of the same conduct."); *cf. Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005) ("The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either.").

The Supreme Court's decision in *Yates* is equally inapt.  The question presented in *Yates* was whether another provision of Chapter 73, Section 1519, applied to a commercial fisherman who "caught undersized red grouper in federal waters" and then directed his crew "to toss the suspect catch into the sea" "[t]o prevent federal authorities from confirming that he had harvested the undersize fish."  574 U.S. at 531.  Section 1519 provides, in relevant part:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or *tangible object* with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519 (emphasis added).  The Court was therefore required to decide whether the phrase "tangible object," as used in Section 1519, covers all "objects in the physical world," or "only objects one can use to record or preserve information."  574 U.S. at 536.

In answering that question, both the plurality and Justice Alito, who concurred in the judgment and, in so doing, provided the decisive fifth vote, employed two canons of statutory interpretation: the canon of "*noscitur a sociis*—a word is known by the company it keeps," *id.* at 543—and the canon of "*ejusdem generis*"—"[w]here general words follow specific words in a

statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words," *id.* at 545 (alterations omitted).  Starting with the first of these canons, the plurality observed that the phrase "tangible object" appears at the end of  "a list of terms that begins with 'any record [or] document," and it concluded that "[t]he term is therefore appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects involving records and documents."  *Id.* at 544.  This conclusion, the plurality further observed, "accords with the list of actions"—or verbs—found in Section 1519: "The section applies to anyone who 'alters, destroys, mutilates, conceals, covers up, *falsifies*, or *makes a false entry in* any record, document or tangible object.'"  *Id.* (quoting 18 U.S.C. § 1519).  Because "[t]he last two [of these] verbs, 'falsify' and 'make a false entry in,' typically take as grammatical objects records, documents, or things used to record or preserve information, such as logbooks or hard drives," the plurality reasoned, "[i]t would be unnatural" to read Section 1519 to the destruction of other types of evidence.  *Id.*  The same conclusion, moreover, followed from application of the *ejusdem* canon.  As the plurality explained, because "tangible objects" is a general phrase that follows "specific words in a statutory enumeration," "tangible objects" should be "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Id.* at 545 (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003)).

Although Justice Alito's concurring opinion disagreed with much of the plurality's reasoning, Justice Alito agreed that the *noscitur* and *ejusdem* canons provided substantial guidance in interpreting Section 1519.  "Applying these canons to [Section] 1519's list of nouns," he wrote, "the term 'tangible object' should refer to something similar to records or documents."  *Id.* at 550 (Alito, J., concurring in the judgment).  That reasoning, moreover,

extended beyond the operative nouns to Section 1519's "list of verbs: 'alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in.'" *Id.* at 551. As Justice Alito colorfully observed, "[a]lthough many of those verbs could apply to nouns as far-flung as salamanders, satellites, or sand dunes, the last phrase in the list—'makes a false entry in'—makes no sense outside of filekeeping." *Id.* Ultimately, in casting the deciding vote, Justice Alito noted that the case presented a "close" question, but that "traditional tools of statutory construction confirm[ed] that [the defendant] ha[d] the better of the argument." *Id.* at 549.

Contrary to what Defendants argue, neither the plurality opinion in *Yates* nor Justice Alito's concurrence requires the Court to read Section 1512(c)(2) to only cover acts impairing the availability or integrity of evidence. First, Section 1512(c)(2) is not part of a list that starts in Section 1512(c)(1), and thus interpretive canons that are most helpful when construing a general term contained in a list that starts with specific terms are inapt. *See Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021) ("[B]oth the *ejusdem* and the *noscitur* canon apply when the term in question is directly preceded by a list of terms."); *Ali*, 552 U.S. at 225 ("The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase."). Second, unlike the list in *Yates*, the verbs contained in Section 1512(c)(1) differ in material respects from the verbs in Section 1512(c)(2). Section 1512(c)(1) applies to anyone who "alters, destroys, mutilates, or conceals" a record or object, while Section 1512(c)(2) applies to anyone who "obstructs, influences, or impedes" an official proceeding. Third, the relevant nouns are also different in kind. Section 1512(c)(1) protects "record[s], document[s], or other object[s]," while Section 1512(c)(2) protects "official proceeding[s]." Just as Justice Alito asked how anyone could "make a false entry in a fish," 574 U.S. at 551 (Alito, J., concurring in the

judgment), the Court might ask here: How anyone could alter, destroy, mutilate or conceal an

"official proceeding" or how anyone could "obstruct[], influence[], or impede[]" "a record,

document, or other object"?  In short, because the two prongs of Section 1512(c) are not parallel,

the *noscitur* and *ejusdem* canons have little bearing on the interpretative question before the

Court.

  Nor is the Court convinced that the discussion of statutory titles in *Yates* supports

Defendants' argument here.  It is true that Justice Alito explained that his "analysis [was]

influenced by [Section 1519's] title: 'Destruction, alterative, or falsification of records in Federal

investigations and bankruptcy.'"  574 U.S. at 552 (Alito, J., concurring in the judgment).  And it

is likewise true that the title for Section 1512 contained in the U.S. Code—"Tampering with a

witness, victim, or an informant"—is consistent with Defendants' view of the statute.  But when

Congress enacted Section 1512(c)(2), that title was already included in the codification.  *See* 18

U.S.C. § 1512 (2000).  The title of the section of the legislation that added Section 1512(c), in

contrast, was "Tampering with a record *or otherwise impeding an official proceeding*."

Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 1102, 116 Stat. 745, 807 (emphasis added).

Unlike in *Yates*, then, Section 1512(c)(2)'s title in the U.S. Code is unenlightening, and the title

under which it was enacted arguably supports a broader reading of the statute.

  Finally, the discussion of legislative history in the *Yates* plurality opinion does not

advance Defendants' argument here.  To start, Justice Alito concurred only in the judgment, and

his separate opinion makes no reference to legislative history or historical context.  But even had

that approach garnered a majority, it would not help Defendants.  In the view of the *Yates*

plurality, "[i]t is highly improbable that Congress would have buried a general spoliation statute

covering objects of any and every kind in a provision" adopted as part of the Sarbanes–Oxley

Act, which "target[ed] fraud in financial recordkeeping." 574 U.S. at 546. Here, however, unlike in *Yates*, the inclusion of the provision at issue in the Sarbanes-Oxley Act and the placement of that provision in an existing section of Chapter 73, make sense.

Unlike Section 1519, which was at issue in *Yates*, Section 1512(c)(2) did not take shape until late in the legislative process. On July 10, 2002, Senator Trent Lott introduced Section 1512(c)(2) as part of a floor amendment to the legislation that would ultimately be incorporated into the Sarbanes–Oxley bill. 148 Cong. Rec. S6542 (daily ed. July 10, 2002). Because Section 1512(c)(2) did not originate in a committee, there is little legislative history that sheds light on the purposes of that particular provision. And what little history exists should not be given much weight because it comes in the form of floor statements. *See NLRB v. SW General, Inc*., 137 S. Ct. 929, 943 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history."). But to the extent the legislative history warrants consideration, it further distinguishes this case from *Yates*. After Senator Lott offered the floor amendment that included Section 1512(c), Senator Orrin Hatch added his support for the amendment, explaining that Section 1512(c) was intended to "close[] [a] loophole by broadening the scope of Section 1512," which the Senator noted was "often used to prosecute" various "forms of obstruction of justice." 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch). Up to that point, Senator Hatch explained, Section 1512 only "prohibit[ed] individuals from *persuading others* to engage in obstructive conduct." *Id.* (emphasis added). But with the addition of Section 1512(c), he continued, Congress would "strengthen[]" the statute by prohibiting acts of obstruction "committed by a defendant *acting alone*." *Id.* (emphasis added).

Placing Senator Hatch's observation in context, it bears note that the ultimately unsuccessful Arthur Andersen prosecution was not brought against any individual for personally destroying records but, rather, was brought against the firm for "corruptly persuad[ing] another person" to do so. *Arthur Andersen*, 544 U.S. at 698 (quoting 18 U.S.C. § 1512(b)). That approach, moreover, was consistent with the statutory structure at the time, which was focused on efforts to obstruct official proceedings by influencing or threatening "others to engage in obstructive conduct," 148 Cong. Rec. S6550 (statement of Sen. Hatch); *see, e.g.*, 18 U.S.C. § 1512(a)(1) ("Whoever kills or attempts to kill *another person*, with intent to . . .") (emphasis added); *id.* § 1512(a)(2) ("Whoever uses physical force or the threat of physical force *against any person*, or attempts to do so, with intent to . . .") (emphasis added); *id.* § 1512(b) ("Whoever knowingly uses intimidation, threatens, or corruptly persuades *another person*, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . .") (emphases added); *id.* § 1512(d) ("Whoever intentionally harasses *another person* . . .") (emphasis added). Section 1512(c) closed this "loophole" and "strengthen[ed]" the statute by prohibiting obstruction "committed by a defendant acting alone," 148 Cong. Rec. S6550 (statement of Sen. Hatch).

Understood in that light, it is unsurprising that Congress added Section 1512(c) to the pre-existing provisions of Section 1512, and it is unlikely that Congress was concerned with only the type of document destruction at issue in the *Arthur Andersen* case. Congress recognized that the existing portions of Section 1512—somewhat oddly—made it a crime to kill, assault, threaten, intimidate, corruptly persuade, or harass another person and, thereby, indirectly to obstruct an official proceeding, but did not make it a crime for the defendant to do so without the (willing or unwilling) participation of a third party. And, in closing that loophole, there is no

34

reason to believe that Congress intended to fix that problem only with respect to "the availability or integrity of evidence." Dkt. 60 at 26. Section 1512(d), for example, not only applies to conduct that hinders or prevents a witness from "testifying in an official proceeding," but also to conduct that prevents or dissuades others, including judges, members of Congress, or agency officials, from attending official proceedings. Either type of misconduct—regardless of whether it involves the availability of evidence—has the indirect effect of obstructing the proceeding itself, and Defendants offer no cogent reason to believe that Congress intended to close the loophole only in the cases involving the availability of evidence. But to the extent Congress's purpose is unclear or subject to debate, "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *cf. Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020) ("The fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." (quotation marks and alterations omitted)).

Apart from invoking the Supreme Court's general statements in *Yates*, Defendants argue that the legislative history of Section 1512(c)(2) "was expressly designed to clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." Dkt. 60 at 28 (quotation marks omitted). But that understanding is at odds with the legislative history discussed above. Defendants, moreover, rely on a lone statement from the legislative history, and that reliance is misplaced. The statement appears in a report from the Senate Judiciary Committee that accompanied S. 2010, the Corporate and Criminal Fraud Accountability Act of 2002. As explained above, however, what

became Section 1512(c) was introduced late in the legislative process, and S. 2010 did not

include Section 1512(c).  *See* S. 2010, 107th Cong. (2002); *see also* S. Rep. 107–146, at 11–14

(providing a section-by-section analysis of S. 2010).  Rather, in relevant part, S. 2010 contained

only Section 1519 and Section 1520, each of which—as we know from *Yates*—specifically deals

with evidence tampering.  *See* S. 2010, 107th Cong. § 2.  (That bill's language would ultimately

be incorporated into Sarbanes–Oxley.)   As stated in the Senate committee report, S. 2010 was

reported out of the Judiciary Committee on May 6, 2002, S. Rep. 107-146, at 1, two months

before Senator Lott offered his floor amendment.

Finally, the *Yates* plurality opinion expressed concern about interpreting Section 1519's

terms broadly because violating the provision was "a felony punishable by up to 20 years in

prison."  574 U.S. at 547.  Section 1512(c)(2) carries the same 20-year maximum penalty, and

this Court expressed a similar concern about construing § 1512(c)(2) broadly in light of that

penalty at the August 3, 2021, hearing on Defendants' pending motion.  *See* Dkt. 53 at 31 (Aug.

3, 2021 Hrg. Tr.).  But if the legislative history explains any aspect of Section 1512(c), it rebuts

the notion that Congress limited such (potentially) draconian penalties to more narrowly defined

and categorically egregious crimes.  At the time Senator Lott offered Section 1512(c)(2) as a

floor amendment, the bill that had passed the House, H.R. 3763, contained no criminal penalties

at all.  As a result, Senator Lott's amendment included an effort to add criminal penalties to the

Senate version of the bill.  Unlike the final version of the bill, which included a maximum 20-

year penalty for violations of Section 1512(c), the Lott amendment proposed only a 10-year

maximum penalty.  *See* 148 Cong. Rec. S6542.  The selection of that 10-year penalty is notable,

however, because of the provision that immediately preceded Section 1512(c) in the Lott

amendment: a proposal to increase the statutory maximum penalties for mail fraud, 18 U.S.C. §

1341, and wire fraud, 18 U.S.C. § 1343, from 5 years to 10 years.  *See id.*  The Lott amendment

eventually passed the Senate by a 97–0 vote and was incorporated into the Senate version of the

bill.  *See id.* at S6551.

The following day, the House took up a new bill, H.R. 5118, which attempted to remedy

the House's earlier failure to include criminal penalties in the Sarbanes–Oxley legislation by

adopting some of the amendments that the Senate had added to the bill the day before.  As

relevant here, H.R. 5118 included the same language as the Lott amendment about amending the

wire and mail fraud statutes and adding Section 1512(c), with one caveat: instead of a maximum

sentence of 10 years, as the Senate bill called for, H.R. 5118 increased the maximum sentence

*for all three offenses* to 20 years.  148 Cong. Rec. H4683 (daily ed. July 16, 2002).  Later that

day, H.R. 5118 passed the House by a vote of 391–28, *id.* at H4693, and when the Senate and the

House versions of the Sarbanes–Oxley legislation were reconciled by the conference committee,

the conferees settled on the House's maximum penalty—20 years—for mail fraud, wire fraud,

and Section 1512(c).

The close proximity of mail fraud, wire fraud, and Section 1512(c) in both the Lott

amendment and H.R. 5118, and the lockstep manner in which both the House and Senate

changed the three statutes' penalties during the amendment process, undercuts any suggestion

that the stiff maximum penalty included in Section 1512(c) counsels in favor of a narrow reading

of the statute.  To the contrary, it suggests that Congress—which undoubtedly knew that the

broadly worded mail and wire fraud statutes criminalized a broad swath of conduct, with

radically varying levels of severity, *see, e.g.*, *Pasquantino*, 544 U.S. at 372; *Deaver v. United

States*, 155 F.2d 740, 744 (D.C. Cir. 1946)—was not deterred by the fact that Section 1512(c)(2)

would reach a wide range of conduct, some minor, but also some extremely serious.

In this situation, it is also important to observe that the maximum penalties in Sections 1341, 1343, and 1512(c) are just that—maximums—and there is no mandatory minimum sentence for any of the three statutes.  In prescribing a 20-year maximum, then, Congress placed its trust in "judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute." *Apprendi v. New Jersey*, 530 U.S. 466, 481 (2000) (emphasis omitted).  Thus, in the context of Section 1512(c), the Court is persuaded that the statute's 20-year maximum does not suggest that Congress intended a narrow or a-textual reading.

Finally, the Court is unpersuaded by Defendants' contention that existing precedent from the courts of appeals counsels in favor of reading Section 1512(c)(2) to apply only to "attempts to interfere with, or render false, evidence that would become available to a proceeding or to prevent the flow of evidence to a proceeding."  Dkt. 60 at 27 (quotation marks omitted).  The Court does not doubt that many—or, in fact, most—cases that the Department of Justice has brought under Section 1512(c)(2) involve an array of novel attempts to tamper with or impede the free-flow of evidence.  *See id.*  But that hardly precludes application of the statute to novel attempts to "corruptly" obstruct official proceedings, including the extraordinary circumstances leading up to the charges in this case.  Indeed, if anything, the conduct at issue in the garden-variety Section 1512(c)(2) case is arguably less severe than other offenses that Defendants' construction of the statute would exclude.  But, even putting that all aside, Defendant are mistaken in positing that the Section 1512(c)(2) caselaw uniformly involves efforts to falsify or interfere with the flow of evidence.  *See*, *e.g.*, *United States v. Reich*, 479 F.3d 179, 185–87 (2d Cir. 2007) (Sotomayor, J.) (sustaining a conviction under Section 1512(c)(2) where the defendant sent an opposing party a forged court order that purported to recall and vacate a

legitimate order, causing the opposing party to withdraw an application for a writ of mandamus to the Second Circuit).

For all of these reasons, the Court is unpersuaded by Defendants' contention that Section 1512(c)(2) applies only to "attempts to interfere with, or render false, evidence that would become available to a proceeding or to prevent the flow of evidence to a proceeding." Dkt. 60 at 27 (quotation marks omitted).

## C.

Finally, the Court turns to Defendants' contentions that, so construed, Section 1512(c)(2) is unconstitutionally vague or overbroad as applied. Dkt. 60 at 33–50. As explained below, both arguments fail.

## 1.

Defendants first argue that, as applied to the allegations contained in the indictment, Section 1512(c)(2) is unconstitutionally vague. A law is impermissibly vague in violation of the Fifth Amendment's Due Process Clause if "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). This doctrine thus divides into two "independent" inquiries, even if certain considerations are relevant to both: (1) whether a law fails to provide "fair notice" to the citizenry of what conduct it prohibits, and (2) whether a law "authorize[s] or even encourage[s] arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion). As to the first inquiry, criminal statutes violate the fair notice requirement when they predicate criminal liability on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings," such as "whether the defendant's conduct was 'annoying' or 'indecent.'" *United States v. Williams*, 553 U.S. 285, 306

(2008).  But the "mere fact that close cases can be envisioned" does not "render[] a statute

vague"—"[w]hat renders a statute vague is not the possibility that it will sometimes be difficult

to determine whether the incriminating fact it establishes has been proved; but rather the

indeterminacy of precisely what that fact is." *Id.* at 305–06.  As to the second inquiry, "[a] law

invites arbitrary and discriminatory enforcement when 'there are no standards governing the

exercise of the discretion' it grants." *Agnew v. Gov't of Dist. of Columbia*, 920 F.3d 49, 55 (D.C.

Cir. 2019) (quoting *Papachristou v. Jacksonville*, 405 U.S. 156, 170 (1972)).  Laws that fail this

requirement include those "whose application turns on subjective judgments or preferences

either of officers or of third parties." *Id.*  "A law may, however, require law enforcement

officers to use their discretion without being unconstitutionally vague." *Id.*

Defendants premise their vagueness argument almost exclusively on the D.C. Circuit's

decision in *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991).  *See* Dkt. 60 at 35–40.

There, the Court held that the term "corruptly," as used in 18 U.S.C. § 1505, was

unconstitutionally vague as applied to the defendant in that case, who had been charged under

the statute for lying to Congress. *Id.* at 379, 385.  For the reasons that Judge Mehta has

explained in detail, *see Caldwell*, 2021 WL 6062718, at *8–10, Defendants' reliance on

*Poindexter* is misplaced.  Most notably, (1) *Poindexter* turned on the specific language of 18

U.S.C. § 1505 and the specific charge in that case—that is, lying to Congress; (2) "[i]n the end,

the [D.C. Circuit] did not conclude that 'corruptly' [even as used] in [S]ection 1505 was

'unconstitutionally vague as applied to all conduct;'" and (3) "[m]uch has transpired in the four

decades that have passed since *Poindexter*." *Id.*

Significantly, that subsequent history includes the Supreme Court's decision in *Arthur*

*Andersen*. *Id.* at *10.  In *Arthur Andersen*, the Supreme Court held that the district court's "jury

40

instructions failed to convey properly the elements of a 'corrup[t] persuas[ion]' conviction under [Section] 1512(b)."  544 U.S. at 698 (alterations in original).  In reaching that conclusion, the Court stressed the need to "exercise[] restraint in assessing the reach of a federal criminal statute" and the concomitant need to provide "fair warning" to the public about "what the law intends to do if a certain line is passed."  *Id.* at 703 (quoting *Aguilar*, 515 U.S. at 600).  But the Court also concluded that the "natural meaning" of "corruptly" is "clear" and that the term is "normally associated with wrongful, immoral, depraved, or evil" conduct.  *Id.* at 705.  And, although the provision at issue in *Arthur Andersen*, Section 1512(b), had a double *mens rea* requirement not applicable here—*i.e.*, "knowingly . . . corruptly"—the Supreme Court did not cast any doubt on the constitutional adequacy of a "corruptly" standard.

As applicable here, several circuits have read the term "corruptly" for purposes of Section 1512(c)(2) to require a showing of "dishonesty" or an "improper purpose."  *See United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) ("Acting 'corruptly' within the meaning of [Section] 1512(c)(2) means acting 'with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct the [proceeding]." (quoting *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011))); *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007) (same); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (concluding that "*Arthur Andersen* is not directly applicable to [S]ection 1512(c)" and that the requirement under Section 1512(c) is, if anything, less demanding; *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007) (explaining that corruptly means "with the purpose of wrongfully impeding the due administration of justice").  None of these courts has even hinted that the term "corruptly" is unconstitutionally vague, either facially or as applied.  And at least one decision, from the Seventh Circuit, has explicitly rejected

a *Poindexter*-based vagueness challenge to the use of "corruptly" in Section 1512(b)(3), in part

because "*Poindexter* predated *Arthur Andersen*." *United States v. Edwards*, 869 F.3d 490, 502

(7th Cir. 2017). The D.C. Circuit has not opined on the meaning of "corruptly" in Section

1512(c)(2), but in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the court did consider

a narrow aspect of *Poindexter*'s discussion of "corruptly" in the context of Section 1512(b). *Id.*

at 629–30. *Morrison* is inapposite here, however, because Section 1512(b), like Section 1505,

differs in material respects from Section 1512(c)(2).

   *Poindexter* aside, the Court is also unpersuaded by Defendants' more general appeals to

the lack of fair notice and the risk of standardless and arbitrary enforcement. Dkt. 60 at 41–46.

"[T]he vagueness doctrine bars enforcement of 'a statute which either forbids or requires the

doing of an act in terms so vague that [people] of common intelligence must necessarily guess at

its meaning and differ as to its application." *United States v. Lanier*, 520 U.S. 259, 266 (1997)

(quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). Neither ignorance about the

existence of a statute nor reasonable debate about how best to interpret the statute render the law

unconstitutionally vague; the public is "charged with generally knowing the law, and what a law

means is a function of interpreting the statute." *United States v. Bronstein*, 849 F.3d 1101, 1107

(D.C. Cir. 2017). Thus, "a statutory term is not rendered unconstitutionally vague [merely]

because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Id.* (second

alteration in original) (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)). "Rather, a

statute is unconstitutionally vague [only] if, [after] applying the rules for interpreting legal texts,

its meaning 'specifie[s]' 'no standard of conduct . . . at all.'" *Id.* (third and fourth alterations in

original) (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)).

Applying these principles here, the Court concludes that Section 1512(c)(2) "provides a discernible standard when legally construed," and it thus passes constitutional muster, both on its face and as applied. As explained above, most of the key terms of the statute are unambiguous and mean what they say. It is unsurprising, for example, that the words "obstruct" and "impede," 18 U.S.C. § 1512(c)(2), mean to come in the way of, to block, or to hold up or that "a proceeding before the Congress," *id.* § 1515(a)(1)(B), includes the joint session of the Senate and House of Representatives held to certify the Electoral College vote. Indeed, if anything, Defendants are the ones pressing an a-textual reading of the statue that does not comport with common usage.

To be sure, not every action that obstructs or influences the business of Congress is a crime; it is not a crime to filibuster in the Senate or to give a convincing speech on the House floor. This is where the statute's *mens rea* requirement comes in. The *mens rea* standard draws the line between lawful and criminal obstruction or influence of a congressional proceeding. For purposes of Section 1512(c), the *mens rea* requirement has two elements.

*First*, the Supreme Court has construed similar statutes, and courts of appeals have construed Section 1512(c), to include a nexus requirement. In *United States v. Aguilar*, the Supreme Court considered the scope of the "omnibus clause" contained in Section 1503, which applies to those who "corruptly or by threats or force . . . influence[], obstruct[], or impede[] . . . the due administration of justice," 18 U.S.C. § 1503(a). 515 U.S. 593, 598 (1995). Recognizing the need to provide "a fair warning" to the public about the reach of the statute, *id.* at 600 (quoting *McBoyle v. United States*, 283, U.S. 25, 27 (1931)), and "to place metes and bounds on the very broad language of the catchall provision," *id.* at 599, the Supreme Court construed the "omnibus clause" to include a nexus requirement: the defendant's "endeavor must have [had] the 'natural and probable effect' of interfering with the due administration of justice," and the

defendant must have "know[n] that his actions [were] likely to affect" such a proceeding. *Id.*

Drawing on a nineteenth century precedent and tying the nexus requirement to the *mens rea*

standard, the Court explained "that a person lacking knowledge of a pending proceeding

necessarily lack[s] the evil intent to obstruct." *Id.* (citing *Pettibone v. United States*, 148 U.S.

197, 207 (1893)).

Following *Aguilar*, the Supreme Court and other courts have adapted the nexus

requirement for purposes of various obstruction statutes.  In *Arthur Andersen*, the Supreme Court

extended the nexus requirement to Section 1512(b), holding that the jury instructions were infirm

not merely because they misstated the "knowingly . . . corruptly" standard, but also because

"[t]hey led the jury to believe that it did not have to find *any* nexus between the 'persua[sion]' to

destroy documents and any particular proceeding," 544 U.S. at 707, and did not have to find that

the defendant knew "that his actions [were] likely to affect" that proceeding, *id.* at 708 (quoting

*Aguilar*, 515 U.S. at 599).  Most recently, in *Marinello*, the Supreme Court adapted the nexus

requirement to another context, holding that a different obstruction statute—this time, an

"omnibus clause" in the Internal Revenue Code, 26 U.S.C. § 7212(a)— required a "nexus"

between "the defendant's conduct and a particular administrative proceeding," which, in the case

of tax proceedings, means "an investigation, an audit, or other targeted administrative action."

138 S. Ct. at 1109.

Although the D.C. Circuit has yet to consider the question, every circuit that has

considered whether Section 1512(c)(2) includes a nexus requirement has concluded that it does.

*See*, *e.g.*, *Reich*, 479 F.3d at 186 (2d Cir. 2007) (Sotomayor, J.); *United States v. Petruk*, 781

F.3d 438, 444–45 (8th Cir. 2015); *United States v. Phillips*, 583 F.3d 1261, 1263–64 (10th Cir.

2009); *United States v. Friske*, 640 F.3d 1288, 1292 (11th Cir. 2011); *United States v. Carson*,

560 F.3d 566, 584 (6th Cir. 2009); *United States v. Tyler*, 732 F.3d 241, 249–50 (3d Cir. 2013); *United States v. Bennett*, 664 F.3d 997, 1013 (5th Cir. 2011), *vacated on other grounds*, 567 U.S. 950 (2012); *United States v. Young*, 916 F.3d 368, 385–86 (4th Cir. 2019). These decisions follow from *Aguilar*, *Arthur Andersen*, and *Marinello*, and are convincing. Under Section 1512(c)(2), then, the charged conduct must have the "natural and probable effect of interfering with" an official proceeding and the accused must have "know[n] that his actions [were] likely to affect" a particular proceeding. *Aguilar*, 515 U.S. at 599.

*Second*, although the nexus requirement is based, at least in part, on the need to establish an "evil intent to obstruct," *Aguilar*, 515 U.S. at 599, the Supreme Court has treated the "corruptly" requirement as a separate element in obstruction cases, *see Arthur Andersen*, 544 U.S. at 707. The predominant view among the courts of appeals is that the "corruptly" standard requires at least an "improper purpose" and an "intent to obstruct."[4] And the government concedes that it will be required to prove at least that Defendants acted with "consciousness of wrongdoing." Dkt. 63 at 29 (quotation marks omitted). In Defendants' view, however, more is required. In particular, they maintain that, even if the "corruptly" standard requires proof of an "improper purpose," that improper purpose must relate to "some alleged corrupt obstruction of evidence being sought in an effort to administer justice." Dkt. 66 at 13. In support of this contention, they cite to an array of cases that involved the corrupt destruction, alternation, or

---

[4] *See, e.g.*, *Gordon*, 710 F.3d at 1151 ("Acting 'corruptly' within the meaning of § 1512(c)(2) means acting 'with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct the . . . proceeding.'" (alteration omitted) (quoting *Friske*, 640 F.3d at 1291)); *Mintmire*, 507 F.3d at 1289 (explaining that "corruptly," as used in Section 1512(c)(2), means "with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct"); *United States v. Bedoy*, 827 F.3d 495, 510 (5th Cir. 2016) (holding that it was "permissible" for the district court to instruct the jury that "corruptly" means "to knowingly and dishonestly act with the specific intent to obstruct, influence or impede a federal official proceeding").

concealment of evidence, *id.*, and to the Seventh Circuit's model jury instructions, which define "corruptly" for purposes of Section 1512 to mean that the defendant acted "with the purpose of wrongfully impeding the due administration of justice," *id.* at 14 (quoting *The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit* 628 (2020 ed.)).  Defendants further argue that, without this limitation, it becomes impossible to distinguish misdemeanor cases brought for unlawful parading, 40 U.S.C. § 5104(e)(2)(G), disruptive conduct, *id.* § 5104(e)(2)(D), or entering or remaining in a restricted building, 18 U.S.C. §§ 1752(a)(1), (b)(2).

As an initial matter, the Court is unpersuaded by Defendants' contention that the word "corruptly," as used in Section 1512(c), requires a wrongful intent to impede the due administration of justice.  For all the reasons discussed above, the Court has already rejected Defendants' contention that Section 1512(c)(2) applies only to judicial or quasi-judicial proceedings or only to conduct that has some impact on the integrity or availability of evidence. Nothing in the plain meaning of "corruptly" counsels otherwise.  As the Supreme Court observed in *Arthur Andersen*, the term "corruptly" is "normally associated with wrongful, immoral, depraved, or evil" motives.  544 U.S. at 705.  To be sure, the meaning of that term varies based on context and other statutory language.  But, here, context weighs against Defendants' reading of the term, as the contrast between Sections 1503 and 1512(c)(2) shows.  Section 1503 is reasonably read to require an improper purpose to obstruct the due administration of justice because that is what the statute says: one violates that statute by "corruptly . . . obstruct[ing] . . . the due administration of justice."  Section 1512(c)(2), in contrast, does not invite that construction because that is not what it says: one violates Section 1512(c)(2) by "corruptly . . . obstruct[ing] . . . any official proceeding."  In short, Defendants' reading is unsupported by the text.

For reasons similar to those explained above, moreover, Defendants' reading of the word "corruptly" also ignores the distinction between what courts (and, at times, administrative agencies) do and what Congress does. Because Congress's constitutionally assigned duties do not include the "administration of justice," it makes little sense to read into the word "corruptly" a requirement that obstruction of a congressional proceeding involve a purpose wrongfully to impede the administration of justice. Context matters for purposes of defining the word "corruptly," and although Defendants' preferred instruction might make sense in a case alleging obstruction of a judicial proceeding, it does not fit in a case such as this one, which involves a congressional proceeding.

Nor is the Court persuaded by Defendants' contention that it is necessary to construe "corruptly" to require, at a minimum, an improper purpose to impede the administration of justice in order to create a guardrail separating felony offenses under Section 1512(c)(2) from misdemeanor offenses under other statutes. Even accepting Defendants' premise that some individuals charged with misdemeanors for breaching the Capitol or engaging in similar conduct could have been charged under Section 1512(c)(2), "the presence of enforcement discretion alone does not render a statutory scheme unconstitutionally vague," *Kincaid v. District of Columbia*, 854 F.3d 721, 729 (D.C. Cir. 2017) (Kavanaugh, J.). "So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied." *United States v. Batchelder*, 442 U.S. 114, 123 (1979). That is because the potential for arbitrary enforcement follows from laws "whose application turns on subjective judgments or preferences either of officers or of third parties." *Agnew*, 920 at 55. The relevant question is not whether prosecutors have pursued every case in which a defendant may be charged under a given statute. All that is required is that

the statute in question "constrains a specific, objectively defined and observable behavior." *Id.*
at 58. And here, as just discussed, Section 1512(c)(2) does just that, providing the requisite
notice of the conduct it prohibits.[5]

It is also incorrect to suggest that there is no meaningful difference, for example, between
someone who stands "on top of [a] chair" at a congressional hearing, shouts "in the direction of
the hearing committee members," and is ultimately carried "out of the committee hearing room
while he continue[s] his demonstration," Gov't Sentencing Memo. at 2, *United States v. Barry*,
No. 18-mj-111 (D.D.C. Oct. 11, 2019) (Dkt. 34), and someone who breaches the Capitol with a
corrupt purpose of preventing or delaying the certification of the electoral vote for President and
Vice President of the United States, *see* Dkt. 60 at 43–45. It is one thing to prove that someone
knowingly paraded in a congressional building, 40 U.S.C. § 5104(e)(2)(F), or engaged in
disorderly or disruptive conduct, *id.* § 5104(e)(2)(D), and quite another thing to prove that

---

[5] To the extent any additional guardrail is necessary, other recognized definitions of the term
"corruptly" both fit the context of the obstruction of a congressional proceeding and provide
additional guidance. In his separate opinion in *Aguilar*, for example, Justice Scalia quoted with
approval the jury instruction given by the district court in that case: "An act is done corruptly if
it's done voluntarily and intentionally to bring about an unlawful result or a lawful result by
some unlawful method, with a hope or expectation of . . . [a] benefit to oneself or a benefit to
another person." 515 U.S. at 616–17 (Scalia, J., concurring in part and dissenting in part).
Because the *Aguilar* majority ruled on other grounds, it did not opine on the meaning of
"corruptly." *Id*. at 598–603. But there is no reason to doubt Justice Scalia's observation that
formulations of this type are "longstanding and well-accepted," *id.* at 616, and, indeed, the D.C.
Circuit cited to a similar definition—"a person acts 'corruptly' when taking action 'with the
intent to obtain an improper advantage for [one]self or someone else, inconsistent with official
duty and the rights of others'"—in *United States v. Pasha*, 797 F.3d 1122, 1132 (D.C. Cir. 2015)
(quotation marks omitted) (quoting *United States v. North*, 910 F.2d 843, 882 (D.C. Cir. 1990),
*opinion withdrawn and superseded in other part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990)). In
the garden-variety disruption or parading case, in contrast, the government need not prove that
the defendant sought unlawfully to obtain a benefit for himself or another person in the
proceeding itself. But, because the Court is persuaded that Defendants' vagueness argument
fails even without this refinement, and because the Court has yet to hear from the parties on the
proper jury instructions, the Court will leave for another day the question whether this
formulation—or a slightly different formulation—will best guide the jury.

someone corruptly obstructed an official proceeding, 18 U.S.C. § 1512(c)(2).  Among other

things, to obtain a conviction on the latter charges, the government must prove beyond a

reasonable doubt that the natural and probable effect of the defendant's actions were to obstruct

the official proceeding; that he knew that his actions were likely to obstruct that proceeding; and

that he acted with the wrongful or improper purpose of delaying or stopping the official

proceeding.  That is a heavy burden, and it is up to the grand jury and the government to decide

whether they have enough evidence to present to the jury.  Defendants' arguments regarding the

sufficiency of the government's evidence—or the evidence that Defendants believe the

government will ultimately present—is premature.  Dkt. 66 at 19–25.

 For similar reasons, the Court declines Defendants' invitation to compare the charges that

the government has brought in each of the January 6 cases or to second guess the government's

decisions to offer plea agreements to lesser charges in some cases.  Dkt. 66 at 17–25.  The

evidence in those cases is not before the Court, and, in any event, separation of powers accords

the executive branch substantial deference in deciding which cases to prosecute under which

statutes and in deciding whether and when to extend a plea offer.  As the D.C. Circuit has

explained:

> Supreme Court precedent teaches that the presence of enforcement discretion
> alone does not render a statutory scheme unconstitutionally vague.  In *United
> States v. Batchelder*, 442 U.S. 114 (1979), for example, the Court confronted a
> statutory scheme under which prosecutors had discretion to prosecute the same
> offense under two different statutes—one carrying a five-year prison term and
> one carrying a two-year prison term.  The defendant, who had been convicted
> under the statute carrying the five-year term, argued that the statutory scheme
> was void for vagueness.  The Supreme Court disagreed. The Court rejected the
> argument that the statutes "impermissibly delegate to the Executive Branch the
> Legislature's responsibility to fix criminal penalties."  *Id.* at 125–26.  No such
> impermissible delegation was present, according to the Court, because the
> provisions at issue "plainly demarcate the range of penalties" to which a
> defendant may be subject.  *Id.* at 126. The Court further noted that the
> prosecutor's broad discretion to determine which charge and sentence to pursue

49

did not alter that analysis.  On the contrary, the Court stated that its precedent has "long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants."  *Id.* at 123–24.

*Kincaid*, 854 F.3d at 729.  The same holds true here.

Finally, the Court is unpersuaded that the rule of lenity weighs in favor of limiting the reach of Section 1512(c)(2) to charges involving "some alleged corrupt obstruction of *evidence being sought in an effort to administer justice*."  Dkt. 66 at 13.  The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute,' . . . such that the Court must simply guess as to what Congress intended."  *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (quotation marks omitted) (quoting *Muscarello v. United States*, 524 U.S. 125, 139 (1998)); *see also Shular v. United States*, 140 S. Ct. 779, 787 (2020) (rule of lenity applies only after court has applied the traditional tools of statutory construction and it is "left with an ambiguous statute").  This is not such a case.  To the contrary, all of the essential terms of the statute have well-accepted meanings and, for all the reasons explained above, the Court is not left simply to guess what Congress intended.

## 2.

Defendants' only remaining argument is that Section 1512(c)(2) is unconstitutionally overbroad.  Dkt. 60 at 41.  Under "First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech."  *Williams*, 553 U.S. at 292.  "[T]he first step in overbreadth analysis is to construe the challenged statute," *id.* at 293, which the Court has done above.  The second step is to determine whether the statute, once construed, "criminalizes a substantial amount of protected expressive activity."  *Id.* at 297.  "Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment," the Supreme Court has long

"recognized that the overbreadth doctrine is 'strong medicine' and have employed it with hesitation, and then 'only as a last resort.'" *New York v. Ferber*, 458 U.S. 747, 769 (1982) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). To account for the "disfavored" status afforded such facial challenges, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450, (2008), courts must "vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep," *Williams*, 553 U.S. at 292.

Defendants fail to satisfy this demanding standard. Far from identifying "a substantial amount of protected expressive activity" that the statute reaches, Defendants fail to identify *any* protected activity that the statute covers—or even chills. They make only two arguments. First, despite employing the overbreadth doctrine, which concerns the risk that a statute will chill the protected activity of *third parties*, they point to *their own* conduct, asserting that "the thrust of the allegations against [them] in respect to violating Section 1512(c)(2) are their *verbal* interactions with law enforcement" and their efforts to protest the certification of the electoral vote. Dkt. 60 at 49. But that misunderstands what the statute requires and what the government will need to prove at trial.[6] Section 1512(c)(2) does not criminalize "verbal interactions with law enforcement" or lawful protects; rather, it applies only to those who corruptly obstruct, influence, or impede official proceedings, or attempt to do so. Nor does the government's case turn in any way on protected speech; rather, the indictment alleges that Defendants corruptly obstructed or attempted to obstruct the certification of the electoral vote. To the extent Defendants maintain that they merely "intended to utilize their First Amendment rights to free speech and assembly in

---

[6] It also ignores evidence that Montgomery fought with a police officer, wrestled him to ground, and kicked him in the chest.

hopes that, by speaking out, Congress would be empowered to . . . investigate voting processes," Dkt. 66 at 27 n.14, that is a factual argument for the jury.

Second, with no support, Defendants assert that, "if the Court can imagine clearly constitutionally protected speech subject to the reach of Section 1512(c)(2), then the statute has a substantial likelihood of burdening First Amendment rights." Dkt. 60 at 50. That contention fails on two grounds. First, that is not how the overbreadth doctrine works. A statute is constitutionally overbroad only if it criminalizes a *substantial* amount of protected speech as compared to the statute's legitimate reach. Second, the Court's imagination is not as good as Defendants hope. In truth, given the requirements that the defendant know and wrongfully intend that her conduct will obstruct, influence, or impede an official proceeding, it is hard to grasp when, if at all, the statute might apply to *protected* speech. The Court, certainly, cannot conclude that any such hypothetical application is "substantial," and Defendants, for their part, fail to identify a single such example.

The Court, accordingly, rejects Defendants' substantial overbreadth challenge.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' motion to dismiss Count 10 of the Indictment, Dkt. 80, is **DENIED**.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  December 28, 2021