**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. 21-CR-00046-RDM** |
| **PATRICK MONTGOMERY,** | § | |
| **BRADY KNOWLTON, and** | § | |
| **GARY WILSON** | § | |
| | § | |
| *Defendants* | § | |

**DEFENDANT MONTGOMERY'S MOTION TO DISMISS ON FIRST**
**AMENDMENT GROUNDS**

TO THE HONORABLE RANDOLPH D. MOSS, UNITED STATES DISTRICT
JUDGE FOR THE DISTRICT OF COLUMBIA:

PATRICK MONTGOMERY, by and through his undersigned counsel, hereby

moves for dismissal of his indictment on First Amendment grounds.  As described

below, the First Amendment protects Montgomery's political expression and

advocacy as alleged on January 6.  Accordingly, each count of this indictment

violates defendants First Amendment rights.

On January 6, 2021, Montgomery came to the U.S. Capitol to do what

thousands before have done: advocate for his political positions and ideas, and

petition government for redress of grievances.

Every court prior to January 6 has recognized that the Capitol is the Peoples'

House, and a forum for political advocacy, petitioning, speech, assembly, and

expression.

A long line of cases hold that people have a right to use the Capitol Grounds as a free speech forum. *See Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972). In *Jeannette Rankin Brigade* a special 3-judge panel of the DC District Court held that the Capitol Grounds are "an area to which access cannot be denied broadly or absolutely." 342 F. Supp. 575, 583-84 (D.D.C. 1972). The Supreme Court summarily affirmed, making *Jeannette Rankin Brigade* binding precedent. 409 U.S. 972 (1972). Later, in *Community for Creative Non-Violence v. Kerrigan*, the DC Circuit held that "there is no doubt that the Capitol Grounds are a public forum." 865 F.2d 382, 383, 387 (1989) (upholding "a reasonable time, place or manner restriction," a regulation limiting the length of time during which demonstration "props and equipment" may remain on the Grounds). Clearly, therefore, the "Grounds (excluding such places as the Senate and House floors, committee rooms, etc.) have traditionally been open to the public," and "the primary purpose for which the Capitol was designed--legislating"--is entirely consistent "with the existence of all parades, assemblages, or processions which may take place on the grounds." *Jeannette Rankin Brigade*, 342 F. Supp. at 584.

Indeed, in *Jeannette Rankin Brigade*, the district court observed that "the fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion." *Id*. *See also, Lederman v. United States*, 291 F.3d 36 (DC Cir. 2002) (striking down a regulation banning leafleting and other "demonstration activities" on the sidewalk at the foot of the House and Senate steps on the East Front of the Capitol). The *Lederman* Court found that sidewalks around the Capitol are a public forum, and that a regulation banning leafleting and other "demonstration activities" at the foot of the House and Senate steps on the east side of the Capitol is unconstitutional.

Note that courts have held that even the *interior* of the Capitol is an appropriate forum for organized prayer sessions and organized walking through the halls.[1]

---

[1] The First Amendment literally says "Congress shall make no law" restricting speech, advocacy, or petitioning. The government's only path around this problem is the notion that the mere presence of the Vice President in the Capitol on Jan. 6 somehow allows for prosecutions of advocates, protestors or petitioners hundreds of yards away, outside, separated by numerous thick marble walls.

But the Supreme Court has never held that the First Amendment can be evaded simply by a Secret Service proclamation that a protected government official lurks nearby. The government often asserts on Judge Friedman's well-articulated opinion in *Bynum v. U.S. Capitol Police Board*, 93 F. Supp. 2d 50 (D.D.C. 2000), which the government says classified the interior of the Capitol as a nonpublic forum. In fact, *Bynum* struck down a previous ban on picketing and parading in the Capitol as too broad. See id. (holding groups of visitors have 1st amendment rights to hold nondisruptive prayer sessions in Capitol hallways).

Judge Friedman himself wrote that his conclusion to categorize the inside of the Capitol as a 'nonpublic forum' was "somewhat surprising." Id. at 56 ("Which brings the Court to what may seem a somewhat surprising conclusion that the inside of the United States Capitol is a nonpublic forum for First Amendment forum analysis purposes"). And despite the *Bynum* Court's pronouncement that the inside of the Capitol is a nonpublic forum for protesting, the Court held that some, limited expression, prayer and petitioning is nonetheless permitted inside the Capitol:

> The Court, however, cannot conclude that the regulation is reasonable in light of the purposes it could legitimately serve. While the regulation is justified by the need expressed in the statute to prevent disruptive conduct in the Capitol, it sweeps too broadly by inviting the Capitol Police to restrict behavior that is in no way disruptive, such as "speechmaking . . . or other expressive conduct. . . ." Traffic Regulations for the Capitol Grounds § 158. Because the regulation's proscriptions are not limited to the legitimate purposes set forth in the statute, it is an unreasonable and therefore an unconstitutional restriction on speech. *See Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc*., 482 U.S. 569, 575 (1987) (general prohibition of First Amendment activity in airport cannot be justified even if airport is nonpublic forum "because no conceivable government interest would justify such an absolute prohibition of speech"). For these reasons, and those discussed in Section II B of this Opinion, the regulation is both unreasonable and unconstitutionally overbroad.

*Bynum*, at 57.

Judge Friedman also found that the "picketing and parading" ban violated due process because it was vague: "While there certainly are types of expressive acts that rise to the level of a demonstration, any regulation that allows a police officer the unfettered discretion to restrict behavior merely because it 'conveys a message' or because it has a 'propensity to attract a crowd of onlookers' cannot survive a due process challenge." Id.

> The regulation as written allows a police officer to restrict any sort of expressive conduct when, in the eyes of the particular officer, it might attract onlookers -- without regard to whether it in fact attracts a crowd of onlookers or whether it in fact disrupts or obstructs. The determination of what conduct is prohibited by such a regulation therefore necessarily will vary depending on the subjective judgment of the particular officer regarding what conduct in his or her judgment has a "propensity to attract a crowd of onlookers." Such a regulation does not provide any standard at all. Rather, it "confers on

**No law makes the Capitol a restricted area.  No court case makes the Capitol a restricted area.  No published federal rule or regulation makes the Capitol a restricted area.**

Significantly, no law of Congress makes the Capitol a restricted area.  No detailed court case ever published[2] makes the Capitol a restricted area.  Indeed, these sources of law resoundingly say the opposite.  So how do prosecutors in these cases contend the Capitol or its grounds were restricted areas on Jan. 6?

**Trespass Law requires both proof of notice and proof of actual license to restrict.**

The federal "restricted area" statutes at issue here are analogous to trespassing laws at the state levels.  These are derived from ancient common law going back in Anglo-American history for centuries.  The basic principles of criminal trespass are enunciated in the Model Penal Code.  See, e.g., *State v. Pixley*, 200 A.3d 174 (Vt. 2018).  In general, a conviction for trespassing requires <u>two</u> distinct elements: first, the license element—that the person is entering the land "without legal authority" or consent, and second, the notice element—that notice against trespass is provided for the property in question. Id.  Said differently, conviction requires <u>proof of both</u> *subjective* notice (the defendant's state of mind) and the *objective* fact of restrictedness.  In this case, each element is contested.

It is not enough for "the State to show that defendant should have known he was not licensed or privileged to enter the dwelling." *State v. Fanger*, 665 A.2d 36, 38 (Vt. 1995)

---

the police a virtually unrestrained power to arrest and charge persons with a violation"
and "the opportunity for abuse . . . is self-evident." [citations omitted].
The virtually standardless, broad discretion given to the Capitol Police by this regulation
also causes it to be unconstitutionally vague.
Bynum, at 58-59.
[2] Ironically the only courts that have ever pronounced the Capitol grounds to be a restricted area are some trial courts in Jan. 6 cases.  Most of these rulings are unpublished.

(quoting Model Penal Code § 221.2(1) (1962)). The government must prove a <u>defendant actually</u> <u>knew</u>.

Case reporters are filled with cases evincing messy facts which are in some ways analogous to the circumstances of January 6. There are both cases where defendants are convicted of trespassing in circumstances <u>without</u> posted warnings; and other cases where courts hold that even heavily-posted 'no trespassing' areas are <u>not</u> restricted areas. *See, e.g., State v. Carter*, 160 S.W.3d 526, 533 (Tenn. 2005) ("[a] person does not have an expectation of privacy in the area in front of his or her residence leading from the public way to the front door").

The vast majority of states that have directly addressed the issue consider signage to be but one consideration when determining whether a person has demonstrated a legitimate expectation of privacy or restricted area. *See, e.g., Michel v. State*, 961 P.2d 436, 437–38 (Alaska Ct.App.1998) (holding that "[p]ersons visiting the residence for social or commercial purposes" would not construe "no trespassing" signs along driveway "as meant to prohibit their entry"); *Burdyshaw v. State*, 10 S.W.3d 918, 921 (Ark.Ct.App.2000) ("[E]ven though the property was posted, the gates were open, the driveway was not blocked, and entry onto the property was not an intrusion prohibited by the Fourth Amendment."); *Burkholder v. Superior Court*, 96 Cal.App.3d 421, 428 (Cal.Ct.App.1979) (holding that expectation of privacy was objectively reasonable when "[e]ntry to the property was openly restricted by posted signs along, and locked gates across[ ] the rural access road signif[ied] an intention to deny access to the public in general, including government agents").[3]

---

[3] *Brown v. State*, 152 So.3d 619, 624 (Fla.Dist.Ct.App.2014) ("While this Court has found that a policeman may enter the curtilage surrounding a home in the same way as a salesman or visitor could, no such person would reasonably go through both a gated four-foot fence and a gated six-foot fence, surrounded by several 'No Trespassing' signs in order to conduct business with the residents."); *Wysong*

*v. State*, 614 So.2d 670, 671 (Fla.Dist.Ct.App.1993) (holding that officers did not illegally enter yard to knock on door despite "no trespassing" sign); *State v. Rigoulot*, 846 P.2d 918, 923 (Idaho Ct.App.1992) ("Posting 'No Trespassing' signs may indicate a desire to restrict unwanted visitors.... However, such signs cannot reasonably be interpreted to exclude normal, legitimate, inquiries or visits by mail carriers, newspaper deliverers, census takers, [etc.] who restrict their movements to the areas of one's property normally used to approach the home." (citations omitted)); *Mundy v. State*, 21 N.E.3d 114, 118–19 (Ind.Ct.App.2014) (holding that it was unreasonable for officers to enter property when it was posted, there was a chain across the driveway, and a security camera was on a tree near the chain); *State v. Fisher*, 154 P.3d 455, 470–75 (Kan.2007) (ruling that deputy was legally on property to conduct "knock and talk" but could not seize evidence from curtilage; presence of "no trespassing" signs was part of curtilage analysis); *Jones v. State*, 943 A.2d 1, 12 (Md.2008) ("For Fourth Amendment purposes, appellant could not have had a reasonable expectation that the 'No Trespassing' sign would or should prevent visitors with a legitimate purpose from walking to the front door, including police officers in furtherance of an investigation."); *State v. Kruse*, 306 S.W.3d 603, 611–12 (Mo.Ct.App.2010) (stating that signage is one consideration when determining whether police intrusion into backyard was reasonable); *State v. Pasour*, 741 S.E.2d 323, 326 (N.C.Ct.App.2012) ("[W]hile not dispositive, a homeowner's intent to keep others out and thus evidence of his or her expectation of privacy in an area may be demonstrated by the presence of 'no trespassing' signs"); *State v. Mittleider*, 809 N.W.2d 303, 307–08 (N.D.2011) (holding that "no trespassing" signs on farm did not create reasonable expectation of privacy in entrance to the farm but leaving open the question of whether such signs could ever create a reasonable expectation of privacy); *State v. Morgan*, No. 13–CA–30, 2014 WL 1836015, at *3–4 (Ohio Ct.App. May 1, 2014) (holding that initial "knock and talk" was "unobjectionable"—despite "no trespassing" signs in front of house but entry into backyard was unreasonable, partly because of the signage), no perm. app. filed ; *State v. Roper*, 294 P.3d 517, 520 (Or.Ct.App.2012) (holding that fence plus signage "objectively manifested intent to exclude the public"); *State v. Gabbard*, 877 P.2d 1217, 1221 (Or.Ct.App.1994) (concluding that "no trespassing" sign on boundary fence, without more, would not have served to exclude the "reasonable visitor ... who desired to contact the residents" and that, therefore, officers could rightfully use driveway to approach house); *Robinson v. Commonwealth*, 639 S.E.2d 217, 222 (Va.2007) ("Implied consent can be negated by obvious indicia of restricted access, such as posted 'no trespassing' signs, gates, or other means that deny access to uninvited persons."); *State v. Johnson*, 879 P.2d 984, 992 (Wash.Ct.App.1994) (holding that the defendants manifested "their subjective intent to close their property by fencing it, erecting a gate, and placing signs near the gate saying 'No Trespassing' and 'Private Property.' ").

In addition, the United States Supreme Court in *Oliver v. United States*, when determining whether "no trespassing" signs created a legitimate expectation of privacy in open fields when there would otherwise be no expectation of privacy stated, "Certainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post 'No Trespassing' signs." *Oliver*, 466 U.S. at 183 n.13. Even under the Jardines search test, which focuses more on trespass law than on expectation of privacy, the officers' actions in merely conducting a "knock and talk" would not be proscribed as a warrantless search. *See Jardines*, 1415–18 (ruling that bringing a drug-sniffing canine into defendant's curtilage objectively demonstrated that the police were intruding upon a constitutionally protected area to search, not merely conducting a "knock and talk"). "The law of trespass generally gives members of the public a license to use a walkway to approach the front door of a house and to remain there for a brief time." Id. at 1420 (Alito, J., dissenting). Consequently, if the officers' actions were not a search, then the Fourth Amendment protections would not apply.

Taking all of these cases into consideration, the emerging rule appears to be that the implied invitation of the front door can be revoked but that the revocation must be obvious to the casual visitor who wishes only to contact the residents of a property. *See State v. Grice*, 767 S.E.2d 312, 319 (N.C.2015) ("The implicit license enjoyed by law enforcement and citizens alike to approach the front

Michel, 961 P.2d at 438. Likewise, we conclude that the sign in this case would not have prevented the casual visitor or the reasonably respectful citizen from approaching appellant's residence. Therefore, the sign did not revoke the implied invitation of the front door, and Investigators Green and Chunn lawfully entered appellant's property when they drove up his driveway and approached his front door. See also *Borrico v. State*, 276 So.3d 458 (Florida App. 2019) (overturning conviction where evidence of notice was confusing, contradictory or nonexistent).

**The presence of so many hundreds of others around defendants who regarded the area as unrestricted also contributed to defendants' innocent states of mind regarding the restrictedness or nonrestrictedness of the area.**

Grounds in frequent use by pedestrians, such as the Capitol grounds, become a right-of-way over time. *See, e.g., McKinnon v. Northeast Illinois Regional Commuter R.R. Corp*., 263 Ill. App. 3d 774, 779 (1994) (reversing the trial court's dismissal where complaint alleged that there was a particular right-of-way extending through a densely populated village that was easily accessible to the public and that the defendant permitted the use of the right-of-way to the extent

---

doors of homes may be limited or rescinded by clear demonstrations by the homeowners and is already limited by our social customs."). Thus, in this case, we must determine whether a small sign reading "no trespassing[,] hunting[,] or fishing," posted in a field next to appellant's driveway that is difficult to see when driving down the driveway, as evidenced by the "dashcam" video presented in this case, is sufficient to revoke the implied invitation. *See, e.g., U.S. v. Ventling*, 678 F.2d 63, 66 (8th Cir.1982); Michel, 961 P.2d at 438. Several courts when ruling on this issue have noted that such a sign, especially on a rural property, is generally intended to prevent people from unauthorized use of the property, not to prevent a casual visitor from approaching the residence) *Ventling*, 678 F.2d at 66.

that it became the custom of persons to do so).  So it is that defendants' assessments that hundreds of people around them who evidently believed they were rightfully in the area is a defense.

The case law regarding the open-public-free-speech-forum area of the Capitol cannot be overcome by mere decree of the Capitol Police, or the Secret Service, or federal prosecutors. The U.S. Capitol is one of America's largest public buildings, with well over 1.5 million square feet, over 600 rooms, and miles of corridors.[4] Previous case law in other federal jurisdictions has invalidated government attempts to extend no-advocacy zones beyond a few feet.

For example, the Supreme Court invalidated attempts to ban protesting within 300 feet of an abortion clinic. *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 771 (1994) (finding thirty-six-foot buffer was acceptable).  "[C]itizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to freedoms protected by the First Amendment." *Id*. at 774.

**The First Amendment as a Defense to trespass.**

In general, violence is not First-Amendment protected.  But trespassing sometimes is. For example, in *People v. Millhollen*, 5 Misc. 3d 810, 786 N.Y.S.2d 703, 194 Ed. Law Rep. 395 (N.Y. City Ct. 2004) a court held that a university student who climbed a tree on a university campus, and remained there after being ordered by a police officer and a university official to descend, was not guilty of trespass, absent evidence that the student's presence in the tree was incompatible with the university's normal activities).

---

[4] See Architect of the Capitol, "U.S. Capitol Building," https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building (accessed 9/27/2022).

The government contends that there is <u>no</u> First Amendment protection for the thousands of people present on Capitol Grounds on January 6. <u>None</u>. But given the binding case law holding that the Capitol grounds is a public free-speech forum, the government's claims that the grounds were totally restricted on Jan. 6 must withstand strict scrutiny analysis. And the evidence in this case illustrates the presence of flags, banners, megaphones, and group persuasive chants—all of which are archetypes of protected petitioning and advocacy rather than assaultive militancy.

A policy, law, barrier, or forum restriction that regulates protected speech must meet First Amendment muster, whether or not it also regulates conduct. *See ACLU of Ill. v. Alvarez*, 679 F.3d 583, 602 (7th Cir. 2012) ("When the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play."); *Bartnicki v. Vopper*, 200 F.3d 109, 121 (3d Cir. 1999) (rejecting the argument "that a statute that governs both pure speech and conduct merits less First Amendment scrutiny than one that regulates speech alone."). The inquiry "is not whether trespassing is protected conduct," but whether the law contains other restrictions on conduct that also "qualif[y] as protected speech." *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021) (quoting *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1194–96 (10th Cir. 2017) (*W. Watersheds Project I*)).

This conclusion is consistent with Supreme Court precedent which has emphasized that First Amendment analysis applies when speech is implicated by a law even if the law "generally functions as a regulation of conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28 (2010) (emphasis in original). Thus, the erection of barriers on Capitol grounds regulates protected speech and accordingly implicates the First Amendment. Exempting the Jan. 6 demonstration from any First Amendment review could result in the criminalization of core free

speech, such as criticism of a politician. *See Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1209 (D. Utah 2017) (observing "[i]f a person's First Amendment rights were extinguished the moment she stepped foot on [a given property], the State could, for example, criminalize any criticism of the Governor, or any discussion about the opposition party, or any talk of politics whatsoever, if done on [a given] property.").

Some acts amount to speech protected by the First Amendment, and may not be prosecuted as trespass, depending on the location of the protest. The Supreme Court of the United States has held that since 'time out of mind,' public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988). In this regard, the right of free speech attaches to premises which have traditionally served as a place for free public assembly by private citizens. *People v. O'Grady*, 147 Misc. 2d 118, 560 N.Y.S.2d 602 (App. Term 1990). And courts have previously held that the Capitol grounds on all sides of the building are just such a free speech forum. *See Jeannette Rankin Brigade, supra*. The government's claim that all of the demonstrators on Capitol Grounds on Jan. 6 were "attackers" rather than protestors conflicts with settled First Amendment law.

**A Court Holding that the Hundreds of Protestors on January 6 have no First Amendment Protection will have a Chilling Effect on Fundamental First Amendment Protections.**

Of all the First Amendment cases ever decided by the Supreme Court, the case of *Adderley v. State of Fla.*, 385 U.S. 39, 48 (1966) may provide the clearest path for analysis. In *Adderly*, the Court upheld the trespassing arrest of 13 college students who entered the grounds of the Leon County, Florida jail to protest prior arrests and city segregation policies. The students blocked a driveway to the jail entrance not normally used by the public and refused to disperse after being ordered by sheriff. Significantly, the majority opinion authored by Justice

Black indicated that the same facts *would lead to First Amendment protection from a trespass conviction* if the facility had been a capitol with a history of political protest and speech advocacy.

The dissenting opinion in *Adderley v. State of Fla.*, authored by Justice Douglas and joined by Brennan and Fortus, found that the student protestors' trespassing arrests should be overturned on First Amendment grounds. 385 U.S. 39, 48 (1966) (Douglas, J., dissenting). "We do violence to the First Amendment when we permit this 'petition for redress of grievances' to be turned into a trespass action," wrote the dissenters. *Id*. at 52.

The parallels between the *Adderly* case and January 6 could not be more compelling.  In fact, there was evidence in the *Adderly* case that workers in the jail were obstructed and afraid to leave the jail facility during the protest. And in some ways, the disruption of the Leon County jail by the *Adderly* protestors was less supported by the law than the protests of January 6.[5]  Even so, three Supreme Court justices pronounced that the student protestors' conduct was First Amendment protected. "In the first place the jailhouse grounds were not marked with 'NO TRESPASSING!' signs," wrote Douglas, *id*. at 52, and "[o]nly the sheriff's fiat [ordering trespassers to disperse" transformed lawful conduct into an unlawful trespass." *Id*.

Three members of the Supreme Court held in 1966 that protestors who entered the grounds of a jail—which (unlike Capitol Grounds) had never been a forum for free speech— blocked traffic, prevented a worker from leaving, and defied orders from a sheriff to disperse were fully protected by the First Amendment.  *And every member of the Supreme Court* held that

---

[5] "The fact that no one gave a formal speech, that no elaborate handbills were distributed, and that the group was not laden with signs would seem to be immaterial" to the question of First Amendment protection, wrote the dissent.  Justice Douglas wrote that the First Amendment protected the *Adderly* protestors nonetheless. Id. at 51.

the First Amendment would have protected the protestors from a trespassing conviction under the same facts *if the facility had been a capitol rather than a jail.*[6]

Justice Douglas cited numerous Supreme Court cases standing for the proposition that the 'custodian' of public property cannot arbitrarily decide "when public places shall be used for the communication of ideas," e.g., Hague v. C.I.O. 307 U.S. 496 (1939); Schneider v. State of New Jersey, 308 U.S. 147, 163—164; Cantwell v. State of Connecticut, 310 U.S. 296; Largent v. State of Texas, 318 U.S. 418; Niemotko v. State of Maryland, 340 U.S. 268; Shuttlesworth v. City of Birmingham, 382 U.S. 87. "For to place such discretion in any public official, be he the 'custodian' of the public property or the local police commissioner (cf. *Kunz v. People of State of New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280), is to place those who assert their First Amendment rights at his mercy." Id. at 54. "It gives him the awesome power to decide whose ideas may be expressed and who shall be denied a place to air their claims and petition their government." Id.

### A.   USCP OFFICERS CAN AND DID AUTHORIZE ENTRY TO CAPITOL

---

[6] The Court compared the jail protest with the protest upheld in *Edwards v. South Carolina*, 372 U.S., at 235, 83 S.Ct., at 683 (1963). In *Edwards*, the Supreme Court overturned convictions of protestors at a state capitol who refused commands to disperse.

> In *Edwards*, the demonstrators went to the South Carolina State Capital grounds to protest. In this case they went to the jail. Traditionally, state capitol grounds are open to the public. Jails, built for security purposes, are not. The demonstrators at the South Carolina Capital went in through a public driveway and as they entered they were told by state officials there that they had a right as citizens to go through the State House grounds as long as they were peaceful. Here the demonstrators entered the jail grounds through a driveway used only for jail purposes and without warning to or permission from the sheriff.

Adderly at 41.
The dissent even gently mocked the majority's proffered distinction between jail grounds and legislative grounds. "Would the case be any different if, as is common, the demonstration took place outside a building which housed both the jail and the legislative body? I think not." *Id*. at 53 (Douglas, J. dissenting).

On its face, 18 U.S.C. 1752 allows a police officer to authorize entry into a restricted building or grounds.  The statute states in relevant part that:

18 U.S.C. § 1752(a)(1) *(emphases added).*

**(a)**Whoever—
**(1)** *__knowingly__* enters or remains in any restricted building or grounds *__without lawful authority to do so;__*

\* \* \*

[shall be punished]

\* \* \*

It is clear error to assert that a law enforcement officer cannot [7] render lawful what would otherwise be lawful.  Such an argument is untenable, when the face of the statute says otherwise.  Clearly, any person may enter "a restricted building or grounds" if authorized to do so. That is the plain text of the statute, beyond dispute and unarguable.

For example, Luke Mogelson, Reporter for The New Yorker Magazine, spent considerable time inside the U.S. Capitol building, and reported his observations in widely publicized articles.  See., e., g.,  **A Reporter's Video from Inside the Capitol Siege,"** https://www.newyorker.com/video/watch/a-reporters-footage-from-inside-the-capitol-siege .  Reporter Mogelson was not arrested for being in the U.S. Capitol, but his reporting was celebrated.  He was allowed into the Capitol building.

The Government would invite us to envision that "lawful authority" to enter a restricted area under 18 U.S.C. 1752 requires some type of authority that not even the then-President of the

---

[7]     Defendants and counsel do not see the relevance of an estoppel argument arises from President Donald Trump's speech.  First, Trump did not tell anyone to go the Capitol but remarked in effect "I know many of you are going to the Capitol" because rallies were announced in December 2020.  Second, most people could not understand Trump's remarks at the Ellipse rally due to the blustering wind and malfunctioning public address speakers.  See: Audio problems at: https://www.youtube.com/watch?v=MjBx58tQagU

United States could grant.  Without "lawful authority" is not clarified.  Any person responsible for supervising real estate has the power to invite or allow a person to enter that real estate.

Therefore, if a "sworn" (commissioned) U.S. Capitol Police officer confirms to these Defendants that they may enter the building – whether others like that decision or not – then the Defendants entered the U.S. Capitol building with  "***lawful authority to do so.***"

Any person allowed into the U.S. Capitol building by a U.S. Capitol police officer has committed no crime.

### B.  18 U.S.C. 1752 IS NOT A GENERIC TRESPASSING STATUTE

Under 18 U.S.C. 1752, the exact same conduct prohibited on a Tuesday may be completely permitted on a Wednesday – in the same location.  This is not a law against trespassing.  It is a law vaguely related to a Secret Service protectee.  The same location that may involve a protectee on a Tuesday may be unrestricted the following day on a Wednesday.

Defendants are charged with ***knowingly*** entering a grounds or building restricted ***within the limited meaning*** of 18 U.S.C. 1752. [8]  The statute does not restrict presence near a crowd engaging in disorder nor require a person to depart an area where there is some chaos or misbehavior.  It does not prohibit citizens from seeing police officers or hearing alarms.  This is not an "If you see police, you must run away" statute.

For example, it is often claimed that the U.S. Capitol had been closed due to COVID.  But 18 U.S.C. 1752 does not apply to a building closed due to COVID.

---

[8]        Commonly referred to as a "restricted area" though the statute refers to buildings or "grounds."  In the absence of definition that could mean anything from the 161,000 acres of Fort Bragg to a townhouse backyard.  The fact that the statute refers to undefined "grounds" is the source of many difficulties.  For example, if the entire District of Columbia were empty the Secret Service's job would be easier.   The centrality of cross-examining any (potential) Secret Service witness on the size and scope of a validly restricted area is a necessary topic.

If the central Virginia earthquake of 2011 that damaged the spires of the National Cathedral had required the closure of the U.S. Capitol building, entering would not be a violation of 18 U.S.C. 1752.  There might be some other law that restricts entry into a building closed due to structural damage or uncertainty.  But 18 U.S.C. 1752 would not be the right statute.

In making this mistake, the Government argues in its Opposition:

> As they approached the Capitol building, the defendants walked by unmistakable signs that they were not allowed to be within that restricted area, including, but not limited to, officers carrying shields and batons and at least one officer deploying a "flashbang" device.

Setting aside ambiguity of the word "signs," the Government Opposition suggests that if a person sees officers carrying shields or batons this is the same as a legally-effective declaration of a restricted building or grounds under 18 U.S.C. 1752.  It is not.

The Government Opposition suggests that if a person sees an officer using a flashbang this is the same as a legally-effective declaration of a restricted building or grounds under 18 U.S.C. 1752.  It is not.  Witnessing the use of a flashbang is not a violation of 18 U.S.C. 1752.

Moreover, this would not identify the ***boundaries*** of a restricted area.  Unless a person knows where the boundary line is, and knows that on one side of the line they are permitted but on the other side of the line they are forbidden, no restricted area can exist.

### C.  THEREFORE, U.S. CAPITOL POLICE INVITED DEFENDANTS

Indeed, the U.S. Capitol Police issued six (6) different permits for demonstrations to be held on the U.S. Capitol Grounds on the afternoon of January 6, 2021, simultaneous with the meeting of the Joint Session of Congress.  See permits issued by Scott Grossi of the U.S. Capitol Police, hyperlinked from each item on the list below.

Brian Lewis Demo Permit

Jesus Lives Demo Permit

One Nation Under God Permit

Rock Ministries Demo Permit

Virginia Freedom Keepers Demo Permit

Women For a Great America Demo Permit

Thus, not only were there no notices to legally effect a restriction, but the U.S. Capitol Police affirmatively ***invited*** demonstrators onto the U.S. Capitol Grounds to attend any or all of six (6) different demonstrations.

### D.  SPECULATION AND CONJECTURE VIOLATE BURDEN OF PROOF

The Government's Opposition misperceives the Defendants' Motion, arguing that:

> Defendants contend that, because the government purportedly "has alleged no facts of [the] crime[s]" charged in the Information (ECF No. 60 at 8-9), it will improperly resort to "conjecture," "speculation," and "guilt by association." Id. at 8-11.

Defendants filed their motion in limine to prohibit conjecture, speculation, and guilt by association because these are always improper but have been prominent parts of the U.S. Attorney's Office's prosecutions of other January 6 Defendants.  The issue is not the

Government's charging documents.  Conjecture, speculation, and guilt by association are always improper because they violate the requirement that Defendants are presumed innocent until proven guilty beyond a reasonable doubt.  Inadequacies in charging documents are not relevant to that discussion in this context.

Demonstrating that the concern is genuine, the Government's Opposition goes on to argue *(emphases added)*:

> At trial, the government expects to prove its case primarily through video and photographic evidence of the defendants' actions on January 6, 2021, evidence of their communications and statements before and after that day, ***and contextual testimony and exhibits of the events*** that took place at the Capitol in connection with the riot that the defendants joined. Such evidence is clearly relevant to establishing the defendants' conduct and intent on January 6.

The Government's Opposition further argues *(emphases added)*:

> Moreover, ***overview exhibits and testimony—already used at dozens of other January 6 trials—will be presented for context*** and to help demonstrate that the defendants' conduct occurred within restricted grounds (Counts One and Two), in a Capitol Building (Counts Three and Four), ***and with intent to impede or disrupt government business and Congress*** (Counts Two and Three).

The Government intends to focus on what other people did that day, rather than what the Defendants did.  This "context" evidence is the "guilt by association" which is objected to.

Such a collectivist guilt can never be acceptable within the criminal jurisprudence of the United States of America.  This is a departure from centuries of Anglo-American jurisprudence. The Government must prove individual guilt by the individual actions of a particular Defendant.

A further flaw metaphor is that these raindrops arrived *after* the baseball game had already been called for rain.  There are no raindrops that can travel through time.

The Court in *Bynum v. United States Capitol Police Board*, 93 F. Supp. 2d 50 (D.D.C. 2000) found regulations purporting to implement 40 U.S.C. §5104(e)(2)(G) to violate the First

Amendment and Due Process. With respect to the First Amendment the *Bynum* Court states:

> The Court, however, cannot conclude that the regulation is reasonable in light of the purposes it could legitimately serve. While the regulation is justified by the need expressed in the statute to prevent disruptive conduct in the Capitol, it sweeps too broadly by inviting the Capitol Police to restrict behavior that is in no way disruptive, such as "speechmaking… or other expressive conduct…" Traffic Regulations for the Capitol Grounds §158. Because the regulations proscriptions are not limited to the legitimate purposes set forth in the statue, it is an unreasonable and therefore an unconstitutional restriction on speech. …

*Id.* at 57 *(Citations omitted).*

In *Bynum* Judge Friedman also found that a "picketing and parading" ban violated due process because it was vague: "While there certainly are types of expressive acts that rise to the level of a demonstration, any regulation that allows a police officer the unfettered discretion to restrict behavior merely because it 'conveys a message' or because it has a 'propensity to attract a crowd of onlookers' cannot survive a due process challenge." *Id.*

With respect to Due Process and unconstitutional vagueness, the *Bynum* Court states:

> In fact, the definition of "demonstration" in the regulation encompassing all expressive conduct, whether disruptive or not appears to expand the restrictive powers given by the statute to the Capitol Police rather than limit or guide them. This definitional "guidepost" thus has the potential to squelch nearly any type of expressive conduct, whether or not it is actually a demonstration, and may sweep within its scope expression that is protected by the First Amendment. The regulation therefore is both unconstitutionally overbroad and unconstitutionally vague.

*Id. at 58.*

The main holding in *Bynum* was that broad regulations purporting to implement 40 U.S.C. §5104(e)(2)(G) violated the First Amendment and Due Process. As part of its analysis, the *Bynum* Court stated:

> Indeed, the regulation goes beyond what Congress intended and permits the Capitol Police to block activity not proscribed or intended to be proscribed by the statute Congress enacted. The statute prohibits loud,

> threatening or abusive language; any disorderly or disruptive conduct engaged in with the intent to impede, disrupt or disturb the orderly conduct of any session of Congress or a congressional hearing or committee meeting; any behavior that obstructs or impedes passage through or within the Capitol or any of its buildings or grounds; physical violence; and parades and picketing. 40 U.S.C. § 193f(b) (4)-(7).[5] When viewed in the context of these other various forms of statutorily prohibited behavior, Congress' statutory prohibition against "demonstrat[ing]" appears aimed at controlling only such conduct that would disrupt the orderly business of Congress not activities such as quiet praying, accompanied by bowed heads and folded hands. The police could properly use the statutory standards of Section 193f(b) itself to control, for example, groups of people praying in a way that impeded or obstructed passageways, hearings or meetings, involved loud, threatening or abusive language or physical violence, or was otherwise disorderly or disruptive. Plaintiff's activity was none of these.

*Bynum* at 57-58.

*See also Lederman v. U.S.*, 291 F.3d 36 (D.C. Cir. 2002) (reviewing facial First Amendment challenge to a regulatory prohibition on demonstration activities outside Capitol building). As stated in *Lederman*,

> We hold only that, as currently written, the demonstration ban imposes "a serious loss to speech . . . for a disproportionately small governmental gain," *Citing White House Vigil for the ERA Comm. v. Clark,* 746 F.2d 1518, 1544 (D.C. Cir. 1984)(Wald, J. concurring in the judgement in part and dissenting in part on other grounds).

*Lederman* at 46.

*Lederman* undercuts a key pillar of the logic*:*

> If "time, place, or manner restrictions can[not] bootstrap *themselves* into validity by their mere existence, even if prolonged," *Henderson v. Lujan,* 964 F.2d 1179, 1183 (D.C. Cir. 1992) (emphasis added), then unconstitutional restrictions certainly cannot, by their mere existence, bootstrap *subsequent* restrictions into validity.

*Lederman* at 43.

In *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) *(emphases added)*, the court states:

> **_The Capitol Grounds_** (excluding such places as the Senate and House floors, committee rooms, etc.) **_have traditionally been open to the public_**; indeed, thousands of people visit them each year. Thus, we cannot agree with the defendants that the Capitol Grounds have ever been characterized by the serenity and quiet of a hospital or library.

While the _Jeannette Rankin Brigade_ court was reviewing an issue concerning the Capitol Grounds, the stated exclusions of the Senate and House floors and committee rooms is more consistent with the public availability issues. In any event, the _Jeannette Ranking Brigade_ court did not specifically opine on areas of Capitol Buildings that were not the Senate and House floors or committee rooms.

In _Jeannette Rankin Brigade,_ 342 F. Supp.at 583-84, the Court held a blanket statutory prohibition on parades, assemblages or processions on Capitol Grounds **_is unconstitutional_**. See also _Gregory v. Chicago_, 394 U.S. 111, 89 S. Ct. 946 (1969) (where the Supreme Court reviewed a protest march aimed at the Chicago city government and held that as long as marches are "peaceful and orderly" they are protected by the First Amendment.); _Edwards v. South Carolina_, 372 U.S. 229, 83 S. Ct. 680 (1963); _Carey v. Brown_, 447 U.S. 455, 100 S. Ct. 2286 (1980); _Police Department of Chicago v. Mosley_, 408 U.S. 92, 92 S. Ct. 2286 (1972); and _Thornhill v. Alabama_, 310 U.S. 88, 60 S. Ct. 736 (1940).

### 4)   40 U.S.C. §5104(e)(2)(G) Does Not Survive Constitutional Muster Because It Is Overbroad Under the First Amendment and Overbroad and Unduly Vague Under the Fifth Amendment

First, a law is unconstitutionally vague when "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." _Johnson v. United States_, 576 U.S. 591, 595 (2015). As stated in _Johnson:_

> [O]ur _holdings_ squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp. For instance, we have deemed a law prohibiting grocers from charging an "unjust or unreasonable rate" void for vagueness—even though charging someone a thousand dollars for a

pound of sugar would surely be unjust and unreasonable. *L. Cohen Grocery Co.,* 255 U.S. at 89, 41 S.Ct 298. We have similarly deemed void for vagueness a law prohibiting people on sidewalks from "conduct[ing] themselves in a manner annoying to persons passing by"— even though spitting in someone's face would surely be annoying. *Coates v. Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed. 2d 214 (1971). These decisions refute any suggestion that the existence of *some* obviously risky crimes establishes the residual clause's constitutionality.

As stated in *N.A.A.C.P. v. Button*, 371 U.S. 415, 83 S. Ct. 328 (1963):

> If the line drawn by the decree between the permitted and prohibited activities of the NAACP, its members and lawyers is an ambiguous one, we will not presume that the statute curtails constitutionally protected activity as little as possible. For standards of permissible statutory vagueness are strict in the area of free expression. See *Smith* v. *California*, 361 U.S. 147, 151; *Winters* v. *New York*, 333 U.S. 507, 509-510, 517-518; *Herndon* v. *Lowry*, 301 U.S. 242; *Stromberg* v. *California*, 283 U.S. 359; *United States* v. *C.I.O.*, 335 U.S. 106, 142 (Rutledge, J., concurring).

*N.A.A.C.P. at 432.*

As discussed above, two court decisions in Bynum and Lederman struck down attempts to provide regulations to provide guidance regarding 40 U.S.C. §5104(e)(2)(G). In other words, two sets of proposed regulations failed Constitutional muster because a board could not properly draw the line between protected and not protected conduct under Due Process and the First Amendment. Again, it is important to understand that 40 U.S.C. §5104(e)(2)(G) does not require illegal entry to the Capitol as an element. On its own terms to "parade, demonstrate, or picket" can draw criminal sanctions under the provision, regardless of how a party entered. Yet, as discussed above, people often go to the Capitol as part of their day and broader range of activities. Sometimes, these activities highlight or concern political causes or issues. They may all wear the same political messages on their t-shirts. They may all walk together in groups. These points should not provide for a criminal violation under the Constitution.

"An overbroad statute "sweeps within its scope a wide range of both protected and nonprotected expressive activity." *Hobbs v. Thompson,* 448 F.2d 456, 460 (5th Cir. 1971)."
*Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 435 (Tex. 1998).

As stated in *Hobbs*:

> Lack of fair warning to actors or lack of adequate standards to guide enforcers also may lead to a "chill" on privileged activity. A person contemplating action who might be covered by a vague statute is left in doubt as to whether he is covered by the statute and, if so, whether his claim of privilege will be upheld. [Citations omitted]. *Hobbs* at 460-461.

As further stated in *Hobbs*:

> The overbreadth doctrine, therefore, focuses directly on the need for precision in legislative draftmanship to avoid conflict with First Amendment rights. Even though the interests a statute promotes may justify some infringement upon First Amendment rights, the overbreadth doctrine condemns those means to that legitimate end which comprehend too broad an incursion upon the realm of First Amendment activity. Where a law is substantially overbroad, in that it sweeps within its scope a wide range of both protected and non-protected expressive activity, and where no "readily apparent construction suggests itself as a vehicle for rehabilitating the statute in a single [proceeding]," *Hobbs* at 460.

As stated by the Supreme Court in *Smith v. Goguen*, 415 U.S. 566, 94 S. Ct. 1242 (1974):

> [The doctrine of due process and vagueness] requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent "arbitrary and discriminatory enforcement." [footnote omitted]. Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts. [footnote omitted] *Id*. at 573.

The overbreadth concerns date back to the legislative history. During a statutory revision in 1967, Representative O'Neal stated, "I am a little bit disturbed about the language…wherein the proposed legislation, if adopted, would make it a violation to parade, demonstrate, or picket within any of the Capitol buildings." Congressional Record-House (October 19, 1967) at 29389,

available at https://www.govinfo.gov/content/pkg/GPO-CRECB-1967-pt22/pdf/GPO-CRECB-1967-pt22-2-1.pdf (last accessed June 1, 2022) (hereinafter "Congressional Record").

> Representative Bingham expressed concerns about overbreadth:

> I am deeply concerned about the broad scope, vague language, and possible interference with first amendment rights of the bill before us today. It was so hastily conceived and reported out of committee that no official views of the Justice Department or the District government were available. Moreover, there seems to be no disposition on the part of the bill's supporters to accept clarifying amendments.

Congressional Record at 29394. He also commented on the law's potential impact on peaceful, quiet visitors, describing the law as "a case of using a shotgun to eliminate at gnat." Congressional Record at 29395. At the time of the 1967 revision, Representative Edwards expressed that he believed the "parading, picketing, or demonstrating language violated the First Amendment because it was *not* limited to disorderly or disruptive conduct. Congressional Record at 29392. Representative Cramer stated that to add "with intent to disrupt the orderly conduct of official business" would "gut [ ] the section," suggesting Representative Cramer, at least, did not care about the qualification. *Id.* at 29394.

Here the range of possible actions that may fall under the umbrella of 40 U.S.C. §5104(e)(2)(G) is a formless mix that includes actions protected under the First Amendment. What if someone broadcasts from his or her smart phone and criticizes the government on that broadcast? That action poses no security issue yet could arguably be viewed as "demonstrating." Or is that reporting? If people gather in the Capitol to celebrate a political victory is that a demonstration or parade? What if people walked in a group carrying signs in a hallway. How is this a different security or operational risk for Congress? Groups of students and others may walk in single or double file all where tee-shirts celebrating America or a school. Is that a "parade?" Again, the Capitol Police and those in charge of security and visitors can restrict areas,

size of groups, duration of stay, volume, and items that might pose a risk, all without referring to whether the conduct is also a First Amendment mode of conduct like a demonstration. People commonly communicate political ideas in the Capitol Buildings and that expression is protected under First Amendment.

### 5) 40 U.S.C. §5104(e)(2)(G) Unconstitutionally Chills and Threatens Constitutionally Protected First Amendment Rights.

"Narrow tailoring is crucial where First Amendment activity is chilled–even if indirectly– '[b]ecause First Amendment freedoms need breathing space to survive.'" Id. at 2384 (citing NACCP v. Button, 371 U.S. 415, 433 (1963)).

> This is especially true in the context of the First Amendment. As the Government stated, this case "would require a remand" to apply a *de minimis* standard. Tr. of Oral Arg. 39 (Sept. 9, 2009). Applying this standard would thus require case-by-case determinations. But archetypical political speech would be chilled in the meantime. " 'First Amendment freedoms need breathing space to survive.' " *WRTL,supra,* at 468–469, 127 S.Ct. 2652 (opinion of ROBERTS , C.J.) (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) ). We decline to adopt an interpretation that requires intricate case-by-case determinations to verify whether political speech is banned, especially if we are convinced that, in the end, this corporation has a constitutional right to speak on this subject.

*Citizens United v. Fed. Election Commission,* 130 S. Ct. 876, 175 L. Ed. 2d 753, 558 U.S. 310, 329 (2010).

> The First Amendment does not permit laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day. Prolix laws chill speech for the same reason that vague laws chill speech: People "of common intelligence must necessarily guess at [the law's] meaning and differ as to its application." *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). The Government may not render a ban on political speech constitutional by carving out a limited exemption through an amorphous regulatory interpretation. We must reject the approach suggested by the *amici* . Section 441b covers *Hillary* .

*Citizens United v. Fed. Election Commission,* 558 at 324.

## I.     Conclusion

Mr. Montgomery and Mr. Knowlton maintain that the indictment against them must be dismissed. Mr. Wilson joins them in their previous objections and argument, as well as the expanded argument made here. All the Defendants respectfully request that the Court dismiss the Third Superseding Indictment.

Date: July 17, 2023

Respectfully Submitted,
*/s/ John M. Pierce*
John M. Pierce  21550
Oxnard Street 3rd
Floor, PMB #172
Woodland Hills, CA 91367
Tel: (213) 400-0725
Email:jpierce@johnpiercelaw.com
Attorney for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of this response was sent to Counsel for the Government, James Peterson, Kelly Moran, and Karen Rochlin and, on July 17, 2023, via CM/ECF and email.

/s/ John Pierce      
John Pierce
